John L. Fortuna, *Pro Hac Vice*
Ari S. Gordin, *Pro Hac Vice*
JONES FORTUNA LP
111-A New Street
Decatur, GA 30030
Telephone: 404-282-4725
jfortuna@jonesfortuna.com
agordin@jonesfortuna.com

*Attorneys for the Central Bering Sea Fishermen's
Association, City of Saint Paul, Alaska, Alaska
Longline Fishermen's Association, Fishing Vessel
Owners' Association, Homer Charter Association,
The Boat Company, Petersburg Vessel Owners'
Association, Alaska Marine Conservation Council,
Halibut Association of North America, North
Pacific Fisheries Association, Aleut Community of
St. Paul Island Tribal Government, and the
Seafood Producers Cooperative*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GROUNDFISH FORUM, INC., | |
| Plaintiff, | |
| v. | Case No. 3:23-cv-00283-JMK |
| NATIONAL MARINE FISHERIES SERVICE, *et al.*, | |
| Defendants. | |

## MOTION TO INTERVENE

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

TABLE OF CITATIONS............................................................................... ii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 2

   I.   The Magnuson-Stevens Fishery Conservation and
       Management Act and Regional Fishery Management
       Councils ............................................................................................ 2

   II.  Halibut's Importance to Bering Sea and Coastal Alaska
       Communities .................................................................................... 4

   III. Management of the Halibut Stock ................................................ 6

   IV. The Problem of Bycatch............................................................... 10

   V.  Amendment 123 to the FMP for Groundfish in the BSAI ..................... 13

ARGUMENT ............................................................................................... 15

   I.   Alliance Members are Entitled to Intervene as a Matter of
       Right .............................................................................................. 15

       A.  Alliance Members have a Significant Protectable Interest in
            Amendment 123 and Bycatch Reductions ...................... 16

       B.  The Disposition of Plaintiff's Claims Could Impair the Alliance's
            Interests as a Practical Matter........................................ 21

       C.  The Halibut Defense Alliance's Interests Are Not Adequately
            Represented .................................................................... 23

       D.  This Motion to Intervene is Timely .................................. 25

   II.  Alliance Members Should Be Granted Permissive
       Intervention.................................................................................... 26

CONCLUSION ............................................................................................ 27

CERTIFICATE OF COMPLIANCE WITH LENGTH LIMIT AND
TYPEFACE AND TYPE-STYLE REQUIREMENTS .................................... C-1

CERTIFICATE OF SERVICE..................................................................... C-1

# TABLE OF CITATIONS

**Ninth Circuit Opinions**            **Page(s)**

*California ex rel.* Lockyer v. United *State*s,
     450 F.3d 436 (9th Cir. 2006) ........................................................ 16

*Chamness v. Bowen,*
     722 F.3d 1110 (9th Cir. 2013) .................................................... 15

*Citizens for Balanced Use v. Mont. Wilderness Ass'n,*
     647 F.3d 893 (9th Cir. 2011) .................................................. 21, 24

*Donnelly v. Glickman,*
     159 F.3d 405 (9th Cir. 1998) .................................................. 26, 16

*Nw. Forest Res. Council v. Glickman,*
     82 F.3d 825 (9th Cir. 1996) ........................................................ 23

*Sw. Ctr. For Biological Diversity v. Berg,*
     268 F.3d 810 (9th Cir. 2001) ...................................................... 15

*United States v. City of L.A.,*
     288 F.3d 391 (9th Cir. 2002) .................................................. 15, 16

*W. Watersheds Project v. Haaland,*
     22 F.4th 828 (9th Cir. 2022) .................................................. 23, 25

**Federal Court Opinions**

*Alaska v. Nat'l Marine Fisheries Serv.,*
     No. 3:22-cv-00249-JMK, 2023 WL 2789352, 2023 U.S. Dist. LEXIS
     60255 (D. Alaska Apr. 5, 2023) .......................................... 15, 20

*Alaska Factory Trawler Ass'n v. Baldridge,*
     831 F.2d 1456 (9th Cir. 1987) .................................................... 20

*Flaherty v. Bryson,*
     850 F. Supp. 2d 38 (D.D.C. 2012) .............................................. 4

*Ga. v. U.S. Army Corps of Eng'rs,*
     302 F.3d 1242 (11th Cir. 2002) ................................................ 24

*NRDC v. Nat'l Marine Fisheries Serv.*,
   71 F. Supp. 3d 35 (D.D.C. 2014) ................................................................. 3, 4

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*,
   No. 3:21-cv-00255-JMK, 2022 WL 2222879, 2022 U.S. Dist. LEXIS
   109879 (D. Alaska June 21, 2022) ................................................................. 4

**United States Code**

16 U.S.C. §§ 1801 ................................................................................................. 3
16 U.S.C. § 1852 .................................................................................................. 3
16 U.S.C. § 1852(b) ............................................................................................. 3
16 U.S.C. § 1852(a)(1)(G) ................................................................................. 3, 4
16 U.S.C. § 1852(g)(1)(A) .................................................................................. 3
16 U.S.C. § 1852(h)(1) ........................................................................................ 3
16 U.S.C. § 1852(h)(3) ...................................................................................... 3, 4
16 U.S.C. § 1852(i)(2) ......................................................................................... 4

**Rules**

Fed. R. Civ. P. 24 ..................................................................... 2, 15, 21, 26

**Other**

81 Fed. Reg. 24,734 (Apr. 27, 2016) ........................................................ 14
88 Fed. Reg. 82,740 (Nov. 24, 2023) ................................................... 1, 14, 24

# INTRODUCTION

This case involves an attempt by the "Amendment 80" fleet of groundfish trawlers to overturn Amendment 123 to the Fishery Management Plan (FMP) for Groundfish of the Bering Sea and Aleutian Islands (BSAI) Management Area, which was adopted with broad support by the North Pacific Fishery Management Council (Council) and approved by the National Marine Fisheries Service (NMFS).[1] Amendment 123 adopts limits on halibut bycatch for the Amendment 80 fleet that vary based on halibut abundance, allowing more bycatch when halibut are abundant and less when they are not.

