Ryan P. Steen, Bar No. 0912084
ryan.steen@stoel.com
Jason T. Morgan, Bar No. 1602010
jason.morgan@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900

Connor R. Smith, Bar No. 1905046
connor.smith@stoel.com
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900

*Attorneys for Plaintiff Groundfish Forum, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GROUNDFISH FORUM, INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; GINA RAIMONDO, in her official capacity as the United States Secretary of Commerce; and JANET COIT, in her official capacity as Assistant Administrator, National Oceanic and Atmospheric Administration, <br><br> Defendants. | Case No.: 3:23-cv-00283-JMK |

## <u>OPENING BRIEF BY PLAINTIFF</u>

### (Local Civil Rule 16.3)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

TABLE OF ABBREVIATIONS ..................................................................................... v

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND ...................................................................................................... 5

    A.    The MSA's Fishery Management Framework. ........................................... 5

    B.    The Amendment 80 Sector and Halibut Bycatch Reduction
        Measures. ................................................................................................... 6

    C.    Amendment 123's Abundance-Based Management. .................................. 8

III. STANDARD FOR JUDICIAL REVIEW UNDER THE MSA ............................... 11

IV. ARGUMENT ........................................................................................................... 11

    A.    Amendment 123 Improperly Allocates the Entire Burden of
        Abundance-Based Management to the Amendment 80 Sector ................. 11

        1.    Amendment 123 Is an Allocation. ................................................. 11

        2.    Amendment 123 Is Not Fair and Equitable .................................. 14

        3.    Amendment 123 Is Not Reasonably Calculated to Promote
            Conservation. ................................................................................. 17

    B.    The Bycatch Reduction Measures Imposed by Amendment 123 Are
        Impracticable and Improperly Intended to Allocate. ................................. 18

        1.    The MSA Requires Practicable Bycatch Reduction Measures. ....... 18

        2.    Amendment 123 Improperly Uses Bycatch Reduction as a
            Guise to Reallocate to the Direct Halibut Fishery. ....................... 20

        3.    Amendment 123 Is Not a Practicable Bycatch Measure ................. 21

    C.    NMFS Violated NEPA by Failing to Consider Alternatives That
        Spread the Burden of Amendment 123 Bycatch Reductions Across
        Sectors. ....................................................................................................... 23

V. CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Bob Marshall All. v. Hodel*,
852 F.2d 1223 (9th Cir. 1988) ................................................................. 5

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) .............................................................. 25

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ................................................................ 24

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................. 13

*Flaherty v. Bryson*,
850 F. Supp. 2d 38 (D.D.C. 2012) ........................................................ 21

*Groundfish Forum v. Ross*,
375 F. Supp. 3d 72 (D.D.C. 2019) ........................................................ 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ............................................................ 11, 16, 21, 22

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ............................................................... 24

*Nat'l Coal. for Marine Conservation v. Evans*,
231 F. Supp. 2d 119 (D.D.C. 2002) ...................................................... 12

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
606 F.3d 1058 (9th Cir. 2010) ............................................................. 25

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010) ............................................................. 23

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ............................................................... 13

*Pac. Dawn LLC v. Pritzker*,
831 F.3d 1166 (9th Cir. 2016) ............................................................. 11

# TABLE OF AUTHORITIES

**Page**

*State of California v. Block*,
690 F.2d 753 (9th Cir. 1982) .................................................................... 24

*Sustainable Fisheries Coal. v. Raimondo*,
589 F. Supp. 3d 162 (D. Mass. 2022) ........................................................ 18

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*,
No. 3:21-CV-00247-JMK, 2022 WL 2222879 (D. Alaska June 21,
2022) ................................................................................................ 12, 15, 17

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ................................................................. 25

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) .................................................................. 5, 23

*Yakutat, Inc. v. Gutierrez*,
407 F.3d 1054 (9th Cir. 2005) ........................................................... passim

**Statutes**

5 U.S.C. § 706(2)(A) ...................................................................................... 11

16 U.S.C. § 1801 .................................................................................. 5, 18, 20

16 U.S.C. § 1851(a)(4) ............................................................................ passim

16 U.S.C. § 1851(a)(9) ............................................................................... 6, 19

16 U.S.C. § 1852 ............................................................................................. 5

16 U.S.C. § 1853(a)(11) ........................................................................ 1, 6, 19

16 U.S.C. § 1853(a)(14) ...................................................................... 4, 14, 17

16 U.S.C. § 1854(a)(1) ................................................................................... 6

16 U.S.C. § 1855(f) ...................................................................................... 11

42 U.S.C. § 4332(2)(C)(iii) ........................................................................... 23

**TABLE OF AUTHORITIES**

Page

**Regulations**

50 C.F.R. § 600.325 ....................................................................................... 12, 15, 17

50 C.F.R. § 679.21 ................................................................................................. 2

**Other Authorities**

72 Fed. Reg. 52,668 (Sept. 14, 2007) ................................................................... 7

89 Fed. Reg. 17,287 (Mar. 11, 2024) ................................................................. 14

142 Cong. Rec. H11418 (1996) .......................................................................... 19

H.R. Rep. No. 104-171 (1995) ........................................................................... 19

