Granta Y. Nakayama, *pro hac vice*
Ashley C. Parrish*, pro hac vice*
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Email: gnakayama@kslaw.com
      aparrish@kslaw.com

*Attorneys for Amici Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| GROUNDFISH FORUM, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>NATIONAL MARINE<br>FISHERIES SERVICE, et al.,<br><br>    Defendants. | Case No. 3:23-cv-00283-JMK |

**BRIEF OF AMICI CURIAE
SENATOR DANIEL S. SULLIVAN AND
<u>REPRESENTATIVE MARY SATTLER PELTOLA</u>**

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................................ 1

INTRODUCTION ..................................................................................................... 3

ARGUMENT ............................................................................................................. 5

I.    Congress Created Regional Fishery Management Councils to Manage and Conserve Fisheries in Federal Waters to Ensure their Long-term Health and Stability. .......................................................................................... 5

II.   The Council Appropriately Considered the Importance of Halibut for All Users. ............................................................................................................ 8

III.  The Council's Decision Reasonably Balances Competing Interests. .............. 11

CONCLUSION ........................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) .................................................................................. 8

*San Miguel Hosp. Corp. v. NLRB*,
  697 F.3d 1181 (D.C. Cir. 2012) ............................................................................. 8

**Statutes**

16 U.S.C. § 1801(b) ............................................................................................. 5, 7, 10

16 U.S.C. § 1802(5). .................................................................................................. 10

16 U.S.C. § 1851(a) ..................................................................................................... 7

16 U.S.C. § 1852(a) ............................................................................................. 3, 5, 6

16 U.S.C. § 1852(b) ..................................................................................................... 6

16 U.S.C. § 1852(c) ..................................................................................................... 6

16 U.S.C. § 1852(e) ..................................................................................................... 7

16 U.S.C. § 1852(h) ..................................................................................................... 7

16 U.S.C. § 1852(i) ...................................................................................................... 7

16 U.S.C. § 1853(a) .................................................................................................. 6, 7

16 U.S.C. § 1853(b) ..................................................................................................... 6

16 U.S.C. § 773 ............................................................................................................ 7

**Other Authorities**

NOAA,
  Final Envt'l Impact Statement for the BSAI Halibut Abundance-Based Mgmt. of
  Amendment 80 Prohibited Species Catch Limit ("*FEIS*") (2022),
  https://tinyurl.com/8re59ecy ................................................................. 9, 10, 11, 12

North Pacific Fishery Management Council,
  Halibut Bycatch, Fisheries & Issues (June 10, 2024),
  https://tinyurl.com/253te6r7 .................................................................................. 9

North Pacific Fishery Management Council,
  How We Work (June 15, 2024),
    https://www.npfmc.org/how-we-work/ ........................................................................ 7

# INTEREST OF AMICI CURIAE[1]

Amici Curiae are two members of Congress who represent Alaska and Alaskans: Senator Dan Sullivan and Representative Mary Sattler Peltola. Senator Sullivan currently serves on the United States Senate Committee on Commerce, Science and Transportation, which has jurisdiction over the Nation's marine fisheries, the regional fishery management councils, and the Northern Pacific Halibut Act of 1982, and is the Ranking Member of the Subcommittee on Oceans, Fisheries, Climate Change and Manufacturing. Before his election to the United States Senate, Senator Sullivan served as Alaska's Attorney General and Commissioner of the Alaska Department of Natural Resources. Representative Peltola currently serves on the United States House of Representatives Committee on Natural Resources, which has jurisdiction over fisheries and wildlife, marine affairs, and international fishing agreements. Before her election to the United States House of Representatives, Representative Peltola served as the Executive Director of the Kuskokwim River Inter-Tribal Fish Commission and on the boards of the Nature Conservancy and the Alaska Humanities Forum.

Amici share a bipartisan interest in ensuring that courts and parties respect the non-partisan decision-making process that Congress established when creating regional fishery management councils. One of those councils, the North Pacific Fishery Management Council ("Council"), is responsible for overseeing the public

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person made a monetary contribution to the brief's preparation or submission.

process that culminated in the approval of Amendment 123 to the Bering Sea and Aleutian Islands Fishery Management Plan.  Amici also share an interest in the continued well-being of the many Alaskans who depend on halibut and the Council's efforts to conserve Alaska's natural resources for the benefit of the fisheries and fishing communities that depend on them.  Halibut is an important source of employment, income, and often essential subsistence for many of Alaska's coastal communities.

Amici submit this brief to address two discrete issues:  (1) the nature of the public, consensus-building process that the Council undertakes when managing fishing resources, and (2) the importance of ensuring that halibut resources are appropriately managed, in tandem with the International Pacific Halibut Commission, for long-term sustainable use by the commercial, recreational, and subsistence sectors, including both direct and indirect use.  These two issues provide essential context for evaluating the merits of this case and the arguments presented by both sides.

