John L. Fortuna, *Pro Hac Vice*
Ari S. Gordin, *Pro Hac Vice*
JONES FORTUNA LP
111-A New Street
Decatur, GA 30030
Telephone: 404-282-4725
jfortuna@jonesfortuna.com
agordin@jonesfortuna.com

*Attorneys for the Central Bering Sea Fishermen's
Association, City of Saint Paul, Alaska, Alaska Longline
Fishermen's Association, Fishing Vessel Owners'
Association, Homer Charter Association, The Boat
Company, Petersburg Vessel Owners' Association,
Alaska Marine Conservation Council, Halibut
Association of North America, North Pacific Fisheries
Association, Aleut Community of St. Paul Island Tribal
Government, and the Seafood Producers Cooperative*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GROUNDFISH FORUM, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE, *et al.*,<br><br>Defendants. | Case No. 3:23-cv-00283-JMK |

## INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    I.   Halibut's Importance to Fishing Families and Communities ................................... 2

    II.  The Devastating Impacts of Bycatch on Halibut Fishermen and
        Communities ................................................................................................................ 3

    III. The Council's Efforts to Reduce Bycatch and Development of A123 ..................... 5

STATUTORY OVERVIEW AND STANDARD OF REVIEW .......................................... 8

ARGUMENT .................................................................................................................... 9

    I.   A123 is Consistent with National Standard 4 ...................................................... 10

        A.   A123 is not an "allocation" under National Standard 4 ................................. 10

        B.   A123 is consistent with National Standard 4's requirements ...................... 12

    II.  A123 is Consistent with National Standard 9 ...................................................... 18

        A.   The Council and NMFS properly exercised their Congressionally delegated
            authority to balance competing interests ........................................................ 18

        B.   GFF's assertions regarding economic losses lack merit ............................... 21

        C.   NMFS's practicability determination appropriately considered social and
            economic costs and benefits .............................................................................. 23

    III. NMFS Satisfied its NEPA Obligations .............................................................. 24

CONCLUSION ............................................................................................................... 25

CERTIFICATE OF COMPLIANCE WITH LENGTH LIMIT AND TYPEFACE AND
TYPE-STYLE REQUIREMENTS ................................................................................. 27

CERTIFICATE OF SERVICE ....................................................................................... 27

# TABLE OF AUTHORITIES

**Ninth Circuit Opinions**                                                    **Page(s)**

*Alaska Factory Trawler Assoc. v. Baldridge,*
   831 F.2d 1456 (9th Cir. 1987).................................................................. 15, 21

*Alliance Against IFQS v. Brown,*
   84 F.3d 343 (9th Cir. 1996) ............................................................. 9, 18, 21

*Douglas Cty. v. Babbitt,*
   48 F.3d 1495 (9th Cir. 1995) ...................................................................... 24

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) ................................................................... 25

*Nw. Envtl. Def. Ctr. v. Brennen,*
   958 F.2d 930 (9th Cir. 1992) .................................................................. 8, 9

*Oceana, Inc. v. Bryson,*
   940 F. Supp. 2d 1029 (N.D. Cal. 2013) .................................................... 25

*Pac. Dawn LLC v. Pritzker,*
   831 F.3d 1166 (9th Cir. 2016) ................................................................... 22

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
   747 F.3d 581 (9th Cir. 2014) ..................................................................... 25

*United Cook Inlet Drift Ass'n v. NMFS,*
   2022 U.S. Dist. LEXIS 109879 (D. Alaska June 21, 2022) ............................ 9, 10, 12

**Federal Court Opinions**

*Assoc. Fisheries of Me., Inc. v. Evans,*
   350 F. Supp. 2d 247 (D. Me. 2004) .............................................................. 8

*Associated Gas Distribs. v. FERC,*
   824 F.2d 981 (D.C. Cir. 1987) .................................................................. 14

*C & W Fish Co. v. Fox,*
   931 F.2d 1556 (D.C. Cir. 1991) .............................................................. 13

*Conserv. L. Found. v. Ross,*
   374 F. Supp. 3d 77 (D.D.C. 2019) ....................................................... 9, 25

*Conserv. L. Found. v. Evans*,
  360 F.3d 21 (1st Cir. 2004) ................................................... 24

*N.C. Fisheries Ass'n v. Gutierrez*,
  518 F. Supp. 2d 62 (D.D.C. 2007) ...................................... 9, 21

*Nat'l Coal. for Marine Conserv. v. Evans*,
  231 F. Supp. 2d 119 (D.D.C. 2002) .................................. 10, 13

*Oceana, Inc. v. Pritzker*,
  24 F. Supp. 3d 49 (D.D.C. 2014) .......................................... 18

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. FRA*,
  10 F.4th 869 (D.C. Cir. 2021) .............................................. 14

**United States Code**

16 U.S.C. § 773c ................................................................... 11

16 U.S.C. § 1802(5) .............................................................. 16

16 U.S.C. § 1802(42) ............................................................ 16

16 U.S.C. § 1851 ............................................................ 12, 16

16 U.S.C. § 1853(a)(14) ....................................................... 16

16 U.S.C. § 1854 .................................................................... 8

16 U.S.C. § 1854(a)(3)–(b) ..................................................... 9

16 U.S.C. § 1855 .................................................................... 9

**Other**

50 C.F.R. § 600.305(a)(1)-(3) ............................................... 15

50 C.F.R. § 600.325 ......................................................... 11, 16

50 C.F.R. § 600.350(d)(3) ...................................................... 24

50 C.F.R. § 600.350(d)(3)(i)(H)–(J) ........................................ 24

50 C.F.R. § 679.2 ............................................................ 10, 11

50 C.F.R. § 679.21 ................................................................ 13

81 Fed. Reg 24,714 (Apr. 27, 2016) ...................................... 5, 8

88 Fed. Reg. 53,704 (Aug. 8, 2023) ....................................... 15

88 Fed. Reg. 82,740 (Nov. 24, 2023) ....................................... 1

89 Fed. Reg. 19,275 (Mar. 18, 2024) ..................................... 15

Brett M. Kavanaugh, *Fixing Statutory Interpretation*,
129 Harv. L. Rev. 2118 (2014) .................................................................................. 19

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK                                                              iv
Case 3:23-cv-00283-SLG     Document 39     Filed 06/27/24     Page 5 of 32

**INTRODUCTION**

This case involves a challenge by the "Amendment 80" fleet (A80) of groundfish trawlers to overturn Amendment 123 (A123) to the Fishery Management Plan (FMP) for Groundfish of the Bering Sea and Aleutian Islands (BSAI). *See* 88 Fed. Reg. 82,740 (Nov. 24, 2023). A123 limits the amount of halibut A80 can kill as bycatch based on halibut abundance, allowing more bycatch when halibut are abundant and less when they are not. This type of "abundance-based management" — that is, using indices of abundance to set fishery limits — is a basic fisheries concept that has long been used to set catch limits for halibut and virtually every other managed fishery, along with bycatch limits for other species in the BSAI. A123 extends this common-sense principle to A80.