Pursuant to Federal Rule of Civil Procedure 24, the Central Bering Sea Fishermen's Association, City of Saint Paul, Alaska, Alaska Longline Fishermen's Association, Fishing Vessel Owners' Association, Homer Charter Association, The Boat Company, Petersburg Vessel Owners' Association, Alaska Marine Conservation Council, Halibut Association of North America, North Pacific Fisheries Association, Aleut Community of St. Paul Island Tribal Government, and the Seafood Producers Cooperative (collectively, the "Halibut Defense Alliance" or "Alliance") move to intervene as defendants in this case.[2]

---

[1] *See* 88 Fed. Reg. 82,740 (Nov. 24, 2023).

[2] The undersigned has consulted with counsel for Plaintiff and the Federal Defendants regarding this motion. Counsel reports that Plaintiff will take a

Alliance members meet the requirements to intervene as of right: (1) they have significant protectable interests in the halibut fishery and limiting bycatch in the Amendment 80 fleet, which is the single largest source of halibut bycatch in the BSAI and is responsible for the overwhelming majority of halibut bycatch across all trawl fisheries; (2) the disposition of Plaintiff's claims will, as a practical matter, impair or impede their ability to protect those interests; (3) the request to intervene is timely; and (4) no existing party adequately represents their interests. *See* Fed. R. Civ. P. 24(a). Alternatively, they should be granted permissive intervention under Rule 24(b) because their unique perspective will aid the Court in the resolution of the issues in this case, and their participation will not unduly delay this case or otherwise prejudice the existing parties.[3]

## BACKGROUND

### I.    The Magnuson-Stevens Fishery Conservation and Management Act and Regional Fishery Management Councils

The Magnuson-Stevens Fishery Conservation and Management Act (MSA) is the primary law governing the management of fisheries in U.S.

---

position on the motion to intervene after reviewing the motion, and will respond within the timeline provided by local rules; the Federal Defendants take no position on the motion.

[3] In accordance with Rule 24(c), a Response and Answer to Plaintiff's Petition and Complaint (Doc. 1) is attached as Exhibit M to this motion.

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          2

federal waters.[4] Adopted in the 1970's amidst concerns over the rapid depletion of fish stocks, the MSA establishes regional fishery management councils made up of government fishery management officials, fishery experts, and affected stakeholders nominated by state governors.[5] The North Pacific Fishery Management Council (Council) is the regional council covering "fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska."[6]

The councils are recognized as "NMFS's most important resource."[7] They use a public and science-driven process to prepare FMPs that "set the … rules for [each] fishery,"[8] taking into account relevant scientific, economic, and social information, as well as informed public participation.[9] FMPs may be amended as necessary to address changing conditions or new information.[10] Amendments are adopted through a public process that includes council meetings, technical review, opportunities for interested people and groups to

---

[4] 16 U.S.C. §§ 1801 *et seq.*

[5] *Id.* § 1852(b); *NRDC v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014).

[6] 16 U.S.C. § 1852(a)(1)(G).

[7] *NRDC*, 71 F. Supp. 3d at 40.

[8] *Id.* at 42.

[9] 16 U.S.C. § 1852(g)(1)(A), (h)(3).

[10] *Id.* § 1852(h)(1).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          3

submit oral testimony and written comments, and public hearings,[11] as occurred over the six-year period that led to Amendment 123 at issue here.

The federal government has a limited role in approving FMPs and FMP amendments. Under the system Congress established, NMFS must review council actions to ensure they comply with federal law and are consistent with ten broadly worded "National Standards" set out in the MSA.[12] Once NMFS determines that the council's plan "complies with federal law," the agency "must issue implementing regulations."[13] The federal government's role is thus limited to "policing [FMPs] for [statutory] compliance."[14] NMFS may not substitute its own judgment or alternatives for those adopted by the council.[15]

## II.  Halibut's Importance to Bering Sea and Coastal Alaska Communities

Halibut is an iconic species that holds tremendous economic, social, and cultural significance along the entire Pacific coast.[16] Halibut support a broad

---

[11] *Id.* § 1852(h)(3), (i)(2).

[12] *Id.* § 1851(a).

[13] *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, No. 3:21-cv-00255-JMK, 2022 WL 2222879, 2022 U.S. Dist. LEXIS 109879, at *6 (D. Alaska June 21, 2022).

[14] *NRDC*, 71 F. Supp. 3d at 42.

[15] *See Flaherty v. Bryson*, 850 F. Supp. 2d 38, 44 (D.D.C. 2012).