## Table of Abbreviations

| | |
|---|---|
| **ABM** | Abundance-Based Management |
| **ABM Workgroup** | North Pacific Fishery Management Council's Abundance-Based Management Workgroup |
| **APA** | Administrative Procedure Act |
| **BSAI** | Bering Sea and Aleutian Islands Management Area |
| **CDQ** | Community Development Quota |
| **Council** | North Pacific Fishery Management Council |
| **EIS** | Environmental Impact Statement |
| **FMP** | Fishery Management Plan |
| **Groundfish FMP** | Fishery Management Plan for Groundfish in the Bering Sea and Aleutian Islands Management Area |
| **IPHC** | International Pacific Halibut Commission |
| **MSA** | Magnuson-Stevens Fishery Conservation and Management Act |
| **NEPA** | National Environmental Policy Act |
| **NMFS** | National Marine Fisheries Service |
| **PSC** | Prohibited Species Catch |
| **SSC** | Scientific and Statistical Committee |

# I.  INTRODUCTION

The National Marine Fisheries Service ("NMFS") violated the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") and the National Environmental Policy Act ("NEPA") by approving Amendment 123 to the fishery management plan ("FMP") for groundfish in the Bering Sea and Aleutian Islands ("BSAI") Management Area (the "Groundfish FMP"). Amendment 123 singles out one sector operating under the Groundfish FMP—called the "Amendment 80" sector—and imposes new and novel halibut bycatch restrictions on that sector alone, at an *annual* cost of up to $100 million.[1] NMFS's analysis confirms Amendment 123 is a net economic *loss* to the nation and provides no conservation benefit to the halibut stock. NMFS's decision shirks, evades, and outright disregards its statutory obligations under the MSA and NEPA.

Bycatch is an unavoidable part of every fishery. The MSA requires each FMP to include measures to "minimize" bycatch, but only "to the extent practicable." 16 U.S.C. § 1853(a)(11) (Required Provision 11). If those bycatch measures grant or restrict fishing privileges, an "allocation" occurs, and the MSA requires NMFS to allocate the grant or restriction of privileges "fairly and equitably" among an FMP's fishing sectors. *Id.* §§ 1851(a)(4) (National Standard 4), 1853(a)(14) (Required Provision 14).

 Harvest limits for targeted fishing for halibut (often called the "directed halibut fishery") are not set by the MSA or the Groundfish FMP, but are set by the International Pacific Halibut Commission ("IPHC") pursuant to treaty. Under the Groundfish FMP,

---

[1] Plaintiff Groundfish Forum represents the Amendment 80 sector.

halibut caught by the groundfish sectors is considered bycatch, or "prohibited species catch" ("PSC"). By regulation, halibut PSC must be discarded—dead or alive.

The Groundfish FMP allocates the harvest of target stocks (such as Pacific cod) to various sectors in the fishery. The Groundfish FMP also allocates halibut PSC limits to the four primary groundfish sectors: Amendment 80, the trawl limited access sector, the non-trawl sector, and the Community Development Quota ("CDQ") Program. 50 C.F.R. § 679.21(b) (allocating halibut PSC limits by sector). When a sector exhausts its halibut PSC allocation, that sector is shut down for the season. *Id*. § 679.21(b)(4).

In 2016, NMFS and the North Pacific Fishery Management Council (the "Council") finalized Amendment 111 to the Groundfish FMP to comprehensively reduce halibut PSC limits across the four primary sectors. NMFS treated Amendment 111 as "an allocation of fishing privileges [that] must be consistent with National Standard 4." NOAA036973-74. Amendment 111 imposed the largest PSC reduction (25%) on the Amendment 80 sector, recognizing that new tools voluntarily developed by the fleet made these reductions possible but that "greater reductions were *not practicable* for the Amendment 80 sector." NOAA001594 (emphasis added). Those tools have significantly minimized halibut bycatch, which is now less than 1% of the Amendment 80 sector's total catch. NOAA053022. Halibut bycatch from all groundfish fisheries represents only about 10% of all halibut caught annually. NOAA059414.

Unfortunately, NMFS and the Council decided to "send[] a message that no good deed goes unpunished." NOAA055166. Rather than stop with the practicable limitations

of Amendment 111, they proceeded to approve Amendment 123—the subject of this litigation. Amendment 123 started with a Council proposal to impose new "abundance-based" halibut PSC restrictions that would apply to all of the primary sectors in the Groundfish FMP. The concept was that in years where halibut abundance was lower, there be a corresponding reduction in each sector's halibut PSC allocation. The Council hoped this new approach would protect the halibut stock and provide more opportunity for the directed halibut fishery. NOAA035106.

But these "hopes" failed to "find a 'science based' answer." *Id*. Four years into evaluating the idea, NMFS and the Council, in 2019, released modeling results in a preliminary environmental impact statement ("EIS") showing that abundance-based management would "have very little impact on Pacific halibut spawning biomass" and "the implementation of abundance based management of halibut PSC is an allocation decision rather than a conservation decision." NOAA042367. NMFS's analysis also showed that any hypothetical benefit to the directed halibut fishery was offset by much greater losses to the groundfish sectors. *Id*. In short, the benefits did not justify the burden and that should have been the end of abundance-based management.

But the Council forged ahead anyway, goaded by halibut groups seeking more bycatch restrictions. *See* NOAA035106, 035118. Claiming a need for "simplifications," the Council pivoted to placing the entire burden of abundance-based management on the Amendment 80 sector. NOAA043184. But these "simplifications" did not fix the identified flaws. They just papered them over. The *revised* EIS erased inconvenient

conclusions (*e.g.*, "abundance based management is an allocation decision rather than a conservation decision"), "excised" all discussion of allocating the new restrictions across the sectors, proposed *only* alternatives that allocated the entire burden to the Amendment 80 fleet, and then retrofitted the EIS's purpose and need statement to match those single-minded alternatives. NOAA001966, 001979, 002110. NMFS then approved the decision, pronouncing that "this action is *not* an allocation." NOAA001139 (emphasis added).