# INTRODUCTION

In considering the issues raised in this case, the Court should respect the results of the public administrative process that, after six years of substantial stakeholder engagement and careful scientific and economic analysis, culminated in the recommendations reflected in Amendment 123. Amendment 123 is an attempt to address the challenges arising due to a decline in halibut stocks, and the need to balance conservation burdens between those who fish directly for halibut and those who catch halibut indirectly. In particular, Amendment 123 changes the management approach in setting annual limits on the amount of halibut bycatch that may be caught by the companies comprising the trawl "Amendment 80" sector that harvests groundfish species in Alaska's Bering Sea and Aleutian Islands. Instead of a fixed limit on halibut bycatch, Amendment 123 establishes a variable limit that becomes more conservative when overall halibut populations decline, and less so as abundance increases.

Congress created the Council to establish regulations for fisheries in the "Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska" through a public process that includes open meetings, technical reviews, and opportunities for public input and comment. 16 U.S.C. § 1852(a)(1)(G). The Council's role is deliberative and iterative, as its decisions and decision-making process must be consistent with multiple federal laws, and it must balance a broad range of interests from a diverse set of stakeholders. Those interests include not only the Amendment 80 sector, but also the commercial and sport fishermen who target halibut, as well as coastal

communities and Alaska Native groups that have relied on halibut as an important subsistence resource for generations.

Amici recognize that no process is perfect, and that conservation and management decisions are often difficult. Congress created the Council, however, to establish a process that deliberately vests decision-making authority in a carefully vetted group of appointees who are bound by an extensive and deliberative public process to ensure that their decisions are driven by science, reflect a careful balance of a range of interests, and are informed by exhaustive information on the topic at hand. More specifically, Congress made it the Council's job to recommend measures that ensure sustainable management of fishery resources that are important to Alaska and the Nation as a whole, including by balancing the principles of the National Standards mandated in the Magnuson-Stevens Fishery Conservation and Management Act. Contrary to what plaintiff's brief suggests, there is no reason to assume that the Council has not properly considered the information collected through its comprehensive public comment and analytical process or that the Council has failed to take a balanced approach that seeks to fairly distribute conservation burdens when halibut populations drop below certain levels.

## ARGUMENT

**I. Congress Created Regional Fishery Management Councils to Manage and Conserve Fisheries in Federal Waters to Ensure their Long-term Health and Stability.**

Amici have a strong interest in ensuring that the Council's transparent and public process for managing federal fisheries in Alaska is respected. When Congress enacted the Magnuson-Stevens Act in 1976, it created a "national program for the conservation and management of fishery resources." 16 U.S.C. § 1801(a)(4)–(6).

Consistent with these objectives, the Magnuson-Stevens Act established separate councils to "exercise sound judgment in the stewardship of fishery resources" in each of eight separate regions across the United States. *Id.* §§ 1852(1)(G), 1801(b)(5). Congress tasked the North Pacific Fishery Management Council, as one of those eight administrative bodies, with responsibility for managing and conserving fisheries in Alaska, including in the Gulf of Alaska, the Aleutian Islands, the Bering Sea, and the Arctic. *Id.* § 1852(a)(1)(G). The Council's public process is intended to take account of, and then balance the interests of, the many U.S. stakeholders who benefit from proper conservation and management of the nation's fishing resources in Alaska. The process is designed to "enable States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of [fishery management] plans." *Id.* § 1801(b)(5).

The Council's process ensures that its recommendations are based on extensive scientific and economic analysis and public input, and its organizational structure reflects its members' expertise and experience in the federal fisheries under their

5

jurisdiction. The Council has 15 members, with 11 voting members. *Id.* § 1852(a)(1)(G). For the voting members, the Governor of Alaska nominates five private citizens, and the Governor of Washington nominates two private citizens. By statute, each of these members "must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding ... conservation and management." *Id.* § 1852(b)(2)(A). The four remaining voting members are principal officials from Alaska, Washington, Oregon, and the National Marine Fisheries Service ("NMFS"). *Id.* § 1852(a)(1)(G). The Council's non-voting members include the regional director of U.S. Fish and Wildlife Service, the district Commander of the U.S. Coast Guard, the executive director of the Pacific States Marine Fisheries Commission, and a representative of the U.S. Department of State. *See id.* § 1852(c)(1).