A80 is the largest source of halibut bycatch mortality in the BSAI. In 2022, it was responsible for almost 74% of the halibut bycatch mortality in all BSAI trawl fisheries. Between 2015 and 2022 alone, A80 killed and wasted almost 24 million pounds of halibut. The overwhelming majority of this bycatch was small juvenile fish inhabiting sensitive nursery areas where almost 90% of A80's bycatch occurs, preventing literally millions of juvenile halibut from migrating out to other areas along the Pacific coast, recruiting to the halibut fishery, or reproducing and contributing to the long-term health of the halibut stock.

Halibut fishermen and their communities have borne the burden of A80's bycatch, seeing their harvest limits reduced to conserve the halibut stock while A80's bycatch limits remained fixed at levels that, *by definition*, did not require bycatch to be minimized to the extent practicable, as National Standard 9 requires. A123 addresses this profound inequity, requiring A80 to share in the effort to conserve the halibut stock and to take reasonable and

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK                1

practicable steps to limit its impacts during times of low halibut abundance. It was adopted by the North Pacific Fishery Management Council with broad support; it follows Congress's clear mandate that bycatch be minimized; and it can be implemented using tools available today with little if any impact on A80 revenues. NMFS's conclusion that it is consistent with the Magnuson-Stevens Act is reasonable and supported by the record. The Groundfish Forum's (GFF) motion should be denied.

## BACKGROUND

### I. Halibut's Importance to Fishing Families and Communities

Halibut is an "iconic species" that holds tremendous economic, social, and cultural significance along the entire Pacific coast, where it is "highly valued … among commercial, recreational, charter, and subsistence fishermen." NOAA035282. Halibut fishing is one of the most important — if not the most important — sources of employment and income for many coastal Alaska communities, where fishing fleets' dependence on halibut often ranges from "90 percent or greater" to "virtually complete." NOAA004119–23. More broadly, through commercial fishing, family-run recreational charter fishing operations, the operation of onshore processing facilities, and the contribution of tax revenues, the halibut economy is critical to communities and small businesses from the Bering Sea and the Gulf of Alaska to Seattle, Washington, where many vessels that fish for halibut in the BSAI are based. *E.g.*, NOAA000194; NOAA000189–95; NOAA060223–25; NOAA000368–74; NOAA059686–87, 881–93; NOAA042466–68; NOAA004126.

Halibut fishing is also a cultural touchstone "for fishermen and their associated communities," where halibut fishing is both "a meaningful vocation and way of life."

NOAA004163. In these communities, the halibut fishery's significance far "exceeds the economic value of the fishery." *Id.* This is especially true for predominantly Alaska Native communities in the BSAI, where the "cultural importance of halibut (as a species) and halibut fishing (as a traditional activity)" is well-documented and fishing is part of traditional practices "rooted in thousands of years of history." NOAA004125.

## II. The Devastating Impacts of Bycatch on Halibut Fishermen and Communities

Halibut stocks are managed by the International Pacific Halibut Commission (IPHC) under a Convention between the United States and Canada. Each year, the IPHC conducts a "stock assessment," which it uses to evaluate the health of the halibut population and set catch limits for each fishery sector in "regulatory areas" that extend from California to the Aleutian Islands and Northern Bering Sea. NOAA003885–88, 3905; Ex. 1, p. 1.[1]

While the IPHC sets annual limits on overall halibut mortality and limits for halibut, it has no power to limit the amount of halibut that can be killed as bycatch in U.S. fisheries, which are managed by the Council and NMFS. NOAA003888. Thus, under the IPHC's system, halibut killed as bycatch are subtracted from the total allowed fishing mortality before directed fishery catch limits are set. NOAA003887–88. In other words, mortality from bycatch is "taken off the top," so it directly reduces the amount of halibut available to other fisheries and users. NOAA003217; *see also* NOAA003887–88.

An enormous number of halibut are killed and wasted as bycatch in the BSAI. Based

---

[1] The FMP here generally coincides with IPHC "Area 4," which covers the parts of Area 4A and 4B north of the Aleutian Islands, along with Areas 4C, 4D, and 4E, which are managed together and simply called "Area 4CDE." NOAA003871.

on data from NMFS, trawl fisheries in the BSAI killed over 15,300 metric tons — *almost 34 million pounds* — of halibut between 2015 and 2022. NOAA000321; Ex. 1, p. 3. A80 is responsible for the overwhelming share of this bycatch. In 2022, A80 accounted for about 69% of the total bycatch mortality in the BSAI and almost 74% of all trawl-sector bycatch. *Id.* More, almost 90% of A80's bycatch is concentrated in parts of the Bering Sea that are home to large numbers of juvenile halibut and A80 kills them in great numbers. NOAA000318–19, 21; Ex. 1, p. 4. Between 2010 and 2020, about 55% of A80's bycatch *by weight* was juvenile halibut. NOAA004102. In 2016, that number was 71.8%. *Id.* And because these juvenile fish do not weigh much (under 5 pounds compared to over 22 pounds for the halibut fishery, NOAA050439), the millions of pounds of halibut A80 catches equates to huge numbers of juvenile fish, meaning that A80 kills literally millions more halibut than halibut fishermen are allowed to catch. NOAA000323–24; Ex. 1, p. 5.