[16] Ex. B, pp. 4-6 (¶¶6-9); Ex. C, p. 3 (¶5); Ex. E, p. 4 (¶6); Ex. F, p. 3 (¶4); Ex. G, p. 3 (¶5); Ex. I, pp. 3-4 (¶¶4-6); Ex. J, p. 3 (¶¶4-6).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK              4

economy in Alaska, that includes directed commercial fisheries, commercial charter and recreational fisheries, and subsistence fisheries, along with a host of associated businesses that provide processing, packaging, fuel, cold storage, and other services.[17]

Halibut fishing is one of the most important — if not the most important — sources of employment and income for many coastal Alaska communities.[18] Halibut fishing is also a cultural touchstone.[19] This is especially true for predominantly Alaska Native communities in the BSAI, who have fished for halibut for thousands of years and have a deep cultural bond with the halibut resource.[20] And halibut is a key source of subsistence for many in coastal Alaska, where the cost of importing foodstuffs is prohibitively high.[21] Often, this "subsistence halibut" is caught by commercial fishermen, who serve as subsistence networks for their local communities.[22] According to the State of Alaska, 95% of rural households use subsistence-caught fish, which is typically

---

[17] Ex. A, pp. 3-4 (¶5); Ex. B, p. 5 (¶7); Ex. C, p. 5 (¶¶8-9); Ex. E, p. 3 (¶4); Ex. G, pp. 2-3 (¶¶3-4); Ex. H, pp. 10-11 (¶¶22-23); Ex. K, p. 5 (¶¶5-12).

[18] Ex. G, pp. 2-3 (¶3); Ex. H, p. 10 (¶21); Ex. I, p. 3 (¶4); Ex. J, p. 3 (¶¶4-5); Ex. K, pp. 3-4 (¶¶6-7).

[19] Ex. C, p. 3 (¶5); Ex. E, p. 4 (¶6); Ex. G, p. 3 (¶5); Ex. I, pp. 3-4 (¶¶5-6); Ex. L, p. 3 (¶4).

[20] Ex. C, p. 3 (¶5); Ex. E, p. 4 (¶6); Ex. L, p. 3 (¶4).

[21] Ex. C, p. 4 (¶6); Ex. E, pp. 3-4 (¶5); Ex. L, p. 4 (¶7).

[22] Ex. C, p. 4 (¶7).

provided by a small group of fishermen that supply most of the community's harvest.[23]

While halibut have supported Bering Sea and other coastal Alaska communities for generations, its significance to communities and businesses has grown recently, as populations of other fisheries, such as snow crab and red king crab, have crashed or the price of other species has declined.[24] In some communities, this has left halibut fishing as one of the few options available to provide income and economic opportunity.[25]

### III. Management of the Halibut Stock

The halibut stock is managed by the International Pacific Halibut Commission (IPHC). Under the terms of the Convention between the United States and Canada, the IPHC is empowered to evaluate the status of the halibut population and to set limits on the amount of halibut that can be removed each year.[26] To that end, the IPHC conducts an annual "stock assessment" to evaluate the health of the halibut population.[27] This assessment incorporates data on halibut abundance, including both the IPHC

---

[23] Ex. C, p. 4 (¶6).

[24] Ex. B, pp. 5-6 (¶8); Ex. E, p. 5 (¶8); Ex. I, p. 3 (¶4); Ex. K, p. 7 (¶16).

[25] Ex. B, pp. 5-6 (¶8).

[26] Ex. A, p. 4 (¶7); Ex. B, pp. 6-9 (¶¶10-13).

[27] Ex. B, pp. 7-9 (¶¶12-13).

"Setline Survey" and the NMFS "Eastern Bering Sea Trawl Survey" that are used in Amendment 123.[28]

Based on the results of its assessment of halibut abundance and population trends, the IPHC sets catch limits for each fishery sector in each of its "regulatory areas," shown on the map below.[29] The FMP at issue here covers the parts of Area 4A and 4B north of the Aleutian Islands, along with Areas 4C, 4D, and 4E, which comprise the central, northern, and eastern Bering Sea, respectively.[30] These latter areas are managed together and simply called "Area 4CDE."[31]

---

[28] Ex. B, pp. 7-8 (¶12).
[29] Ex. B, pp. 8-9 (¶13).
[30] Ex. B, pp. 8-9 (¶13).
[31] Ex. B, pp. 8-9 (¶13).



The halibut stock declined significantly during the 1990s and 2000s and it has remained at low levels ever since.[32] As halibut stocks declined, the IPHC reduced the total allowable mortality limits to conserve the population, but these reductions proved unable to restore it.[33] A chart from the IPHC's 2024 stock assessment showing the halibut population's decline is included below.[34]

---

[32] Ex. A, p. 6 (¶11); Ex. B, pp. 9-10 (¶14).
[33] Ex. A, p. 6 (¶11); Ex. B, pp. 10-11 (¶¶15-16).
[34] Ex. B, pp. 9-10 (¶14).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          8



More recent data provides cause for concern. Halibut catch rates in the directed fishery and recruitment of new fish to the population are at low levels.[35] Indeed, according IPHC scientists, recent recruitment is at low levels that have not been seen since at least the early 1970s.[36] At the same time, catch rates in the commercial fishery — that is, the amount of halibut caught per unit of fishing effort — have also been falling.[37] In 2023, for example, the commercial catch rate in Area 4CDE fell by about 30% compared to 2022

---

[35] Ex. A, p. 6 (¶11); Ex. B, pp. 9-10 (¶¶14-15).