NMFS's action is patently arbitrary and violates the MSA and NEPA. *First*, NMFS has a statutory duty under National Standard 4 and Required Provision 14 of the MSA to ensure that any allocation of fishing privileges or restrictions is "fair and equitable." 16 U.S.C. §§ 1851(a)(4), 1853(a)(14). NMFS shirked that duty by singling out the Amendment 80 sector to bear the entire burden of its new "abundance-based" approach and then arbitrarily pretending that its decision was "not an allocation." This alone warrants vacatur of Amendment 123.

*Second*, Amendment 123's restrictions are impracticable. In Amendment 111, NMFS *already* concluded that additional restrictions were "not practicable" for the Amendment 80 sector. The record here demonstrates that no new tools are available to the fleet, meaning that Amendment 123's new halibut PSC restrictions can only be achieved by significantly reducing fishing for target stocks. NMFS's own analysis confirms the costs will be hundreds of millions of dollars, causing some Amendment 80 firms to "exit the fishery" (*i.e.*, go bankrupt). NOAA054918. "Practicability" has no

meaning or limit if it can be satisfied by ratcheting down a fishery's effort to the point of insolvency. For this reason, too, Amendment 123 should be vacated.

*Third*, NMFS violated NEPA. "'The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted). There should be no dispute that a reasonable alternative—indeed, a required alternative—for Amendment 123 was to spread the burden of any necessary abundance-based halibut PSC restrictions fairly and equitably across all the sectors in the Groundfish FMP, as was done in the Amendment 111 NEPA process. Instead, NMFS arbitrarily "excised" all such alternatives from the EIS. Deleting viable alternatives from an EIS does not provide the "[i]nformed and meaningful consideration of alternatives" required by NEPA. *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988).

For these reasons, and those set forth below, Amendment 123 is arbitrary, capricious, and contrary to law, and it should be vacated.

## II. BACKGROUND

### A. The MSA's Fishery Management Framework.

The MSA creates a "national program for the conservation and management of the fishery resource." 16 U.S.C. § 1801(a)(6). The Act establishes eight Regional Fishery Management Councils, each of which prepares FMPs (and amendments to FMPs) for each fishery under its authority. *Id*. § 1852(a), (h)(1). The Secretary of Commerce, acting through NMFS, reviews each FMP or amendment "to determine whether it is consistent

with the [Act's] national standards, the other provisions of th[e] chapter, and any other applicable law." *Id*. § 1854(a)(1).

All FMPs and amendments "shall be consistent" with the MSA's 10 "National Standards" (*id*. § 1851(a)(1)-(10)) and must include the MSA's 15 "Required Provisions" (*id*. § 1853(a)(1)-(15)). As relevant here, National Standard 4 and Required Provision 14 address the obligation to allocate fishing privileges and restrictions fairly and equitably among an FMP's sectors. *Id*. §§ 1851(a)(4), 1853(a)(14). National Standard 9 and Required Provision 11 address the requirement to minimize bycatch to the extent practicable. *Id*. §§ 1851(a)(9), 1853(a)(11).

## B.     The Amendment 80 Sector and Halibut Bycatch Reduction Measures.

The Groundfish Forum is a nonprofit trade association based in Seattle, Washington, representing five companies that collectively operate all the vessels in the Amendment 80 sector.[2] Groundfish Forum members supply seafood to the United States and other markets worldwide. NOAA053016. The Amendment 80 sector has received Responsible Fisheries Management and Marine Stewardship Council certification for environmental sustainability. *Id*.

The Amendment 80 sector is one of several fishing sectors governed by the Groundfish FMP. NOAA000510. These fishing sectors "cannot be prosecuted without some level of halibut bycatch because groundfish and halibut occur in the same areas at

---

[2] Groundfish Forum's members are directly regulated by Amendment 123 and have standing to challenge NMFS's decision and faulty environmental analysis. *See* Declaration of Christopher Woodley ¶¶ 2-22.

the same times and no fishing gear or technique has been developed that can harvest commercial quantities of groundfish while avoiding all halibut bycatch." NOAA000447.

The Amendment 80 program was created in 2008 as an initiative "by the Council and NMFS to reduce bycatch and discard of fish species in the BSAI non-pollock trawl groundfish fisheries." 72 Fed. Reg. 52,668, 52,669 (Sept. 14, 2007). Among other things, the Amendment 80 program establishes "allocations" of both target catch and PSC. *Id*. at 52,671-72. In 2008, the Amendment 80 halibut PSC allocation was reduced to 2,525 mt, followed by a series of additional annual stair-step reductions to 2,325 mt in 2012, NOAA053313, followed by an additional 25% reduction (more than any other sector) in Amendment 111 to 1,745 mt in 2015. NOAA001589.