As an administrative body focused on conservation and management, the Council is well positioned to assess the challenges posed by variations in halibut stocks and to set appropriate restrictions on halibut bycatch that take account of the interests of many different stakeholders. Congress specifically vested the Council with responsibility for making recommendations that "establish specified limitations" that "are necessary and appropriate for the conservation and management of" the fisheries, including by adopting limitations on "bycatch" and the "use of specified types and quantities" of different methods of fishing. *Id.* §§ 1853(a)(11), (b)(3)–(4). In making these recommendations, the Council must consider the "social and economic needs" of affected States and "promote" the "development" of fishing, "including

6

bottom fish off Alaska … in a non-wasteful matter." *Id*. § 1801(b)(5)–(6). The Council also must take steps to "minimize adverse economic impacts on [fishing] communities … to the extent practicable." *Id*. § 1851(a)(8). While a separate governing body sets quotas for direct halibut fishing, *see id*. § 773, Congress expressly tasked the Council with responsibility for creating "conservation and management measures" that, to the extent practicable, apply to "minimize bycatch" and, if bycatch cannot be avoided, "minimize the mortality of [such] bycatch." *Id*. § 1853(a)(11); *see also id*. § 1851(a)(9).

The Council's process is designed to take account of complex scientific and economic information and the diverse interests of those who engage in, depend on, and are impacted by the federal fisheries in Alaska. The statute requires the Council to "meet at appropriate times and places in any of the constituent States of the Council." *Id*. § 1852(e). The Council typically has met five times a year, with each meeting lasting approximately seven days. *See* North Pacific Fishery Management Council, How We Work (June 15, 2024), https://www.npfmc.org/how-we-work/. The Council's "regular meeting[s] … [are] open to the public," and the Council publishes "[t]imely public notice of each regular meeting … including the time, place, and agenda of the meeting." 16 U.S.C. § 1852(i)(2)(A)–(C).

Significantly, the Council's decisions are subject to a "majority vote [by] the voting members present," and only "[a] majority of the voting members … constitute a quorum" sufficient to initiate a vote. 16 U.S.C. § 1852(e)(1). Once amendments are passed by a majority of a valid quorum, they are submitted to the Secretary of Commerce for approval. *See id*. § 1852(h)(1).

7

Given the Council's careful structure and its extensive public-engagement process, it is important that interested parties respect that process and afford the Council the presumption of regularity to which it is entitled. *See San Miguel Hosp. Corp. v. NLRB*, 697 F.3d 1181, 1186–1187 (D.C. Cir. 2012) (noting general principle that agencies are entitled to a presumption of regularity). Where, as here, an administrative body exercises judgment requiring the exercise of technical expertise and a careful balancing of relevant factors, applying clear statutory requirements to a well-developed administrative record, the Court should be wary of open-ended invitations to "substitute its judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014).

## II. The Council Appropriately Considered the Importance of Halibut for All Users.

When recommending Amendment 123, eight out of the 11 council members, including all six Alaska seats, voted to support the recommendation. In reaching that decision, the Council considered the broader social and economic consequences of new bycatch restrictions to the affected communities and user groups. The Council's approach revisited the harvest limits previously applied and recommended linking the halibut bycatch limit for the Amendment 80 commercial groundfish trawl fleet in the relevant groundfish fisheries to halibut abundance. Given the importance of halibut to all users, including local communities, the Council's variable approach is intended to prevent halibut bycatch from becoming a larger proportion of total removals in the Bering Sea and Aleutian Islands when halibut abundance declines.

Halibut has long been "integral to the health of Alaska marine ecosystems" and is "of great economic and cultural importance to stakeholders in Alaska and elsewhere in the United States." North Pacific Fishery Management Council, Halibut Bycatch, Fisheries & Issues (June 10, 2024), https://tinyurl.com/253te6r7. Halibut fishing is a cornerstone of Alaska's economy and local culture, and the Bering Sea is an important location for harvesting halibut. Commercial fishing vessels catch halibut that are processed and widely distributed to consumers domestically, and even internationally. Moreover, halibut fishing supports a vast network of businesses across the State, including fishing gear suppliers, boat builders, and transportation companies. Halibut also serves as a valuable food source for local communities, where halibut is a staple that provides essential nutrients and protein to local diets. As the Council's record shows, at least 17 Alaskan communities are "considered halibut-dependent," and 16 of those communities "are home to federally recognized Alaska Native tribes." NOAA, Final Envt'l Impact Statement for the BSAI Halibut Abundance-Based Mgmt. of Amendment 80 Prohibited Species Catch Limit ("*FEIS*"), at 262 (2022), https://tinyurl.com/8re59ecy.

Although the sustainable management of halibut stocks is essential to the long-term viability of many of Alaska's coastal communities, halibut stocks have declined in recent years, by almost fifty percent—from 133.4 million halibut in 2006 to less than 70 million halibut in 2019. *See FEIS*, at 62, 63. That decline is significant because under the existing regulatory quota system, overseen by the International Pacific Halibut Commission under the terms of a treaty between the United States

9

and Canada, halibut bycatch is subtracted from the total available halibut biomass before determining the annual allowable harvest levels for those who fish directly for halibut. As a result, when halibut biomass levels decrease, halibut bycatch becomes a greater portion of the overall allowable catch, and smaller amounts of halibut remain for commercial fishermen directly targeting halibut.