Killing large numbers of juvenile fish is, in a word, bad. Juvenile bycatch in the BSAI "can affect the overall productivity of the stock," because these fish can never grow, reproduce, contribute to the halibut population, or recruit to the directed fishery. NOAA004031. Further, juvenile halibut from the BSAI migrate out to other areas. *Id.* (discussing "emigration of exploitable halibut from these areas"); NOAA050440 (70% to 90% of juvenile halibut tagged in the BSAI are recovered in the Gulf of Alaska). Thus, reducing mortality of these smaller halibut leads "to longer term benefits to the commercial halibut fisheries throughout the distribution of the halibut stock," benefiting populations and fisheries "in the Bering Sea and elsewhere as these halibut migrate and recruit into the commercial halibut fisheries." NOAA004192; NOAA003881. Indeed, an IPHC study finds

that every pound of bycatch reduction increases halibut fishery yield by as much as 144%, while other studies put the increase as high as 330%. NOAA003447; NOAA033074.

Bycatch has devastated the halibut fishery. The halibut stock declined by as much as 70% during the period from 1992 to 2010. NOAA003886; NOAA003216–17; Ex. 1, p. 2. Because the IPHC has no power over bycatch, however, its only management option to conserve the stock was to reduce fishery limits. Further, because bycatch limits for other fisheries did not vary with halibut abundance, bycatch consumed an ever-increasing proportion of the halibut as abundance declined. *E.g.*, NOAA003873; NOAA037449.

This created a profound imbalance. By 2014, bycatch mortality in the BSAI far exceeded commercial halibut fishery landings, especially in Area 4CDE, where bycatch skyrocketed and halibut fishery catches plummeted. NOAA037058; Ex. 1, p. 6. Indeed, bycatch was so high, and so few halibut were left over, that bycatch threatened to consume all the available halibut and preempt the halibut fishery entirely. *E.g.*, NOAA037059. This caused widespread economic uncertainty and pushed the halibut fishery in Area 4 to the brink of collapse, with catastrophic consequences for halibut fishermen and their communities. *E.g.*, NOAA003234–36; Ex. 1, p. 7–8.

## III.    The Council's Efforts to Reduce Bycatch and Development of A123

The Council began to address the harm caused by excessive bycatch in 2015, adopting Amendment 111 and reducing bycatch limits across all sectors by 15–25%. 81 Fed. Reg 24,714, 24,716 (Apr. 27, 2016). At that time, GFF and its members told the Council that reduced bycatch limits would result in "devastation to employees in our sector and the support industries that depend on it"; that they were already "using all available

means to reduce bycatch to the extent practicable," and that the reductions being considered "would be disastrous to Amendment 80 fisheries." NOAA000325. These threats proved empty, however — A80 reduced its bycatch to levels "well below" the new limits, while its revenues actually increased under the lower limits. NOAA035283; NOAA000325–26.

When the 2015 limits were set, the Council emphasized they were only a first step and further reductions were needed. NOAA035283. The Council thus began evaluating a range of complicated measures to set bycatch limits tied to halibut abundance, including "alternatives that applied to all groundfish fishing sectors."[2] However, after "extensive consideration of proposed changes" and stakeholder input, NOAA043184, and agonizingly slow progress despite devoting five years and enormous resources to the effort, the Council decided to simplify the action in two ways. First, it focused the initial abundance-based management effort on A80, explaining the fleet was "responsible for more than 60% of the annual halibut bycatch mortality in the Bering Sea"; that it had "already initiated" other actions to reduce bycatch in other trawl fisheries; and the remaining sectors "contribute a relatively small proportion" of the annual bycatch. *Id*; *see also* NOAA043160–62. Second,

---

[2] The Council considered a host of alternatives, including "complex multi-dimensional control rules," "alternatives that apply to all groundfish fishing sectors," "roll-over provisions," and various "survey indices" of halibut abundance, and even extending the action to include the entire Gulf of Alaska; it worked to develop a "simulation model" of the halibut stock and fishery responses that could inform its decision and set bycatch limits; it received extensive feedback from its Scientific and Statistical Committee (SSC) regarding the alternatives it was considering; and it heard from thousands of stakeholders across 28 Council meetings, not including meetings of its SSC and abundance-based management working group, where halibut bycatch limits were considered. NOAA003942–44; *see generally* ECF 20-1 & 25-2.

the Council abandoned its complicated "simulation model" and approach based on complex "multi-dimensional control rules," moving instead "to lookup table alternatives" submitted by stakeholders that would be "more transparent … to the public" and "analyzed in the traditional method." NOAA003942–44; NOAA035123.

These critical decisions finally let the Council make progress, and the Council adopted A123 in December 2021. NOAA060271–72. A123 establishes a variable bycatch limit for A80 using two fishery-independent indices of halibut abundance derived from scientific survey data — the IPHC Setline Survey and NMFS's Eastern Bering Sea trawl survey index — both of which are used in the IPHC stock assessments on which the directed fishery harvest limits are based. NOAA035283–84. Under A123, A80's annual bycatch limit remains at its prior level (1,745 mt) when abundance is high, but becomes increasingly protective as abundance declines, reaching 1,134 mt if halibut abundance were to reach the "very low" condition, which has never previously occurred. NOAA035313.

In setting the limits in A123, the Council struck a carefully considered balance among a range of alternatives. It emphasized both "the complex and challenging nature of this action" and the need "to establish abundance-based management of halibut PSC ["prohibited species catch" or bycatch] for the A80 groundfish fisheries and to promote continued participation of other fishery participants and communities dependent on the halibut stock in the BSAI." NOAA060296. And it declined to adopt more stringent cuts advocated by many users on grounds that the costs to A80 might be too high, instead selecting a middle-ground solution that, in its view, struck the "appropriate balance between the Magnuson-Stevens Act requirements to establish conservation and

management measures that minimize bycatch to the extent practicable under MSA National Standard 9 while achieving optimum yield on a continuing basis under MSA National Standard 1." *Id.* A123 was passed with broad support, with 8 of the 11 members voting to adopt it. NOAA060271–72.