[36] Ex. B, pp. 9-10 (¶14).

[37] Ex. B, pp. 9-10 (¶¶14-15).

levels.[38] This has resulted in reduced halibut harvests, increased costs for halibut fishermen, and concerns about the long-term health of the resource.[39]

Given these trends, the IPHC has continued to reduce the total amount of halibut that can be removed from the population. In 2023, for example, the IPHC reduced the total mortality limits for the halibut stock by 14.4% from 2022 levels.[40] In January of this year, the IPHC adopted even lower limits for 2024, reducing the total mortality limit by another 4.57%.[41]

## IV. The Problem of Bycatch

While the IPHC can set overall limits on halibut removals, it has no control over how much halibut can be killed as bycatch in U.S. fisheries, which are managed by the Council and NMFS.[42] Because the IPHC has no authority to regulate bycatch, its only option to conserve the stock is to reduce fishery harvest levels.[43] The IPHC thus subtracts halibut killed as bycatch from the total allowable catch before determining the allowable harvest for halibut

---

[38] Ex. B, pp. 22-23 (¶¶34-35).

[39] Ex. B, pp. 22-23 (¶¶34-35); Ex. D, p. 6 (¶10); Ex. K, pp. 6-7 (¶14).

[40] Ex. B, p. 10 (¶15).

[41] Ex. B, p. 10 (¶15).

[42] Ex. B, p. 7 (¶11).

[43] Ex. A, p. 4 (¶7); Ex. B, p. 7 (¶11).

fisheries.[44] In other words, bycatch mortality is "taken off the top," leaving whatever halibut happen to remain for other users.[45]

Unfortunately, an enormous number of halibut are killed and wasted as bycatch in BSAI trawl fisheries.[46] Based on data from NMFS, trawl fisheries in the BSAI killed almost 34 million pounds of halibut between 2015 and 2022.[47] The Amendment 80 fleet is responsible for the overwhelming share of this bycatch. In 2022, for example, the Amendment 80 fleet accounted for about 69% of the total bycatch mortality in the BSAI and almost 74% of the trawl-sector bycatch.[48] Importantly, the period from 2015 to 2022 follows efforts by the Council to reduce Amendment 80's bycatch limits, so the values above already account for steps taken by the fleet to reduce its impacts.[49]

Amendment 80's bycatch is highly concentrated in Area 4CDE, with almost 90% of Amendment 80's bycatch occurring there in recent years.[50] The Bering Sea — and portions of Area 4CDE particularly — is a nursery habitat

---

[44] Ex. B, p. 7 (¶11).

[45] Ex. B, p. 7 (¶11); Ex. F, p. 3 (¶5); Ex. G, p. 4 (¶6).

[46] Ex. B, pp. 11-15 (¶¶17-19).

[47] Ex. B, p. 11 (¶17).

[48] Ex. B, pp. 16-17 (¶22).

[49] Ex. B, pp. 17-18 (¶23).

[50] Ex. A, p. 10 (¶20); Ex. B, pp. 17-18 (¶23); Ex. D, p. 4 (¶6).

for juvenile halibut.[51] Not surprisingly, then, the Amendment 80 fleet and other trawl fisheries kill a large number of juvenile fish.[52] The Central Bering Sea Fishermen's Association, one of six statutorily authorized Community Development Quota (CDQ) organizations for Western Alaska, estimates that trawlers killed over 4.1 million halibut in Area 4CDE from 2015 to 2022.[53] For comparison, this is almost 8 times more halibut than the directed fishery landed.[54]

Killing juvenile halibut has long-term effects on the halibut fishery. This is because these fish never grow large enough to recruit to the directed fishery, they never reproduce or contribute to the halibut population, and they can never migrate from their Bering Sea nursery habitat to other areas along Alaska's coast.[55]

---

[51] Ex. A, pp. 11-12 (¶¶22-23); Ex. B, pp. 13-15 (¶¶19-20); Ex. C, p. 6 (¶11); Ex. D, p. 4 (¶6); Ex. F, p. 3 (¶5); Ex. G, p. 5 (¶9); Ex. H, pp. 8-9 (¶¶17-18); Ex. J, p. 5 (¶10).

[52] Ex. B, pp. 13-15 (¶19); Ex. D, p. 4 (¶6).

[53] Ex. B, pp. 13-15 (¶19).

[54] Ex. B, pp. 13-15 (¶19).

[55] Ex. A, pp. 11-12 (¶¶22-23); Ex. B, pp. 15-16 (¶¶20-21); Ex. C, p. 6 (¶11); Ex. D, p. 4 (¶6); Ex. F, p. 3 (¶5); Ex. G, p. 5 (¶9); Ex. H, pp. 9-10 (¶¶19-20); Ex. J, p. 5 (¶10).

## V. Amendment 123 to the FMP for Groundfish in the BSAI

Historically, the Amendment 80 fleet operated under bycatch limits that were fixed at constant levels.[56] Because fishery harvest levels were being reduced as halibut abundance declined — but bycatch limits remained fixed — bycatch consumed an ever-growing share of the available halibut.[57] For context, directed fishery landings in Area 4CDE previously accounted for about 43% of all halibut removals in the area.[58] By 2014, however, this number had fallen to just 20%, meaning that almost 80% of the area's halibut were killed and wasted as bycatch.[59] Ultimately, bycatch threatened to consume all of the available halibut and preempt the directed fishery entirely.[60]

This imbalance between bycatch mortality and fishery harvests led the Council to reduce bycatch limits. First, in 2015, the Council reduced Amendment 80's bycatch limit by 25%, going from an annual fixed limit of

---

[56] Ex. B, p. 15 (¶24).