The reductions implemented by Amendment 111 were made possible by a "suite of tools to reduce halibut bycatch" developed by the Amendment 80 sector in cooperation with the Council. NOAA038181. These strategies include fleet communication, the use of small test tows, reduced night fishing, the use of excluders, and "deck sorting." *Id*. Deck sorting, in particular, has been very effective at reducing halibut bycatch mortality by allowing halibut that are incidentally caught to be sorted on deck and returned to the sea as soon as possible. *See* NOAA001988; NOAA002058. Amendment 111 recognized that these measures imposed significant costs on the industry and that further bycatch reductions were "not practicable and would reduce the net benefit to the nation." NOAA001590; NOAA001594 ("The Council considered, and rejected, alternatives that would have adopted greater reductions in the PSC limit for the Amendment 80 sector.").

Consistent with Amendment 111, the Amendment 80 sector has indeed

minimized bycatch to the extent practicable. In 2022, the Amendment 80 sector was able

to catch approximately 335,000 mt of target groundfish, with a bycatch rate of only about

1 kg of halibut for every 214 kg of groundfish (or about a 0.4% bycatch rate).

NOAA053022. The Pacific halibut stock has been stable since 2012, at around 100,000

mt, and is not overfished. NOAA053020-21.

## C.     Amendment 123's Abundance-Based Management.

In 2015, the Council started "exploring ways" to link halibut abundance to halibut

PSC levels. NOAA038263. The Council established a working group (the "ABM

Workgroup"), which produced a discussion paper in April 2016. NOAA038674. The

paper explained that current PSC limits "are allocated amongst" the BSAI sectors and

that "[a] policy decision in the development of alternatives will be to either retain the

Status Quo sectors, allocations and structure or to modify them." NOAA038698-99. The

Council reviewed this paper, prepared a draft statement of purpose and need, and directed

the ABM Workgroup to describe "the potential implications of abundance-based halibut

PSC allocations using the proportional allocations to the four sectors defined under

Amendment 111 as the basis for structure and comparison." NOAA038894.

Over time, the ABM Workgroup produced multiple revised discussion papers.

*See* NOAA039089 (September 2016); NOAA040097-98 (October 2017); NOAA040445

(March 2018). Each paper utilized the status quo allocation of halibut PSC to the BSAI

sectors. *See* NOAA0039133; NOAA040145-46; NOAA040086; NOAA040476-77. In

October 2018, the Council revised the alternatives presented in the discussion paper explaining that "[t]he analysis should clearly demonstrate the effects of the alternatives on the resulting allocations to the Amendment 80, BSAI trawl limited access, non-trawl, and CDQ sectors." NOAA040849. The Council and NMFS considered "allocating additional PSC to good performers or reallocating PSC from poor performers"—a decision requiring "close scrutiny." NOAA041469. In September 2019, the ABM Workgroup produced a preliminary draft EIS. *See* NOAA041691. The draft explored a no-action alternative and two alternatives for indexing PSC limits to halibut abundance for all BSAI groundfish sectors based on status quo allocations. NOAA041741-42.

This preliminary draft EIS also showed that abundance-based management was not likely to have any measurable impact on halibut biomass. NOAA041940. As a result, abundance-based management would be "an allocation decision rather than a conservation decision." NOAA01490. The Council's scientific and statistical committee ("SSC") "concur[red] with the analysts' conclusion" that abundance-based management "is an allocation decision rather than a conservation decision." NOAA042893. The SSC also raised serious concerns about the premise of the Council's abundance-based method, finding that "the groundfish fleet's ability to avoid halibut is poorly related to indices of abundance." *Id*. Instead, the relationship between bycatch levels and halibut surveys of biomass "ranges from moderate to non-existent." *Id*.

It was in December 2019—directly after reviewing the analysis in the preliminary draft EIS—that the Council reversed course and explored avenues to "streamline" and

"simplify" the action. *See* NOAA043046; NOAA035122. In February 2020, the State of Alaska's Council representative proposed a motion, passed by the Council, that singled out the Washington-based Amendment 80 sector for abundance-based management. NOAA043160-62; *see also* NOAA035146 (discussing "aggressive campaign by some stakeholders to dismiss impacts to Amendment 80 sector as only affecting five corporations in Seattle"). The intent was that "[t]he action will now focus exclusively on the Amendment 80 sector." NOAA043184.

By the October 2020 Council meeting, Council staff had prepared a revised preliminary draft EIS with alternatives focused solely on reductions to the Amendment 80 sector. NOAA044498; NOAA044280. In addition to deleting the alternatives related to other sectors, the revised draft deleted the discussion of status quo allocation of PSC across the sectors. *See* NOAA044498-800. On October 13, 2020, the Council passed a motion to revise the purpose and need statement, to match (in retrospect) the already-prepared Amendment 80-only alternatives. NOAA045065. In April 2021, the Council reviewed a revised preliminary draft EIS and made modifications to the options under the alternatives. *See* NOAA046377-80. Finally, in December 2021, the Council took final action, imposing the new abundance-based halibut PSC restriction solely on the Amendment 80 sector. *See* NOAA047600; NOAA047812-14. On November 24, 2023, NMFS published the final rule implementing Amendment 123, reducing the Amendment 80 sector's halibut PSC allocation by as much as 35%. NOAA001093.

### III.  STANDARD FOR JUDICIAL REVIEW UNDER THE MSA

"Actions taken by the Secretary under regulations implementing fishery management plans are 'subject to judicial review to the extent authorized by, and in accordance with,' the Administrative Procedure Act (APA)." *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016) (quoting 16 U.S.C. § 1855(f)). "Judicial review under the APA allows courts to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id*. (quoting 5 U.S.C. § 706(2)(A)). "To determine whether the agency's decision was arbitrary and capricious, the court must consider whether the decision was based on a consideration of the relevant factors required by the statute . . . ." *Id*. An agency's decision may "be found to be arbitrary and capricious 'if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise.'" *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1067 (9th Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*Motor V.*"), 463 U.S. 29, 43 (1983)).