Contrary to plaintiffs' position, the questions for the Council were not only whether bycatch restrictions may have measurable impacts on halibut biomass but more broadly whether increased bycatch protections are appropriate to serve the "social and economic needs" of affected fishing communities and "minimize the economic impacts" on those communities, especially in circumstances when halibut stocks are at historically low levels. 16 U.S.C. § 1801(b)(5)–(6), (8). Total halibut catch for Alaska businesses and communities that fish in the Bering Sea declined by more than fifty percent between 2010 and 2020, and their revenues declined by an even greater percentage in that same time. *See FEIS*, at 185 (Table 4-5 and Table 4-6). It is thus not surprising that the Council would re-evaluate existing management measures and, in particular, whether the existing halibut bycatch measures were appropriate. Indeed, considering these broader consequences is important because Congress took care in the Magnuson-Stevens Act to define "conservation and management" to refer to all of the "measures []which are required to rebuild, restore, or maintain … fishery resource[s] … and []which are designed to assure that … a supply of food and other products may be [obtained], on a continuing basis," and that "long-term adverse effects on fishery resources … are avoided." 16 U.S.C. § 1802(5).

10

## III. The Council's Decision Reasonably Balances Competing Interests.

The Council confronted two primary issues before recommending Amendment 123. First, it had to decide whether the Amendment 80 sector's static bycatch limit should be updated and revised into a variable bycatch limit that would change depending on the annual levels of halibut stock. *See FEIS*, at 50. Second, if the Council decided to recommend a variable limit, it had to decide how much the bycatch limit for the Amendment 80 sector should be adjusted (both under status quo halibut stock levels as well as when halibut biomass levels are higher or lower). *Id.*

In addressing these questions, the Council decided to recommend changing the static approach and to apply a variable limit based on the same management approach—focused on the abundance of fishing stocks—that is generally applied to all fisheries throughout Alaska. *Id.* at 78. The Council also rejected more restrictive proposals, permitting the Amendment 80 sector's bycatch limit to rise 10 percent "above the current ... limit" when halibut stocks become more abundant. *Id.*

After years of careful information gathering and analysis, the Council had the appropriate information to make this recommendation. The Council spent more than five years launching broad-based research efforts into annual halibut levels, drafting policy proposals, engaging with community stakeholders, and reforming its proposals in light of feedback. *See FEIS*, at 50. The Council supported its decision with a more than four-hundred-page final environmental impact statement. Moreover, in a series of public comments and hearings, the Council considered the social and economic impacts on all affected stakeholders. *See id.* The Council engaged in rigorous

11

statistical analyses of Amendment 123's economic impact on the groundfish industry and the directed halibut sectors. *See id.* at 237.

By recommending a new approach, the Council has determined that halibut bycatch limits should vary with halibut abundance, similar to the approach that governs the directed fishery. Moreover, in reaching its recommendation, the Council proposed and carefully considered many alternatives to Amendment 123. *See FEIS*, at 70–71. It also balanced and weighed several factors, "including the likely impacts on the halibut stock and the affected participants in the Amendment 80 and directed halibut fisheries." *Id.* at 78. After careful consideration of multiple alternatives, the Council concluded that Amendment 123 was appropriately tailored to balance both economic and conservation concerns. The Council found that the Amendment 80 sector's average annual bycatch between 2016 and 2022 would not have approached the abundance-based limit created by Amendment 123 in any one of those years. *See id.* at 81. Moreover, to avoid an undue burden when overall halibut levels reach historically low levels, the Council restricted the potential catch limit to no less than 35 percent below the previous limit. *Id.*

\* \* \* \*

The problem of declining halibut stocks poses a significant threat to the social and economic well-being of Alaska's coastal communities and fisheries. In these circumstances, it is important that, as Congress has required, the Council be allowed to make the difficult conservation recommendations that are necessary to protect the halibut stocks and balance users' interests for the benefit of the Nation. The Council

has followed the processes and done the work that Congress intended. It is important that stakeholders are able to rely on that process, and that the Council's exercise of expertise, based on its analysis of extensive analytical materials and the results of a thorough public process, receives the respect to which it is entitled.

## CONCLUSION

The Court should deny the plaintiff's motion for summary judgment.

Respectfully submitted,

/s/ Ashley C. Parrish
Granta Y. Nakayama, *pro hac vice*
Ashley C. Parrish, *pro hac vice*
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Email: gnakayama@kslaw.com
aparrish@kslaw.com

*Attorneys for Amici Curiae
Senator Daniel S. Sullivan and
Representative Mary Sattler Peltola*

June 27, 2024