NMFS approved A123 in March 2022 and adopted regulations implementing it in November 2023. NOAA001053; NOAA035282. Exercising its limited authority to review FMP amendments adopted by the Council, NMFS found A123 was both "necessary to comply with the obligation in the [MSA] that FMPs minimize bycatch to the extent practicable," and "consistent with the Magnuson-Stevens Act's National Standards." NOAA035282. This litigation followed.

## STATUTORY OVERVIEW AND STANDARD OF REVIEW

The MSA is our nation's primary fishery management law. Through the MSA, Congress created "an elaborate mechanism to weigh [the] competing interests" that permeate fishery management. *Assoc. Fisheries of Me., Inc. v. Evans*, 350 F. Supp. 2d 247, 249 (D. Me. 2004). To that end, Congress created eight regional fishery management councils, which it gave "primary responsibility" for establishing FMPs to regulate fishing in their region. *Id.* Congress, in turn, vested the Secretary of Commerce, through NMFS, with limited power to review FMPs and plan amendments approved by the councils to confirm they are consistent with ten National Standards set forth in the Act and other applicable laws. *Id.*; *see also Nw. Envtl. Def. Ctr. v. Brennen*, 958 F.2d 930, 932 (9th Cir. 1992); 16 U.S.C. § 1854(a). If NMFS determines an FMP or amendment is consistent with applicable statutes, it "shall approve" the amendment and "shall promulgate" regulations

implementing it. 16 U.S.C. § 1854(a)(3)–(b); *Nw. Envtl. Def.*, 958 F.2d at 932.

NMFS's approval of an FMP amendment is subject to review under the deferential arbitrary and capricious standard. 16 U.S.C. § 1855(f)(1); *United Cook Inlet Drift Ass'n v. NMFS*, 2022 WL 2222879, 2022 U.S. Dist. LEXIS 109879, at *29–30 (D. Alaska June 21, 2022) ("*UCIDA*"); *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007) ("Judicial review … under the [MSA] is especially deferential."). As this Court has observed, "[f]isheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges." *Id.* (citing *Gutierrez*, 518 F. Supp. 2d at 80). Thus, the Court's "only function is to determine whether the Secretary has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Alliance Against IFQS v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996) (internal quotations omitted).

Importantly, "it is the 'actions of the NMFS … [that] are subject to judicial review,' rather than the actions of the Council directly." *Conserv. L. Found. v. Ross*, 374 F. Supp. 3d 77, 94 (D.D.C. 2019) (quoting *NRDC v. NMFS.*, 71 F. Supp. 3d 35, 43 (D.D.C. 2014)).

> Particularly where a party challenges an FMP, plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 16 U.S.C. § 1851(a), a court's task is not to review de novo whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record. *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *16 (quotations and citation omitted).

## ARGUMENT

GFF argues A123 should be set aside for three basic reasons: (1) GFF claims A123 violates National Standard 4 because it is an "allocation" of fishing privileges that is not

"fair and equitable" and not "reasonably calculated to promote conservation"; (2) GFF asserts it violates National Standard 9, because its bycatch reductions are not "practicable"; and (3) GFF claims NMFS violated NEPA by failing to consider alternatives that would have set abundance-based bycatch limits for other fisheries. None of these claims has merit.

## I.     A123 is Consistent with National Standard 4

### A.     A123 is not an "allocation" under National Standard 4

GFF claims A123 "is an allocation" to the directed fishery under National Standard 4, ECF 26, p. 17–20, but GFF is wrong. Under National Standard 4, an "'allocation' is a 'direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals.'" *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *41 (quoting 50 C.F.R. § 600.325(c)(1)). A123 is not an allocation because setting bycatch limits does not "distribute" the opportunity to participate in any fishery.

Halibut is a "prohibited species" in groundfish fisheries, which A80 and other groundfish participants may neither target as part of the halibut fishery nor keep when caught incidentally. 50 C.F.R. § 679.2. Reducing A80's limit has no direct effect on the opportunity to harvest groundfish. It changes neither the species A80 may target nor the share of the total allowable groundfish catch assigned to any sector or participant. This is not an "allocation" under National Standard 4. *See Nat'l Coal. for Marine Conserv. v. Evans*, 231 F. Supp. 2d 119, 131 (D.D.C. 2002) (accepting that "measure to reduce bycatch … is not a type of allocation measure addressed by National Standard Four").

It is true that A123 has indirect allocative effects. As the Council and NMFS both recognized, halibut fishery limits are expected to go up when there is less bycatch mortality

for the IPHC to subtract from its annual harvest limits. *E.g.*, NOAA004160; NOAA035305. Considerations of fairness and equity, embodied in both National Standard 4 and the Halibut Act, also appropriately inform the decision to adopt A123. *See*, *e.g.*, 16 U.S.C. § 773c(c) (requiring any assignment of "halibut fishing privileges" to be "fair and equitable" and ensure that "no particular … entity acquires an excessive share"). But the Council "does not have direct authority over setting halibut catch limits," and A123 cannot make a "direct allocation or assignment of fishing privileges to the directed halibut fishery participants." NOAA004160.

Incidental and indirect effects, even if expected, do not make A123 an "allocation" under National Standard 4. Every "management measure … has incidental allocative effects." 50 C.F.R. § 600.325(c)(1). "[O]nly those measures that result in *direct distributions* of fishing privileges," however, are "judged against the allocation requirements of Standard 4." *Id.* (emphasis added).[3] The indirect allocative effects that GFF cites — and that were openly discussed by the Council and evaluated in the EIS — do not make A123 an "allocation" under National Standard 4. *Id.*

In the end, GFF's discussion of A123 lays bare its real complaint, which is that it will be forced to kill fewer halibut as bycatch when halibut abundance is low and the impacts of its bycatch on others are most profound. GFF specifically and repeatedly

---

[3] For similar reasons, GFF's focus on "catch limits" and "quotas" is misplaced. These terms are used in § 600.325 as examples of actions that could constitute a "direct and deliberate distribution of the opportunity to participate in a fishery." A123 does not do so for the reasons explained above, so it is not an "allocation" under National Standard 4.

describes A123 as "allocat[ing] the burdens of abundance-based management," complaining that it will be forced "to bear the entire burden of [the] new 'abundance-based' approach." ECF 26, p. 9–10, 18, 21. But National Standard 4 addresses "allocations" of "fishing privileges," not supposed regulatory "burdens" based on the manner in which bycatch limits are determined. That certain individual A80 companies *might* have to curtail operations at the end of *some unspecified future* fishing season (which the record shows is unlikely) does not make A123 an allocation or render it improper.