[57] Ex. B, pp. 11-13 (¶18). Ex. D, p. 5 (¶8); Ex. E, pp. 5-6 (¶9); Ex. F, pp. 3-4 (¶6); Ex. G, p. 4 (¶7).

[58] Ex. C, p. 6-7 (¶13).

[59] Ex. B, p. 11 (¶17).

[60] Ex. B, p. 18 (¶24).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          13

2,325 metric tons (mt) (about 5.2 million pounds) down to 1,745 mt (about 3.9 million pounds).[61]

It was understood these reductions were only a first step,[62] however, and the Council began studying ways to set bycatch limits that reflected the status of the halibut population, so bycatch limits (like harvest limits) would vary with abundance.[63] Over the next six years, the Council considered various measures to achieve this objective, finally adopting Amendment 123 in December 2021, which NFMS approved.[64]

Amendment 123 establishes a variable bycatch limit for the Amendment 80 fleet based on the NMFS Eastern Bering Sea Trawl Survey and the IPHC Setline Survey — the same indices of halibut abundance used in the IPHC's stock assessment.[65] Under Amendment 123, the fleet's annual bycatch limit remains at 1,745 mt when abundance is high but becomes increasingly

---

[61] The Council adopted smaller reductions for other fishery sectors, recognizing that the Amendment 80 fleet was both the largest contributor to halibut bycatch (accounting for about 60% of the total bycatch mortality from 2008 to 2014) and most able to decrease bycatch through changes in fishing behavior. *See* 81 Fed. Reg. 24734, 24721 (Apr. 27, 2016). The average bycatch reduction across all sectors was 21%. *See id.* at 24716.

[62] Ex. B, pp. 20-21 (¶29); Ex. H, p. 7 (¶14).

[63] Ex. A, p. 7-8 (¶14); Ex. B, p. 21 (¶30); Ex. K, pp. 8-9 (¶¶19-20).

[64] 88 Fed. Reg. 82,740 (Nov. 24, 2023).

[65] Ex. B, pp. 7-8 (¶12).

protective as abundance declines, reaching 1,134 mt (a 35% reduction from current levels) if halibut abundance were to reach the "very low" condition, something that has never previously occurred.[66]

## ARGUMENT

## I. Alliance Members are Entitled to Intervene as a Matter of Right

An applicant for intervention as of right under Rule 24(a) must show:

> (1) it has a significant protectable interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent the applicant's interest.[67]

Courts apply this test broadly in favor of intervention,[68] with their assessment focusing on "practical considerations, not technical distinctions."[69] "A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts."[70] "[A]llowing parties with a

---

[66] Ex. B, pp. 19-20 (¶27).

[67] *Chamness v. Bowen*, 722 F.3d 1110, 1121 (9th Cir. 2013).

[68] *Alaska v. Nat'l Marine Fisheries Serv.*, No. 3:22-cv-00249-JMK, 2023 WL 2789352, 2023 U.S. Dist. LEXIS 60255, at *3-4 (D. Alaska Apr. 5, 2023) (quoting *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 950 (9th Cir. 2009)).

[69] *Sw. Ctr. For Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (internal citation omitted).

[70] *United States v. City of L.A.*, 288 F.3d 391, 397-98 (9th Cir. 2002) (quotations omitted).

*practical* interest in the outcome of a particular case to intervene" also may "prevent or simplify future litigation" and "allow[s] an additional interested party to express its views before the court."[71] Alliance members readily meet these requirements.

### A. Alliance Members Have a Significant Protectable Interest in Amendment 123 and Bycatch Reductions

A party seeking to intervene as of right has a "significantly protectable" interest in an action if it asserts an interest that is protected under some law that is related to the plaintiff's claims.[72] The "interest" test does not require a "specific legal or equitable interest," but instead is a "practical, threshold inquiry" and a "practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."[73] The "relationship" requirement is met if resolution of the plaintiff's claims will affect the applicant.[74]

Spanning communities from the State of Washington to the Bering Sea, Alliance members represent every sector of the halibut economy. They include

---

[71] *Id.* at 398 (emphasis in original) (quotations omitted).

[72] *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006).

[73] *City of L.A.*, 288 F.3d at 398 (quotations omitted).

[74] *Id.*; *Donnelly v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          16

commercial fishermen[75]; guided charter businesses[76]; an authorized CDQ organization that provides economic opportunity through fisheries investments[77]; halibut processors[78]; communities that depend on halibut for their subsistence, economies, and culture[79]; and organizations dedicated to sound fisheries management and conservation of the halibut stock.[80]

Alliance members have substantial regulatory, economic, and social interests that are directly related to Amendment 123 and lower halibut bycatch limits. Amendment 80's bycatch directly affects other users' access to halibut.[81] Killing adult fish directly reduces the harvest limits for halibut fishermen.[82] Removing adult fish also directly reduces the density of halibut in the BSAI, leading to lower catch rates and requiring halibut fishermen to incur more cost and expend more effort to catch the same amount of fish.[83] And

---

[75] Ex. A, p. 3 (¶4); Ex. B, pp. 4-5 (¶6); Ex. D, p. 2 (¶2); Ex. I, pp. 2-3 (¶¶2-3); Ex. J, pp. 2-3 (¶¶2-4); Ex. K, pp. 2-3 (¶¶3-4).