### IV.  ARGUMENT

**A.    Amendment 123 Improperly Allocates the Entire Burden of Abundance-Based Management to the Amendment 80 Sector.**

**1.    Amendment 123 Is an Allocation.**

In the final rule, NMFS disavows the application of National Standard 4 (and says

almost nothing about Required Provision 14), claiming instead that Amendment 123 "is

not an allocation under National Standard 4." NOAA001139. NMFS is wrong.

National Standard 4 applies to conservation and management measures that

"allocate or assign fishing privileges among various United States fishermen." 16 U.S.C.

§ 1851(a)(4). "An 'allocation' is a 'direct and deliberate distribution of the opportunity to

participate in a fishery among identifiable, discrete user groups or individuals.'" *United

Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, No. 3:21-CV-00247-JMK, 2022

WL 2222879, at *13 (D. Alaska June 21, 2022) (quoting 50 C.F.R. § 600.325(c)(1)).

Allocations "'include, for example, per-vessel catch limits, quotas by vessel class and

gear type, different quotas or fishing seasons for recreational and commercial fishermen,

assignment of ocean areas to different gear users, and limitation of permits to a certain

number of vessels or fishermen.'" *Id*. (quoting *Nat'l Coal. for Marine Conservation v.

Evans*, 231 F. Supp. 2d 119, 131 (D.D.C. 2002)).

Amendment 123 is an allocation. It applies to an "identifiable, discrete user

group"—the Amendment 80 sector—and imposes abundance-based restrictions

exclusively on that sector. 50 C.F.R. § 600.325(c)(1). These restrictions subject the

Amendment 80 sector to different prohibited species "catch limits" (PSC) or "different

quotas." *Id*. If reached, these limits require the sector to stop fishing, eliminating the

"opportunity to participate" in the groundfish fishery for the rest of the year. *Id*.

Indeed, NMFS determined in Amendment 111 that the assignment of halibut PSC

is "an allocation of fishing privileges and must be consistent with National Standard 4."

NOAA036973-74. It rigorously applied National Standard 4 to that allocation of halibut PSC to ensure it was fair and equitable. *See* NOAA001592. Even in the Amendment 123 process, NMFS and the Council both consistently referred to the assignment of PSC as an "allocation"—up and until their pivot to single out the Amendment 80 sector.[3]

NMFS's conclusion that Amendment 123 is "not an allocation" is therefore a complete reversal from Amendment 111 and its stated positions during the Amendment 123 process. NMFS reversed course without even acknowledging its prior contrary positions or explaining why it reached the exact opposite conclusion at the end of the Amendment 123 process. This is a hallmark of arbitrary agency action. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) ("Unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary and capricious change." (quotations and citation omitted)).

Nor could there be a reasoned explanation for NMFS's new position. NMFS's own EIS still explains—despite the efforts to "excise" discussions about "allocation"—

---

[3] In addition to altering the halibut PSC allocations, Amendment 123 also allocates halibut catch from the Amendment 80 sector to the directed halibut fishery. The Council's original "objectives" for abundance-based management include "providing opportunity for the directed halibut fishery," NOAA040249-30, and this is "ultimately an allocation issue" driven by "directed halibut fishery users" who sought to benefit from a larger reduction in the Amendment 80 sector's halibut PSC allocation. NOAA035106.

that Amendment 123 "allocate[s] fishing privileges (in this case, a halibut PSC that varies with abundance)," NOAA004140, and is "intended" to "allocate fishing privileges," NOAA003876. As one Council member explained when voting for Amendment 123: "we're trying to . . . allocate fishing privileges . . . ." NOAA055172; NOAA035101 ("ABM is primarily an allocative action."). Indeed, NMFS *continues* to refer to its apportionment of halibut PSC as "allocations of PSC." 89 Fed. Reg. 17,287, 17,303 (Mar. 11, 2024). In short, NMFS's conclusion that Amendment 123 "is not an allocation" is contrary to the record, all applicable law, and NMFS's prior (and current) practice. Amendment 123 should be vacated for this error alone.

### 2. Amendment 123 Is Not Fair and Equitable.

After concluding that Amendment 123 is "not an allocation," NMFS summarily claimed that "even if it were" an allocation "it is fair and equitable and consistent with National Standard 4 . . . due to the high proportion of the halibut PSC used in that sector." NOAA001139. This, too, is arbitrary, capricious, and contrary to law.

NMFS's obligation under National Standard 4 and Required Provision 14 is to ensure that the Amendment 123 allocation is "fair and equitable to all such fishermen," 16 U.S.C. § 1851(a)(4), and that the burden of the restriction is allocated "fairly and equitably among the commercial, recreational, and charter fishing sectors," *id*. § 1853(a)(14); *Yakutat*, 407 F.3d at 1059. This requires an "analysis" of "[a]llocation schemes considered, but rejected by the Council," how the allocation scheme is "rationally connected to the achievement of [Optimum Yield] or with the furtherance of a

legitimate FMP objective," and how the allocation results in "the advantaging of one group to the detriment of another" that is justified by the need to achieve the "objectives of the FMP." 50 C.F.R. § 600.325(c)(2)-(3)(i)(A). The allocation "may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups." *Id*. § 600.325(c)(3)(i)(B). This requires "an initial estimate of the relative benefits and hardships imposed by the allocation, and [a comparison of] its consequences with those of alternative allocation schemes[.]" *Id*.