## B. A123 is consistent with National Standard 4's requirements

Even if A123 were an allocation under National Standard 4, NMFS's conclusion that it is consistent with the National Standards should be affirmed. National Standard 4 requires that allocations be: (1) fair and equitable and (2) reasonably calculated to promote conservation. 16 U.S.C. § 1851(a)(4). A123 meets both requirements.

### 1. A123 is fair and equitable

*First*, A123 furthers legitimate FMP objectives. "Allocations are 'fair and equitable' if they are 'rationally connected to the … furtherance of a legitimate FMP objective.'" *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *41 (quoting *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 890 (9th Cir. 2010)). Here, an objective of the FMP is to "reduce bycatch and waste," specifically by "manag[ing] incidental catch and bycatch," "control[ling] the bycatch of prohibited species," and "reduc[ing] waste to biologically and socially acceptable levels." FMP, p. 5, *available at* https://bit.ly/BSAI-FMP; NOAA031286. A123 is directly related to this goal, because reducing halibut bycatch during times of low halibut abundance reduces waste during these critical periods. NOAA035295 (amendment furthers

FMP objectives of "reduction of bycatch and waste"); NOAA035294 (Council's decision is a "rational approach … and promotes its wise use").

GFF does not assert that reduction of bycatch and waste is not a "legitimate FMP objective." Nor does it argue that A123, which reduces bycatch at times of low abundance, is not "rationally connected" to the objective of controlling bycatch and reducing waste. This alone satisfies the "fair and equitable" prong of National Standard 4. *See C & W Fish Co. v. Fox*, 931 F.2d 1556, 1563 n.13 (D.C. Cir. 1991) (explaining that bycatch reduction is a "legitimate objective" and upholding bycatch reduction measure as fair and equitable); *Nat'l Coal. for Marine Conserv.*, 231 F. Supp 2d at 131 (upholding measure that "furthers the 'legitimate FMP objective' of reducing bycatch").

*Second*, nothing about A80's bycatch limit is unfair or inequitable when considered against other groundfish sectors: A80 will remain the primary source of all halibut bycatch mortality in the BSAI, and its bycatch limits will continue to far exceed those of other sectors. Under A123, A80's limit of 1,745 mt essentially equals that of all other sectors combined and is more than double the 745 mt bycatch limit for other trawl sectors. *See* 50 C.F.R. § 679.21(b)(1). Even at the lowest levels, which are not in effect and may never be reached, A80's limit is 39.1% of the allowable bycatch across all sectors; over 150% of the limit for other trawl sectors; and dwarfs the bycatch of other non-trawl sectors, which are not major contributors. Giving A80 half of all allowable bycatch and more than double the other largest sectors is hardly unfair or inequitable to A80.

*Third*, A80 was not unfairly "singled out." GFF argues A123 is not fair and equitable because other fishery sectors were not also subjected to the "burdens of abundance-based

management." ECF 26, p. 21. But agencies do not "have to regulate a particular area all at once." *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. FRA*, 10 F.4th 869, 875 (D.C. Cir. 2021). Rather, agencies can move forward "pragmatic[ally]" and "'have great discretion to treat a problem partially' and 'regulate in a piecemeal fashion.'" *Id.* (quoting *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 409–10 (D.C. Cir. 2013) (cleaned up)). An agency is "entitled to the highest deference in deciding priorities among issues, including the sequence and grouping in which it tackles them," *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1039 (D.C. Cir. 1987), and "courts should not strike down a regulation" simply because "it is a first step toward a complete solution," *Transp. Div.*, 10 F.4th at 875 (quotations omitted).

While GFF complains that A123 does not change the bycatch limits for other sectors too, an agency is not required "to reweave the whole whenever it reweaves a part." *Assoc. Gas Distribs.*, 824 F.2d at 1039. Setting abundance-based limits is a "complex and challenging" task, NOAA060296, one where the Council spent years seeking a global solution before simplifying the action to focus on the problem's biggest contributor. Given A80's overwhelming contribution to halibut bycatch and where that bycatch occurs (in areas with high concentrations of juveniles), the Council's reasoned decision to focus on A80 — made "after extensive consideration of proposed changes," analysis of literally dozens of alternatives, and "after considering the issues identified in the problem statement, the amount of halibut bycatch in each fishery sector, input at numerous public meetings, and other proposed actions … in other fishery sectors" — is rational, fair, and equitable. NOAA035290; NOAA043273. So too is NMFS's endorsement of this "step-wise

approach," as "allow[ing] for a simplified and more efficient approach to adjusting halibut PSC management measures in the BSAI."[4] NOAA035290. In contrast, GFF's position that every Council action must either comprehensively address every sector and every part of a complex problem or be considered unfair and inequitable would cripple the Council and hamstring fishery regulation. National Standard 4 requires no such thing.

_Fourth_, to the extent GFF suggests A123 "allocates" halibut between A80 and the directed fishery — which the Council and NMFS cannot do — A80's share is beyond fair. As discussed, bycatch mortality in Area 4 has exceeded directed fishery landings for years, threatening the halibut fishery with preemption and driving it to the brink of collapse. Even with A123, a limit of 1,745 mt is almost 60% of all allowable halibut mortality in Area 4 for 2024, while its current 2024 limit of 1,396 mt exceeds the total 2024 fishery limit in Area 4CDE by 151 mt or over 330,000 pounds.[5] Nothing about this is unfair or inequitable to A80.[6] Nor is it unfair and inequitable for A80 to manage its bycatch based on the same

---

[4] Consistent with its stepwise approach, the Council has reduced bycatch in other sectors. In narrowing A123, for example, it explained it had already initiated an action addressing the next largest source of bycatch (~20%). NOAA043184. This was adopted as Amendment 122, which reduced Pacific cod trawl bycatch limits by 12.5% in 2024 and 2025, respectively, for a total reduction of 25%. _See_ 88 Fed. Reg. 53,704 (Aug. 8, 2023).