[76] Ex. F, pp. 2-3 (¶¶2-3); Ex. H, pp. 3-5 (¶¶6-9).

[77] Ex. B, pp. 2-3 (¶¶3-4)

[78] Ex. A, p. 3 (¶4); Ex. G, p. 2 (¶2); Ex. K, p. 3 (¶¶5-6).

[79] Ex. E, pp. 2-3 (¶3); Ex. L, pp. 2-3 (¶¶2-3).

[80] Ex. A, pp. 4-5 (¶8); Ex. H, pp. 2-3(¶4); Ex. J, p. 2(¶2).

[81] Ex. B, p. 7 (¶11); Ex. F, p. 3 (¶5); Ex. G, p. 4 (¶6).

[82] Ex. C, pp. 5-6 (¶¶8-12); Ex. D, pp. 4-6 (¶¶7-10); Ex. F, p. 3 (¶5); Ex. G, p. 4 (¶7); Ex. I, pp. 4-6 (¶¶7-10); Ex. K, p. 7 (¶15).

[83] Ex. B, p. 23 (¶35); Ex. C, pp. 8-9 (¶18); Ex. D, p. 6 (¶10); Ex. G, p. 4 (¶7); Ex. I, p. 4 (¶7); Ex. J, pp. 3-4 (¶7).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          17

killing juvenile fish in the Bering Sea, as the Amendment 80 fleet does in very large numbers, reduces the long-term productivity of the fishery. Indeed, according to a study by the IPHC, every pound of bycatch reduction adds as much as 1.44 pounds of yield to the broader halibut fishery.[84]

Amendment 80's bycatch thus directly implicates the economic interests of other users. Reduced harvest limits directly reduce the incomes of businesses and individuals involved in the halibut fishery.[85] Further, the constant threat of ever-lower limits — and even complete preemption of the directed fishery — has driven down the value of halibut quota held by individual fishermen, created significant financial uncertainty for fishermen and businesses, threatened their abilities to service debt incurred to enter the halibut fishery, limited future investment in the fishery, and driven many participants from the fishery entirely.[86]

Reducing halibut bycatch also implicates "downstream" economic interests. A lack of available halibut has forced processors to restructure their

---

[84] Ex. A, pp. 11-12 (¶23); Ex. B, p. 16 (¶21); Ex. C, p. 6 (¶11).

[85] Ex. E, pp. 5-6 (¶9); Ex. F, pp. 3-4 (¶6); Ex. H, pp. 5-6 (¶11); Ex. J, pp. 3-4 (¶7); Ex. K, p. 7 (¶15).

[86] Ex. B, p. 18 (¶25); Ex. C, pp. 5-6 (¶10); Ex. D, p. 6 (¶10); Ex. H, pp. 5-6 (¶¶10-11); Ex. I, pp. 4-6 (¶¶7-10); Ex. J, pp. 3-4 (¶¶7-8); Ex. K, pp. 7-8 (¶17).

businesses or close their doors and has led to a loss of market share.[87] Halibut are also significant sources of economic activity for many coastal communities, where halibut operations provide critical sources of employment, contribute tax revenues, and provide an influx of money to the community's economy that supports homeported vessels, processors, wholesalers, retailers, and service-suppliers.[88] In fact, the IPHC estimates that each dollar in commercial landing value generates over $4 in economic activity for local communities.[89]

Alliance members' interests also extend far beyond economics. Halibut and halibut fishing are cultural touchstones in many Bering Sea and coastal Alaska communities, where the halibut harvest is central to their communal identity.[90] This is particularly true for Bering Sea communities with predominantly Alaska Native residents, for whom participating in the halibut harvest is a source of immense personal and cultural pride.[91] More, subsistence halibut provides a critical source of sustenance for Bering Sea and rural Alaska communities.[92] Much of this halibut is caught and distributed by commercial

---

[87] Ex. G, pp. 4-5 (¶8).

[88] Ex. A, pp. 13-15 (¶¶28-30); Ex. K, pp. 5-6 (¶¶11-12); Ex. G, pp. 2-3 (¶3).

[89] Ex. A, pp. 14-15 (¶29); Ex. H, pp. 10-11 (¶23).

[90] Ex. B, p. 6 (¶9). Ex. C, p. 4 (¶7); Ex. E, p. 4 (¶6); Ex. J, p. 3 (¶6).

[91] Ex. B, p. 6 (¶9); Ex. E, p. 4 (¶6); Ex. L, p. 3 (¶4).

[92] Ex. B, p. 6 (¶9); Ex. C, p. 4 (¶6); Ex. E, pp. 3-4 (¶5), Ex. L, p. 4 (¶7).

halibut fishermen, who require a viable fishery to provide this important service.[93]

Finally, Alliance members have a strong interest in sound fisheries management and wise use of the halibut resource.[94] They have fought to limit halibut bycatch in the Bering Sea for decades and have advocated a switch to abundance-based bycatch management for many years.[95] They are engaged in the Council, NMFS, and IPHC regulatory processes.[96] And they participated actively in the process over a period of many years that led to Amendment 123 and advocated its adoption.[97] These interests all support intervention.[98]

---

[93] Ex. C, p. 4 (¶7); Ex. L, p. 4 (¶7).