None of that required analysis occurred for Amendment 123. Instead, NMFS and the Council decided halfway through the process to single out the Amendment 80 sector for the new "abundance-based" restrictions. Although their own analysis concluded that abundance-based management was just an allocation to the directed halibut fishery (an allocation that had no conservation benefit and net negative economic consequences), they simply deleted that conclusion. *Compare* NOAA017429 *with* NOAA004121. They also excised the alternatives that would have allocated the burdens of abundance-based management across the other Groundfish FMP sectors, with the intended result that "[t]hose other sectors would no longer be directly regulated by the alternatives under consideration." NOAA004016. Because no other alternatives were on the table, there was not even a basis in the record for an analysis of the "fairness" or "equities" of NMFS's action. In other words, a "fair and equitable" analysis can only occur by evaluating and comparing impacts and benefits *across the relevant sectors*. *See United Cook*, 2022 WL 2222879, at *15 (National Standard 4 violated where "an explanation as to why

recreational fisherman have carte blanche to fish for salmon stocks covered by the FMP is noticeably absent" and "[a]n assessment of those privileges as compared to the prohibition applied to commercial fisherman also was not considered"). In any event, singling out and imposing hundreds of millions of dollars of costs on *one* sector under a multi-sector FMP cannot in any true sense of the term be "fair and equitable."

Before Amendment 123, Amendment 111 allocated halibut PSC across the primary Groundfish FMP sectors, and that allocation was "fair and equitable . . . for each sector based on an evaluation of what is practicable for that sector." NOAA001592; NOAA053985 (Amendment 111 "assign[ed] allocations of halibut PSC limits" across Groundfish FMP sectors "in a manner that is fair and equitable and consistent with National Standard 4"). Amendment 123 alters that prior equitable allocation, substantially reducing the Amendment 111 allocation for *only* the Amendment 80 fleet, with no analysis of what was practicable, possible, or reasonable for other sectors. The Council's own analysis showed that any decision "allocating" or "reallocating" PSC by sector was "an action by NMFS that is subject to close scrutiny." NOAA041469. Yet no such scrutiny is in the record. NMFS cannot plausibly find—and did not, in fact, find—that Amendment 123 allocates halibut PSC restrictions fairly or equitably among sectors. NMFS therefore "entirely failed to consider an important aspect of the problem"— another hallmark of arbitrary and capricious agency action. *Motor V.,* 463 U.S. at 43.

Finally, NMFS gave a half-hearted nod to Required Provision 14, claiming that it was "equitable" to "require lower bycatch levels during times of low abundance given

that the directed [halibut] fishery is expected to have lower harvest levels at times of low abundance." NOAA001145. But this misses the point of Required Provision 14: NMFS "*must* allocate the restrictions equitably among commercial, recreational and charter fishing sectors." *Yakutat*, 407 F.3d at 1059 (emphasis added). NMFS's rationale (brief as it is) says nothing about *whether, how, and why* the restriction is equitably allocated across the groundfish sectors (because, in fact, it isn't). Besides, NMFS has no plausible explanation for why it is fair and equitable to allocate a $100 million per year burden to the Amendment 80 sector, when that burden has no conservation benefit and no meaningful economic benefit to the directed halibut fishery (whether in times of "low abundance or not). Amendment 123 is not fair or equitable, and thus violates the MSA.

### 3. Amendment 123 Is Not Reasonably Calculated to Promote Conservation.

In addition to being fair and equitable, allocations must be "[r]easonably calculated to promote conservation." 50 C.F.R. § 600.325(a)(2); 16 U.S.C. § 1853(a)(14) (applying to "necessary" conservation and management measures); *see Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 89 (D.D.C. 2019) ("[I]f the Service decides to allocate fishing privileges to a specific group, that allocation must actually 'promote' a conservation purpose—that is, advance or further it—rather than just avoid jeopardizing one."); *United Cook*, 2022 WL 2222879, at *15 (FMP amendment that was "not rationally related to conservation" violated National Standard 4). Amendment 123 fails this standard as well.

NMFS's own analysis confirms that "the implementation of abundance-based

management of halibut PSC is an allocation decision rather than a conservation decision" because it has "very little impact on Pacific halibut spawning biomass and recruitment." NOAA042367; NOAA0042542 (SSC concurring). As one Council member explained, "our purpose and need statement does not mention conservation as an objective" and instead only "notes that this action *could* promote conservation," a possibility that is not well supported by the scientific evidence. NOAA055183 (emphasis added); NOAA003873 ("This action *could* also promote conservation of the halibut stock and *may* provide additional opportunities for the directed halibut fishery." (emphasis added)). An allocation decision violates National Standard 4 when, as here, it is premised on "potential" and contingent "biological benefits." *Sustainable Fisheries Coal. v. Raimondo*, 589 F. Supp. 3d 162, 172 (D. Mass. 2022) ("potential" and contingent "biological benefits" provided "lackluster support for . . . conclusion that the final rule promotes conservation"), *appeal dismissed,* 2022 WL 17349184 (1st Cir. June 30, 2022).

In sum, NMFS violated National Standard 4 and Required Provision 14, and Amendment 123 should be vacated.