[5] _See_ 89 Fed. Reg. 19,275, 19,281–82 (Mar. 18, 2024). The 2024 fishery limit in Area 4CDE is 934 mt "net weight," _id._ at 19,282. This equates to 1,245 mt "round weight," the unit of A80's limit. _See_ NOAA003872 (0.75 conversion factor from net weight to round weight).

[6] GFF claims NMFS failed to conduct a "required" cost-benefit analysis, ECF 26, p. 21, but the cited provisions are guidelines to promote expeditious NMFS review, not actionable requirements. _See_ 50 C.F.R. § 600.305(a)(1)-(3); _Alaska Factory Trawler Assoc_. 831 F.2d at 1464. Regardless, the analysis was conducted and, "after considering the totality of potential impacts, including quantifiable and non-quantifiable economic and non-

(_footnote continued on next page_)

_Groundfish Forum, Inc. v. NMFS_
Case No. 3:23-cv-00283-JMK                    15

considerations of abundance used to manage the directed halibut fishery. NOAA035309.

*Finally*, A123 does not violate "Required Provision 14," as GFF suggests. ECF 26, p. 20, 23. That provision requires conservation measures that "reduce the overall harvest in *a* fishery" to allocate "any harvest restrictions" "fairly and equitably among the commercial, recreational, and charter fishing sectors in *the* fishery." 16 U.S.C. § 1853(a)(14) (emphasis added). Here, A123 does not reduce harvests in the BSAI groundfish fishery, which is the subject of the FMP. NOAA004079 (optimum yield in the BSAI groundfish fishery would be achieved even with zero A80 catch). Further, "recreational" and "charter" sectors do not exist in the groundfish fishery. *See* FMP, p. 110. GFF's complaint that A123 does not consider these sectors is unfounded.

### 2. A123 promotes conservation

In addition to being fair and equitable, allocations under National Standard 4 must be "reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(1)(4). "This requirement poses only a minimal hurdle," which A123 clears by any definition. *C & W Fish*, 931 F.2d at 1564 (D.C. Cir. 1991) (explaining measure "will prevent excessive by-catch and, accordingly, is reasonably calculated to promote conservation").

Applying the statutory definition of "conservation and management," A123 is "useful in rebuilding, restoring, or maintaining" both the halibut fishery and halibut stock, which are "distinct from and broader than" the coastwide spawning stock biomass.

_____

economic impacts, the Council and NMFS concluded that Amendment 123's overall benefits outweigh the negative economic impacts of this action and that Amendment 123 maximizes the net benefits to the Nation." NOAA035282; *see also* NOAA035299–300.

NOAA035294; 16 U.S.C. § 1802(5), (42). The common-sense approach of reducing waste in times of low abundance also meets the regulatory definition because it is a "more rational approach to managing the halibut resource" and "promotes its wise use." NOAA035294; 50 C.F.R. § 600.325(c)(3)(ii). And it is consistent with the ordinary meaning of "conservation," because it "avoid[s] wasteful or destructive use of" halibut. *See* Merriam-Webster, www.merriam-webster.com/dictionary/conserve (last visited May, 29, 2024).

GFF's repeated references suggesting there is no "conservation benefit" rely on a cramped definition of "conservation" that focuses only on potential changes to coastwide spawning stock biomass and recruitment — one that cannot be squared with either the statutory or regulatory definitions or the ordinary meaning of the term. *Compare supra*, *with* ECF 26, p. 24 (arguing A123 does not promote conservation "because it has 'very little impact on Pacific halibut spawning biomass and recruitment'" (quoting NOAA042367)). That participants in the long Council process may have sometimes used "conservation" in this narrower sense does not render NMFS's application of statutory and regulatory definitions unlawful.

GFF's focus on the words "could" or "may" to suggest that conservation benefits are only "potential" or "contingent" is also misplaced. First, these statements merely acknowledge the reality that the Council has no direct authority to set halibut harvest limits. Second, the benefits of A123 are both real and "expected." NOAA035294 ("by definition, lower halibut PSC limits *will result* in lower halibut mortality, which is *expected to* provide benefits to the coastwide halibut stock, the directed halibut fisheries, or both"); *id.* ("NMFS *expects* that much of the biomass conserved by this measure *will accrue* to the directed

commercial halibut fishing limits."). This conclusion is supported by the administrative record, which describes both the short and long-term benefits of reducing bycatch, not just potential or contingent impacts. *E.g.*, NOAA003881; NOAA004235; NOAA003251–52. Use of conditional words in this context does not render NMFS's conclusion arbitrary.

## II.    A123 is Consistent with National Standard 9

GFF asserts A123 violates National Standard 9 because the bycatch limits are "not 'practicable,'" claiming it will impose massive economic losses and there is nothing more A80 can do to limit its bycatch. ECF 26, p. 27–28. Neither claim is correct.

### A.    The Council and NMFS properly exercised their Congressionally delegated authority to balance competing interests

A123 reflects a careful balance by the Council among many competing objectives. Over a five-year period, the Council received extensive information from agency experts, stakeholders, and the public about how best to address the complex problems bycatch presents. It carefully analyzed both the tools available to A80 to reduce its bycatch, as well as the economic and social costs and benefits to all affected parties. And, on that basis, the Council made a reasoned determination that A123 reduced bycatch to the extent practicable, as National Standard 9 requires, which NMFS has affirmed. This is exactly how the MSA is supposed to work. *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 67 (D.D.C. 2014) (by using the phrase "to the extent practicable," Congress "delegated … discretion to weigh the relevant factors"); *Alliance Against IFQS*, 84 F.3d at 350 ("Congress required the Secretary to exercise discretion and judgment in balancing among

the conflicting national standards in section 1851.").[7]

GFF's assertion that A123's limits are not practicable provides no basis to overturn the Council's careful balance. A80 uniformly achieved the previous limits set by Amendment 111, never once approaching the static 1,745 mt limit, much less being constrained by it. NOAA000322. What is more, A80's current bycatch levels using its existing fishing practices are already below the limits set by A123 in many years. *E.g.*, NOAA000330–31; Ex. 1, p. 9. Thus, A80 can meet the new limits in many years without doing anything more than it already does today. And, to the extent further reductions are required, the record shows they can be readily achieved.