[94] Ex. C, pp. 2-3 (¶3); Ex. D, p. 3 (¶4); Ex. G, p. 2 (¶2).

[95] Ex. B, pp. 20-21 (¶¶29-31); Ex. C, p. 7 (¶¶14-15); Ex. D, pp. 3-4 (¶5); Ex. E, pp. 6-7 (¶¶10-12); Ex. G, p. 6 (¶¶11-12); Ex. H, pp. 6-8 (¶¶12-16); Ex. I, pp. 6-7 (¶¶11-14); Ex. K, pp. 8-9 (¶18-20); Ex. L, pp. 4-5 (¶¶8-9).

[96] Ex. A, pp. 4, 7-9 (¶¶6, 14-16); Ex. B, pp. 20-21 (¶¶29-31); Ex. C, pp. 7-8 (¶¶14-16); Ex. D, p. 3 (¶4); Ex. G, pp. 5-6 (¶10); Ex. I, p. 2 (¶2); Ex. K, pp. 8-10 (¶¶18-23).

[97] Ex. A, pp. 6-9 (¶¶12-16); Ex. B, p. 21 (¶¶30-31); Ex. C, pp. 7-8 (¶¶15-16); Ex. D, pp. 5-6 (¶9); Ex. E, p. 7 (¶12); Ex. F, pp.4-5 (¶8); Ex. G, p. 6 (¶12); Ex. H, pp. 7-8 (¶¶15-16); Ex. I, p. 7 (¶¶13-14); Ex. K, pp. 8-10 (¶¶18-23); Ex. L, p. 5 (¶9).

[98] *See, e.g.*, *Alaska v. Nat'l Marine Fisheries Serv.*, No. 3:22-cv-00249-JMK, 2023 WL 2789352, 2023 U.S. Dist. LEXIS 60255, *19–20 (D. Alaska Apr. 5, 2023). *See also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) ("A public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported."); *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987) (allowing intervention of longline fishermen and on-shore processors in challenge brought by groundfish trawlers to FMP amendment).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          20

## B. The Disposition of Plaintiff's Claims Could Impair the Alliance's Interests as a Practical Matter

The impairment inquiry under Rule 24(a) focuses on practical effects. "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene…."[99]

Plaintiff asks this Court to set Amendment 123 aside and to reinstate a fixed bycatch limit of 1,745 mt for the Amendment 80 fleet[100] — an amount that exceeds the IPHC's total allowable halibut mortality limit for the central, northern, and eastern Bering Sea combined.[101] For the same reasons the Alliance members have a protectable interest in Amendment 123 and reduced bycatch limits, they would suffer practical harm to those interests if it were overturned.

In the short term, Alliance members would suffer lower harvest limits and reduced access to halibut. This would impair their immediate economic interests through reduced revenues, depressed quota values, increased economic uncertainty, and reduced tax revenues from business either

---

[99] *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011).

[100] Doc. 1 at 41-42.

[101] Ex. B, pp. 10-11 (¶16).

participating in or providing services to the halibut fishery, as the painful history under the prior bycatch limits confirms.[102] It would also impair their economic interests in the longer term, because juvenile halibut killed in the BSAI cannot migrate to other areas to support either the halibut spawning stock or active fisheries there.[103]

Alliance members' other interests would be impaired as well. Their interests in conservation and wise use of the halibut resource would be harmed, as more halibut would be killed and discarded as bycatch.[104] Directed fishery participants would again be forced to bear the entire burden of conserving the halibut resource through lower harvest limits, while Amendment 80 would return to business as usual — taking the large amounts of halibut as bycatch despite the stock's condition and bearing none of the conservation responsibility.[105] Alliance members' investments of time and resources advocating common-sense policies that regulate bycatch based on the

---

[102] Ex. B, pp. 21-22 (¶32); Ex. C, pp. 8-9 (¶18); Ex. E, p. 7 (¶13); Ex. F, p. 5 (¶9); Ex. G, p. 6 (¶13); Ex. H, p. 11 (¶24); Ex. I, pp. 7-8 (¶15); Ex. J, p. 5 (¶11); Ex. K, pp. 10-11 (¶24); Ex. L, p. 6 (¶11).

[103] Ex. A, pp. 11-12 (¶¶22-23); Ex. B, pp. 15-16 (¶¶20-21); Ex. C, pp. 8-9 (¶18); Ex. D, p. 4 (¶6); Ex. E, pp. 7-8 (¶14); Ex. F, p. 3 (¶5); Ex. G, p. 5 (¶9); Ex. H, pp. 9-10 (¶¶19-20); Ex. J, p. 5 (¶10); Ex. K, pp. 10-11 (¶24).

[104] Ex. A, pp. 4-5 (¶8); Ex. C, p. 9 (¶19).

[105] Ex. A, pp. 8-9 (¶16-17); Ex. B, pp. 25-26 (¶¶38-39).

best evidence of abundance — in the same way that virtually every other fishery is regulated — would be wasted, while their faith in the process's ability to protect the interests of small family-owned fishing operations against pressure from industrial fishing interests would be jeopardized.[106] Finally, their social, cultural, and subsistence interests in halibut would be harmed, as access to halibut and the halibut fishery are limited.[107]

### C. The Halibut Defense Alliance's Interests Are Not Adequately Represented

No party adequately represents Alliance members' interests. "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate."[108] In evaluating adequacy of representation, courts consider

> (1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect."[109]

---

[106] Ex. C, p. 9 (¶19); Ex. I, pp. 7-8 (¶15).