**B.      The Bycatch Reduction Measures Imposed by Amendment 123 Are Impracticable and Improperly Intended to Allocate.**

**1.      The MSA Requires Practicable Bycatch Reduction Measures.**

In 1996, Congress amended the MSA to clarify that "the policy of the Congress" was to "assure that the national fishery conservation and management program . . . encourages development of *practical measures* that *minimize* bycatch and avoid unnecessary waste of fish." 16 U.S.C. § 1801(c)(3) (emphasis added). Congress added

National Standard 9, which states that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id*. § 1851(a)(9). Congress also added Required Provision 11, mandating "conservation and management measures that, to the extent practicable and in the following priority – (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided." *Id*. § 1853(a)(11).

Importantly, Congress considered, but ultimately did not adopt, stronger versions of National Standard 9 and Required Provision 11 that would have required bycatch reduction to the "maximum extent practicable." H.R. Rep. No. 104-171, 1995 WL 390916, at *27 (1995). The word "maximum" was struck from the Senate version ultimately adopted into law, resulting in bycatch restrictions that "are not as strong" as some members of Congress might have liked. 142 Cong. Rec. H11418 at H11436, 1996 WL 565494 (1996) (Statement of Rep. Young). Instead, both "the standard and the required provision make clear that bycatch be avoided where practicable," and the "use of the term 'to the extent practicable' was chosen deliberately by both the Senate and the House." *Id*. at H11437. This was intended to instruct councils to "make reasonable efforts in their management plans to prevent bycatch," which "requires an analysis of the costs of imposing a management action," but "Congress [did] not intend that this provision will be used to allocate among fishing gear groups, nor to impose costs on fishermen and processors that cannot be reasonably met." *Id*.

## 2. Amendment 123 Improperly Uses Bycatch Reduction as a Guise to Reallocate to the Direct Halibut Fishery.

NMFS and the Council stated early in the Amendment 123 process that they wanted to "provide an opportunity for the directed halibut fishery" to catch more halibut. NOAA040175. The Council could not directly authorize increased halibut harvest (as that is under the authority of the IPHC). But the IPHC could theoretically provide "opportunities for directed halibut fishing" as an "indirect result of any action taken to establish abundance based limits." NOAA040176-77. Thus, "[t]he Council's objectives include[d] . . . (indirectly) providing opportunity for the directed halibut fishery," NOAA040249-30, and NMFS believed that "the direct effect of reduced PSC limits is increased catch limits for directed halibut fishing," NOAA017429.

But bycatch restrictions are supposed to be "practical measures that minimize bycatch and avoid unnecessary waste of fish" (16 U.S.C. § 1801(c)(3)), not "indirect" allocation decisions to benefit specific user groups. 142 Cong. Rec. at H11437 (National Standard 9 and Required Provision 11 are not intended to be "used to allocate among fishing gear groups"). The Council was hoping that it "could find a 'science based' answer" showing that its allocation decision was actually based on conservation, but was unable to do so, making Amendment 123 "ultimately an allocation issue." NOAA035106. And even if this was a legitimate bycatch measure, NMFS still must demonstrate that the measure is both "necessary" and "fair and equitable" (which as set forth above, it is not). *See Yakutat*, 407 F.3d at 1059 (bycatch measures must be allocated fairly and equitably). Bycatch reduction cannot be a pretext for allocation, and NMFS thus "relied on factors

which Congress has not intended it to consider." *Motor V.*, 463 U.S. at 43.

### 3. Amendment 123 Is Not a Practicable Bycatch Measure.

The restrictions imposed by Amendment 123 are also not "practicable." In order to determine practicability, NMFS and the Council are required to have "'thoroughly reviewed the relevant scientific data on bycatch and consulted with participants in the fishery to determine whether the proposed regulations would be effective and practical.'" *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 59 (D.D.C. 2012) (citations omitted). Here, the evidence is unequivocal that Amendment 111 *already* imposed all the available practicable tools and "greater reductions were not practicable." NOAA001594. Throughout the Amendment 123 process, the Amendment 80 sector repeatedly explained that it "has *already* reduced halibut PSC usage to the maximum extent practicable using all available tools" resulting in a reduction of "nearly 35% since 2014," that there are "[n]o new tools available," that lower PSC limits will come as the result of substantial loss of harvest, and that some member companies "may not survive under substantially lower PSC limits." NOAA053060.[4]

These concerns are confirmed in the record. NMFS's own draft EIS explains: "[b]ecause of the efforts and expenditures already undertaken by the sector, dramatic increases in halibut avoidance or reductions in mortality are not expected with the tools

---

[4] *See also* NOAA048357-58 (discussing "enormous costs with very little benefit," "staggering" economic losses of $68 million to $138 million per year to the Amendment 80 sector, and "132 sole, mackerel and flounder meals being lost for every 1 halibut meal gained"); NOAA060247 (Advisory Panel minutes explaining "all PSC reduction tools (e.g., excluders and decksorting) are currently being maximized").

that are currently available to the fleet." NOAA001997. Instead, "[i]f substantial

reductions in halibut mortality are realized, they are likely to be derived from the

development and implementation of *new technologies that are not currently available or

practicable.*" *Id*. (emphasis added). As one Council member explained:

> So we're not creating any new tools or flexibility for the Amendment 80
> fleet, and so I find cuts at the levels in the motion to be punitive cuts to the
> Amendment 80 fleet to reallocate halibut from one user group to another
> with no real conservation benefit. And cuts at these levels could put some
> Amendment 80 companies out of business, and I don't think that's the
> right thing to be doing here.