The EIS extensively discusses both the existing tools available to A80 and those under development (*e.g.,* NOAA004084–89), while also explaining that existing measures to reduce bycatch are not fully implemented. *E.g.*, NOAA003883, 4086, 4087; *see also* NOAA003205–06. It also explains how reducing limits will bring tools into use. "A fleet's last response to constraining halibut PSC limits is to reduce total groundfish harvest." NOAA004084. Thus, A80 will "optimize their harvest" in response to lower limits, including by "prioritizing fishing operations to the best target fishery, area, and time to

---

[7] Even Justice Kavanaugh, who is a vocal critic of agency deference, would agree it applies here. As he has explained, statutory language requiring a determination as to what is "reasonable," "serious," or "major" requires what can only be described as a delegated "policy decision," which "courts should be leery of second-guessing." Thus, courts should "still defer in cases involving statutes using broad and open-ended terms like 'reasonable,' 'appropriate,' 'feasible,' or '*practicable*,'" allowing agencies to "choose among reasonable options allowed by the text of the statute." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2152–54 (2014) (emphasis added).

maximize net revenue, and reducing effort in the target fishery, area, and time that produce less net revenue." *Id.* This assumption is especially appropriate for A80, where certain species like low-priced yellowfin sole, *see infra* n.8, account for a disproportionate share of the bycatch. NOAA004001–04; NOAA060474.

Similarly, measures like excluders, which NMFS researchers have found to be highly effective (excluding between 83.7% and 93.7% of halibut by weight) but result in marginal cost increases, will become more cost-effective as bycatch limits are reduced and each pound of halibut bycatch becomes more valuable. NOAA004087–89; NOAA059664–66, 59737–41, 59976–60021. As a prominent natural resources economist explained:

> The regulatory environment in which the fleet operates determines their willingness to innovate to reduce bycatch, and there exist ongoing margins for cost effective adjustment. Continued bycatch reductions require stricter regulation. Past reductions in bycatch and the adoption of proven by catch avoidance technologies have only occurred after bycatch limits were lowered. NOAA053012 (3:52:10 to 3:52:32); *see also* NOAA003425–26.

Advancement of these devices will only increase as they become more necessary and widely adopted; in fact, studies by "A80 fishermen of halibut excluders in the Bering Sea flatfish trawl fishery and to conduct field testing to explore improved designs" are occurring today. NOAA004087–88. *See also*, *e.g.*, NOAA059400–06; NOAA059407–13.

GFF's contrary claims are unavailing. Its assertion that A80 "'has *already* reduced halibut PSC usage to the maximum extent practicable using all available tools," and its threat that "member companies 'may not survive under substantially lower PSC limits," are identical to the claims GFF made about Amendment 111, which history has proven untrue. *Compare* ECF 26, p. 27, *with* NOAA000325–26. Similarly, statements made in

2016 regarding the practicability of further reductions were based on information available then; they say nothing about the purported impracticability of A123, given lessons learned over the past eight years. Finally, GFF's citations to statements from a *draft* EIS, ECF 26, p. 27–28, fail to account for information developed in response to the draft, which shows the needed reductions are readily achievable. *E.g.*, NOAA003205–06, 3264–75, 3293–94.

### B. GFF's assertions regarding economic losses lack merit

GFF suggests A123 is impracticable and arbitrary because it will inflict "enormous costs" and "staggering economic losses," repeatedly asserting it will cost the fleet "$100 million per year." *E.g.*, ECF 26, p. 7, 17, 23. These claims also lack merit.[8]

On the law, management measures are not impracticable because they are expensive. To the contrary, courts have approved management measures even when they "will undoubtedly have an adverse impact" on interested groups, *Alliance Against IFQS*, 84 F.3d at 350, or "some interest groups might be harmed," *Alaska Factory Trawler Assoc. v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987). *See also* NOAA004235. And "courts have consistently rejected challenges" under the National Standards when NMFS was

---

[8] GFF claims members "have been forced to tie up fishing vessels for the 2024 season as a result of A123." ECF 26-2, p. 7. Based on media reports, however, these decisions appear to be driven by market conditions and the low value of their target species. *See* Undercurrent News, *American Seafoods latest to tie up yellowfin sole vessel as industry seeks to counteract low prices with marketing* (May 28, 2024), https://bit.ly/UCN-YFS (reporting that "multiple US vessels elect not to operate in the Alaskan yellowfin sole fishery due to low prices," including non-A80 companies that are unaffected by A123, for which the decision is "100% market driven" and due to the sector being "too reliant on sending … yellowfin sole to China for processing"). Notably, members of A80 not over-invested in low-value yellowfin sole appear to be fully operating. *See id.*

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK          21

"aware of potentially devastating economic consequences," but "ultimately concluded that the benefits of the challenged regulation outweighed the identified harms." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 92. Where, as here, the "Council considered the potential negative economic and social impacts to the Amendment 80 sector," but concluded that A123 strikes the best "balance between potential costs to that sector and conservation of the halibut resource," NOAA004186, the Court should not substitute its judgment for that of the agency, *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1176 (9th Cir. 2016).

On the facts, GFF's claim that A123 will impose "staggering economic losses" of "$100 million" per year is meritless. Both the EIS and NMFS repeatedly state that the values GFF cites, which are based on economic models developed using historical data, "are not stand-alone predictions of future Amendment 80 revenues," NOAA035301, because they "do not capture behavioral adjustments such as changes in targeting, fishing location, or other halibut avoidance strategies that might have been employed" in past years had the limits been different, NOAA035282. Thus, they are useful only "to inform the reader of the relative difference in direction and magnitude of the alternatives" considered and should not be presented as actual estimates of future A80 revenues. *E.g.,* NOAA035301. In other words, the EIS and NMFS's decision both emphasize that the economic impact values GFF cites should not be used as GFF uses them here.