[107] Ex. B, p. 6 (¶9); Ex. C, pp. 3-4 (¶¶5-6); Ex. E, p. 4 (¶6); Ex. L, pp. 4, 6 (¶¶6-7, 11).

[108] *W. Watersheds Project v. Haaland*, 22 F.4th 828, 840 (9th Cir. 2022) (quoting *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011)).

[109] *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996).

When a group intervenes to defend a federal agency's action, the "government's representation of the public interest may not be 'identical to the individual parochial interest' of [the] particular group."[110]

Here, the interests of Alliance members focus specifically on management of the halibut resource. These interests differ substantially from the broader interests reflected in Amendment 123 and those of NMFS, as an agency of the Federal government. By definition, Amendment 123 was a compromise that sought to "balance" "several factors when establishing [bycatch] limits, including the likely impacts on the halibut stock and affected participants in the Amendment 80 and directed halibut fisheries."[111] And because Amendment 123 seeks to "balance the interests" of Amendment 80 against other "halibut user groups in the BSAI,"[112] — rather than prioritizing health of the halibut resource and halibut fisheries, where Alliance members focus — the federal government's interests in Amendment 123 necessarily differ from those of the Alliance.

---

[110] *Citizens for Balanced Use*, 647 F.3d at 899. *See also Ga. v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002) ("We do not believe that a federal defendant with a primary interest in the management of a resource has interests identical to those of an entity with economic interests in the use of that resource.").

[111] 88 Fed. Reg. at 82,767; Ex. B, p. 19 (¶26).

[112] 88 Fed. Reg. at 82,767.

Likewise, Alliance members are likely to offer arguments and context to the proceedings that others will not. Before the Council and NMFS, for example, Alliance members submitted extensive comments and testimony from a highly regarded natural resources economist explaining that the Environmental Impact Statements grossly overstate the potential economic impacts to the Amendment 80 fleet, while also substantially understating the benefits to the directed fishery from reduced halibut bycatch, both inside and outside of the BSAI.[113] No existing party will provide this perspective to the Court.

### D. This Motion to Intervene is Timely

Finally, the Alliance's motion to intervene is timely. "To determine whether a motion for intervention as of right is timely, we consider the totality of circumstances facing the would-be intervenor, with a focus on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay."[114]

Here, the proceedings are in their very early stages. Plaintiffs' petition for review was recently filed and service on the Federal Defendants was only

---

[113] Ex. B, pp. 23-25 (¶¶36-38).
[114] *W. Watersheds Project*, 22 F.4th at 835-36 (quotations omitted).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          25

just perfected on January 17, 2024.[115] The Federal Defendants have not yet responded to Plaintiff's Petition or produced the administrative record, which is not due until March 5, 2024,[116] and there have been no substantive proceedings to date. No party will be prejudiced by the Alliance's intervention.

## II. Alliance Members Should Be Granted Permissive Intervention

Alternatively, Alliance members should be granted leave to intervene in this action under Rule 24(b). Permissive intervention is allowed under Rule 24(b) as long as the applicant for intervention shows that "(1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims."[117] As with intervention as of right, permissive intervention is construed liberally in favor of the moving party.[118]

As discussed above, the Alliance's members have direct interests in maintaining the abundance-based bycatch limits implemented by Amendment 123, and thus present common issues of law and fact with Plaintiff's claims. The Alliance's motion to intervene is timely and will not prejudice existing parties, and the court has a basis for jurisdiction over the claims. Moreover,

---

[115] Doc. 7 at 2.
[116] Doc. 8 at 2.
[117] *Donnelly*, 159 F.3d at 412.
[118] *City of L.A.*, 288 F.3d at 397–98.

Alliance members have unique perspectives and expertise regarding halibut's significance and the impact that bycatch has on the halibut fishery and halibut-dependent communities. The Alliance should be allowed to intervene as a defendant.

## CONCLUSION

Alliance members respectfully request that the Court grant their Motion to Intervene and that their Response to the Petition be filed.

Respectfully submitted this 6th day of February, 2024.

JOHN L. FORTUNA
JONES FORTUNA LP

Attorneys for the Central Bering Sea Fishermen's Association, City of Saint Paul, Alaska, Alaska Longline Fishermen's Association, Fishing Vessel Owners' Association, Homer Charter Association, The Boat Company, Petersburg Vessel Owners' Association, Alaska Marine Conservation Council, Halibut Association of North America, North Pacific Fisheries Association, Aleut Community of St. Paul Island Tribal Government, and the Seafood Producers Cooperative

By:    /s/ John L. Fortuna
John L. Fortuna, *Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMIT AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

1.     This motion complies with the length limit of L.Civ.R. 7.4(a)(2) because the document was prepared using a computer and, excluding the sections identified in L.Civ.R. 7.4(a)(4), contains 5,659 words.

2.     This motion complies with the typeface and type-style requirements of L.Civ.R. 7.5 because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 for Business in 13-point Century Schoolbook font.

## CERTIFICATE OF SERVICE

I certify that on this date I filed the foregoing Motion to Intervene with the Court's CM/ECF System, which will electronically serve the same on all parties.

By:     /s/ John L. Fortuna
        John L. Fortuna, *Pro Hac Vice*

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          C-1