NOAA055162. Put another way, "this action does not solve any problems while it

imposes significant harm to the Amendment 80 fleet." *Id*.

Despite this record, NMFS approved Amendment 123, summarily concluding

that "while NMFS agrees that there may be costs associated with the action, those costs

do not exceed what is practicable." NOAA001155. But NMFS does not explain this

assertion or make any effort to address the directly contrary evidence. Indeed, if

"practicability" can be justified against any "costs" without explanation, then the term

has no limit or meaning. NMFS could simply reduce a fishery to the point of insolvency

because NMFS deemed it "practicable" to do so.

NMFS therefore "offered an explanation for its decision that runs counter to the

evidence before the agency" and "is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor V.*, 463 U.S. at 43.

Amendment 123 is arbitrary and capricious, and it should be vacated.

**C.   NMFS Violated NEPA by Failing to Consider Alternatives That Spread the Burden of Amendment 123 Bycatch Reductions Across Sectors.**

An agency must produce an EIS that is "intended to be used to guide decisionmaking" and "the alternatives analysis is naturally 'the heart'" of that EIS. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir. 2010). Every EIS "must '[r]igorously explore and objectively evaluate all reasonable alternatives,' and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.;* 42 U.S.C. § 4332(2)(C)(iii). "'The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" *Westlands*, 376 F.3d at 868 (citation omitted).

The Amendment 123 EIS violates NEPA by excluding plainly viable—indeed, required—alternatives. There can be no real dispute that it was "viable" to consider an alternative that applied abundance-based restrictions to many sectors in the groundfish fishery. NMFS's 2019 preliminary draft EIS did precisely that, considering alternatives that imposed "gear-specific PSC limits" across the sectors, using the existing PSC "allocation proportions to the extent possible." NOAA017194. The Amendment 111 EIS also spread new PSC allocations across the Groundfish FMP sectors. But, here, NMFS "excised" those alternatives from the EIS altogether. NOAA004016.

The final EIS eliminates these viable alternatives because "the Council narrowed the focus of the action and accompanying analysis to only the Amendment 80 sector, eliminating the other sectors from the action and analysis[.]" NOAA003942. But NEPA does not allow agencies to unilaterally "narrow[] the focus of the action" to avoid

inclusion of viable alternatives. Quite the opposite. "NEPA requires . . . full and meaningful consideration [of] *all viable alternatives*." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878 (9th Cir. 2022) (quotations and citation omitted; emphasis added). The EIS is intended to serve "as an instrument for airing the issue of resource demand," and an agency violates NEPA where—as NMFS did here by deleting viable alternatives—it "shroud[s] the issue from public scrutiny behind the claim of administrative expertise." *State of California v. Block*, 690 F.2d 753, 768 (9th Cir. 1982).

NMFS's actions here are particularly egregious because it has a *statutory duty* to "allocate the [bycatch] restrictions equitably among commercial, recreational and charter fishing sectors." *Yakutat*, 407 F.3d at 1059. Instead of taking a hard look at how it could achieve a result consistent with that mandate, NMFS only considered alternatives that singled out one sector to bear the entire burden of the new abundance-based restrictions. An agency violates NEPA when it "fail[s] to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813-14 (9th Cir. 1999). Alternatives that comply with NMFS's plain statutory duties under the MSA are feasible alternatives "that [cannot] be ignored." *Id.* at 814.

Finally, and relatedly, the EIS's purpose and need statement is unlawful. "An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a

foreordained formality." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (quotations and citation omitted). That is exactly what happened here. After the Council and NMFS decided to single out the Amendment 80 sector, they retrofitted the purpose and need statement to match that decision. *See* NOAA045065; NOAA044514; NOAA044538 (expressing need to "revisit purpose and need statement and objectives *in light of changing this action* to only directly modify PSC limits for the Amendment 80 sector" (emphasis added)).

That, too, is the opposite of what the law requires. The purpose and need statement must be both consistent with the agency's statutory authority and broad enough to *guide* the agency's selection of *viable* alternatives. *Nat'l Parks*, 606 F.3d at 1070; *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (in formulating the purpose and need "an agency should always consider the views of Congress, expressed . . . in the agency's statutory authorization to act"). Here, the purpose and need statement was just an afterthought—edited to reflect an unexplained decision to single out the Amendment 80 sector and to match new, already-prepared alternatives, crafted to focus on one sector.

## V. CONCLUSION

For the foregoing reasons, Amendment 123, the associated final rule and implementing regulations, and the EIS are arbitrary, capricious, and contrary to law, and should therefore be vacated. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("ordinary practice is to vacate unlawful agency action.").

DATED: April 26, 2024          STOEL RIVES LLP


                               */s/ Ryan P. Steen*
                               Ryan P. Steen, Bar No. 0912084
                               ryan.steen@stoel.com
                               Jason T. Morgan, Bar No. 1602010
                               jason.morgan@stoel.com
                               Connor R. Smith, Bar No. 1905046
                               connor.smith@stoel.com

                               *Attorneys for Plaintiff Groundfish Forum,*
                               *Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I filed a true and correct copy of the

foregoing document with the Clerk of the Court for the United States District Court,

District of Alaska by using the CM/ECF system, which will electronically serve a copy of

the foregoing on counsel of record.

/s/ Ryan P. Steen
Ryan P. Steen, AK Bar No. 0912084