More, GFF's claims rely on selectively chosen and biased model runs that use data from periods when A80's bycatch limits were significantly higher; its fishing behavior was markedly different; and that do not represent future conditions. As NMFS explained:

> After extensive input from the public, the affected industry, and the Council's SSC, NMFS concluded that the 2016 through 2019 dataset is likely the best predictor of potential revenue impacts for the reasons stated in the Analysis. Data from years prior to Amendment 111's implementation (that is, prior to 2016) have higher PSC limits and less PSC avoidance behavior, meaning the 2016 through 2019 period is likely to be more reliable in predicting future results under lower PSC limits and more PSC avoidance behavior.

NOAA035301; NOAA004076–77 (due to "substantial changes in fleet operation," data from "more recent years are likely to be better representative of future outcomes.").

This is significant. As the EIS emphasizes, using unrepresentative historical data "has the largest impact" on modeled A80 revenues "of any other variations between the scenarios." NOAA004075. And when 2016 to 2019 data that reflect A80's current behavior are analyzed, the revenue impacts GFF cites dwindle or disappear entirely — ranging from *literally zero* to at most 2% under the 1,396 mt limit now in effect. NOAA004074. Further, extensive information in the record shows even these modest impacts are overstated, because they fail to account for adaptations that will occur in response to the new limits, and there are multiple rational steps A80 can take to minimize the limits' effects. *See* NOAA000336; NOAA059655–57. Given this, NMFS' determination that "the costs do not exceed what is practicable" is amply supported by the record.

### C. NMFS's practicability determination appropriately considered social and economic costs and benefits

Finally, GFF is wrong to claim (ECF 26, p. 26–27) that NMFS relied on factors Congress did not intend when it considered increased directed fishing opportunities and important social benefits that limiting bycatch will provide. The statutory term "practicable" intentionally delegates authority to NMFS to use its "expertise and

discretion" to interpret and apply it. *Conserv. L. Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004). And NMFS's regulations interpreting National Standard 9 specifically direct Councils to consider, among other things, "changes in the economic, social, or cultural value of fishing activities," "changes in the distribution of benefits and costs," and "social effects." 50 C.F.R. § 600.350(d)(3)(i)(H)–(J). Considering the benefits of A123 to the halibut fishery and the communities that depend on it was not improper.

GFF's claim (ECF 26, p. 20–21) that A123 improperly uses bycatch limits to effect an allocation is equally flawed. A80's bycatch was substantially below the prior limits for years. By definition, those limits did not ensure bycatch is minimized to the extent practicable. As the Council and NMFS explained, the "practicability of measures that address bycatch can evolve over time, and the Council and NMFS are required to revisit them" when available information shows existing measures do not satisfy National Standard 9's requirements. NOAA004162. In that context, it is both necessary and appropriate to consider the imbalance between A80's bycatch and other fisheries, and A80's disproportionate impacts in setting new limits. *See* 50 C.F.R. § 600.350(d)(3).

## III. NMFS Satisfied its NEPA Obligations

GFF asserts the EIS violated NEPA requirements by failing to consider alternatives imposing limits on other sectors, and by relying on an "unreasonably narrow" purpose and need statement. ECF 26, p. 29–31. GFF's arguments fail.[9]

---

[9] It is far from clear under Ninth Circuit precedent that NEPA applies to an action reducing harmful bycatch, which conserves the environment. *See Douglas Cty. v. Babbitt*, 48 F.3d

(*footnote continued on next page*)

Here, the purpose and need statement and the range of alternatives analyzed were reasonable. As GFF acknowledges (ECF 26, p. 21), the Council considered a wide range of alternatives, including adopting abundance-based limits for other groundfish sectors, but eliminated those alternatives from consideration and articulated a rational reason for doing so. *E.g.,* NOAA043184. Councils "are the primary bodies charged with developing FMPs in the first instance, a process that generally involves years of research and the weighing of various alternatives," while NMFS's "options are limited" to approval or disapproval. *Conserv. L. Found.*, 374 F. Supp. 3d at 117 (cleaned up). "Nothing requires the Agency to duplicate or supplement the Council's work," and NMFS "need not reanalyze alternatives previously rejected" by the Council. *Id.* (quotations omitted). GFF offers no reason why the purpose and need statement and alternatives analysis are inadequate given the Council's extensive work to develop alternatives and NMFS's limited statutory role.

## CONCLUSION

For these reasons, GFF's motion should be denied and the Council's careful balance adopted in A123 should be upheld.

---

1495, 1505 (9th Cir. 1995) ("[A]n EA or an EIS is not necessary for federal actions that conserve the environment."); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1090 (9th Cir. 2014) ("The Secretary's decision [to limit commercial oyster harvesting] is essentially an environmental conservation effort, which has not triggered NEPA in the past."). *But see San Luis & Delta-Mendota Water Auth. v. Jewell,* 747 F.3d 581, 646, 653 (9th Cir. 2014). Courts "have applied this rule to reject NEPA challenges where challenged actions maintained the status quo or had only beneficial environmental impacts," including approval of FMP amendments that "set[] catch levels equal or less than the levels permitted under [the prior FMP]." *Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1057, 1060 (N.D. Cal. 2013) (collecting cases and holding FMP changes that "will have only a neutral or beneficial effect on the environment" do not trigger NEPA obligations).

*Groundfish Forum, Inc. v. NMFS*
Case No. 3:23-cv-00283-JMK                    25

Respectfully submitted this 27th day of June, 2024.

/s/ *John L. Fortuna*
John L. Fortuna, *Pro Hac Vice*
Ari S. Gordin, *Pro Hac Vice*

Attorneys for Intervenor-Defendants

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMIT AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

1. This brief complies with the length limit set by this Court, because the document was prepared using a computer and, excluding the sections identified in L.Civ.R. 7.4(a)(4), is 25 pages.

2. This brief complies with the typeface and type-style requirements of L.Civ.R. 7.5 because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 for Business in 13-point Times New Roman font.

## CERTIFICATE OF SERVICE

I certify that on this date I filed the foregoing Intervenor-Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment with the Court's CM/ECF System, which will electronically serve the same on all parties.

/s/ *John L. Fortuna*
John L. Fortuna, *Pro Hac Vice*