TREG R. TAYLOR
ATTORNEY GENERAL

Aaron C. Peterson (Alaska Bar No. 1011087)
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov

*Attorney for State of Alaska*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| GROUNDFISH FORUM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL MARINE FISHERIES | ) | Case No. 3:23-cv-00283-JMK |
| SERVICE, *et al.,* | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | ***AMICUS CURIAE* BRIEF OF THE** |
| and | ) | **STATE OF ALASKA** |
| | ) | |
| CENTRAL BERING SEA | ) | |
| FISHERMAN'S ASSOCIATION, *et al.,* | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

ARGUMENT ....................................................................................................... 4

    I.    **Amendment 123 conforms to sustainability objectives of MSA without imposing inequitable or impracticable standards on the Amendment 80 Sector.** ............................................................................................... 4

        *a.*    *Amendment 123 will minimize harm to rural Western Alaska communities.* ..................................................................................... 4

        *b.*    *MSA's National Standards 1 and 8 mandate long-term viability of fish stocks.* ....................................................................................... 6

        *c.*    *Amendment 123 aligns with equitable standards outlined by National Standard 4.* ..................................................................... 11

        *d.*    *Federal fisheries programs designed to benefit rural Western Alaska depend on sustainably managed fisheries.* ...................................... 13

    II.    **Amendment 123 appropriately seeks to minimize the Amendment 80 Sector halibut bycatch.** .............................................................................. 18

        *a.*    *Minimizing bycatch is a critical function of the Fisheries Conservation Act.* ............................................................................. 18

        *b.*    *Conservation and economic benefits of bycatch reductions outweigh short-term costs.* .......................................................................... 19

        *c.*    *Amendment 123 accounts for Amendment 80 sector's disproportionate impact on bycatch.* ................................................ 20

CONCLUSION ................................................................................................. 23

# INTRODUCTION

The State of Alaska respectfully submits this brief to counter the Groundfish Forum claims regarding Amendment 123 to the fishery management plan (FMP) for groundfish in the Bering Sea and Aleutian Islands (BSAI) Management Area. Contrary to the plaintiff's assertions, NMFS's actions are neither arbitrary nor capricious, nor do they violate the Magnuson-Stevens Fishery Conservation and Management Act (MSA) or the National Environmental Policy Act (NEPA).

This briefing will focus on the paramount significance of sustainability as outlined in Magnuson-Stevens Act (MSA) National Standard 1, emphasizing the need to avert economic harm to fishing communities in line with National Standard 8, and underscore the imperative of minimizing bycatch, as mandated by National Standard 9. These objectives are especially crucial in the context of the Pacific halibut, a species of considerable importance to rural Western Alaska communities.

Halibut is critical to Alaska's economy, supporting commercial and recreational fishing, and attracting tourism, which generates significant revenue. It also holds cultural and subsistence importance for rural communities, providing a vital food source and maintaining traditional practices. Ensuring the sustainability of Pacific halibut not only supports ecological balance but also preserves the livelihoods and economic stability of fishing communities that rely on this resource. By aligning with these national standards, NMFS helps to ensure responsible fisheries management that protects the interests of rural Alaska communities and supports their ongoing development and prosperity. All of these objectives are fundamentally important to the State of Alaska.

# BACKGROUND

The Magnuson-Stevens Act, officially known as the Magnuson-Stevens Fishery Conservation and Management Act, is the primary law governing marine fisheries management in U.S. federal waters.[1] First enacted in 1976, the Act aims to prevent overfishing, rebuild overfished stocks, and ensure the conservation and management of the U.S. fishery resources.[2] To achieve its objectives, the MSA established an Exclusive Economic Zone (EEZ) extending 200 nautical miles from the U.S. coast, within which the United States has exclusive rights to conserve and manage marine resources.[3] The Magnuson-Stevens Act expressly preserves the jurisdiction of the states over fishery management within their boundaries.[4]

The act creates eight Regional Fishery Management Councils that develop Fishery Management Plans (FMPs) tailored to the specific needs of their regions.[5] These plans include measures such as annual catch limits (ACLs), overfishing limits (OFL), fishing seasons, and gear restrictions to regulate fishing activities.[6] Additionally, accountability measures are implemented to ensure compliance with ACLs and address any overages,

---

[1]     16 U.S.C. §§ 1801–1884, *Nat'l Res. Def. Council, Inc. v. Daley*, 209 F.3d 747 (D.C.Cir.2000); *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054 (9th Cir. 2005); *Pacific Coast Federation of Fishermen's Associations v. Blank*, 693 F.3d 1084 (9th Cir. 2012); *Oceana, Inc. v. Bryson*, 940 F.Supp.2d 1029 (N.D. Cal. 2013).

[2]     *See id.*; *See also Alliance Against IFQs v. Brown*, 84 F.3d 343 (1996).

[3]     *16 U.S.C. § 1802(11); See also City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 160 (4th Cir.2002).

[4]     16 U.S.C. § 1856(a)(1).

[5]     16 U.S.C. § 1852.

[6]     *See e.g. Oceana, Inc. v. Bryson*, at 1037.

which may involve adjustments to future catch limits or enforcement actions.[7] The Ninth

Circuit has explained how these measures work in harmony:

> In order to control for scientific uncertainty in identifying the overfishing limit, the guidelines require Councils to specify an "acceptable biological catch" level ("ABC"), which is defined as "a level of a stock or stock complex's annual catch that accounts for the scientific uncertainty in the estimate of OFL and any other scientific uncertainty." By taking into account scientific uncertainty, the "acceptable biological catch" level for a particular fishery is likely to be more conservative than the overfishing level for that same fishery. ("While the ABC is allowed to equal OFL, NMFS expects that in most cases ABC will be reduced from OFL to reduce the probability that overfishing might occur in a year."). Generally, when a Council sets an annual catch limit in a fishery management plan, the "ACL cannot exceed the ABC." The guidelines require Councils to "evaluate and describe" these metrics "in their [plans] and amend the [plans], if necessary, to align their management objectives to end or prevent overfishing" for "all stocks and stock complexes" considered to be located "in the fishery."[8]

The MSA details ten National Standards to guide the development and

implementation of FMPs in a manner that balances ecological sustainability with

economic and social considerations.[9] FMPs must comply with the standards[10] and NMFS

is permitted to balance the standards against one another.[11]

---

[7] *Id.*

[8] *Id.* (internal citations omitted). Also, Overfishing is defined as a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis. *See also San Joaquin River Group Authority v. National Marine Fisheries Service*, 819 F.Supp.2d 1077 (E.D. Cal. 2011)); *Oceana, Inc. v. Ross*, 483 F.Supp.3d 764 (N.D. Cal. 2020); *Oceana, Inc. v. Coggins*, 606 F.Supp.3d 920 (N.D. Cal. 2022).

[9] 16 U.S.C. § 1851(a)(1)-(10).

[10] *Pac. Coast Fed'n of Fishermen's Associations v. Blank*, 693 F.3d at 1087. (citing 16 U.S.C. §§ 1851(a), 1853(a)(1)(C), 1854(a)(1)(A)).

[11] *Pac. Coast Fed'n of Fishermen's Ass'n v. Locke*, No. C 10-04790 CRB, 2011 WL 3443533, at *9 (N.D. Cal. Aug. 5, 2011) (*citing Conservation Law Found. v. Mineta*, 131 F.Supp.2d 19, 27 (D.D.C.2001)).

# ARGUMENT

I. **Amendment 123 conforms to sustainability objectives of MSA without imposing inequitable or impracticable standards on the Amendment 80 Sector.**

   a.   *Amendment 123 will minimize harm to rural Western Alaska communities.*

Pacific halibut is a cornerstone species for rural Western Alaska communities, providing essential income, employment, and food security.[12] The Community Development Quota (CDQ) Program was established to ensure that these communities benefit from the rich marine resources in the BSAI Management Area.[13] Overfishing and poor management of halibut stocks could devastate these communities, making sustainable management practices paramount. NMFS's adoption of Amendment 123 is thus a proactive step to safeguard halibut populations, ensuring that rural Western Alaska communities can continue to thrive and support their traditional ways of life.

Nearly all of the communities in the BSAI Management Area analyzed in the social impact assessment are considered "halibut-dependent," while the remaining are considered "substantially engaged."[14] The former are most vulnerable to overharvested halibut stocks, though all BSAI communities are impacted during times of halibut scarcity.[15] St. Paul in Area 4C remains the highest-producing halibut fleet of any

---

[12]   16 U.S.C.A. § 1855(i)(1)(A)(i)-(iv); *See also* Norton Sound Economic Development Corporation 2022 Annual Report, at 8, "most federally managed commercial species have been added to the [CDQ] program, granting western Alaskan residents ten percent of the Bering Sea fisheries through direct allocations that include [] halibut…." And "NSEDC approaches our investments in IFQ and fishery operations with a strategic eye toward diversification."

[13]   *Id.*

[14]   NOAA003660.

[15]   *See id.*

community and one of the most reliant communities on halibut, as it accounts for 99% of their ex-vessel gross revenue.[16] The smaller community fleets of St. George and Savoonga even report absolute reliance at 100%.[17] And though most other community fleets have greater revenue diversification, a total of ten BSAI communities attribute more than 85% of their ex-vessel gross revenue to halibut.[18]

Rural communities within Area 4 could potentially experience the beneficial "incidental reallocative effects" from Amendment 123's implementation.[19] This is the case because, despite measures adopted by the Amendment 80 sector to reduce prohibited species catch (PSC) halibut mortality, Area 4 is still the most highly concentrated area for Amendment 80 halibut PSC, accounting for 83-90% of annual PSC occurrence.[20] Consequently, further PSC reductions would most likely benefit this area and its respective communities, including St. Paul (Area 4C), whose halibut ex-vessel revenues have dipped below the period average over each of the last seven years.[21] BSAI communities that fall within this region and identify as "halibut-dependent" would likely realize any potential indirect benefit to the directed fishery during low-abundance conditions.[22]

---

[16]    NOAA003735.

[17]    NOAA003680.

[18]    NOAA003769.

[19]    NOAA004121.

[20]    *Id.*

[21]    NOAA003735.

[22]    NOAA004121.

Furthermore, the potential benefits gained would help rural Western Alaska communities develop greater resilience during times of unpredictable resource availability and market volatility.[23] Amendment 123 reduces the likelihood that small-scale commercial halibut fisheries will shut down when resource abundance is low.[24] The State continues to recognize the importance of maintaining and supporting the vitality of these community fisheries ever since it first implemented: "[The program] is intended to provide stable, long-term employment in eligible communities by guaranteeing them a definite proportion of the halibut and sablefish resources."[25] And by ensuring these communities have access to sustainably managed halibut resources, Amendment 123 will continue to help communities in Western Alaska diversify their local economies and alleviate any growing socio-economic crises.[26]

   b.   *MSA's National Standards 1 and 8 mandate long-term viability of fish stocks.*

National Standard 1 of the MSA focuses mainly on the prevention of overfishing and achieving optimum yield on a continuing basis.[27] It reads "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis,

---

[23]   NOAA004125.

[24]   *Id.*

[25]   57 Fed. Reg. 57,140 (Dec. 3, 1992).

[26]   *Id.*

[27]   *San Joaquin River Group Authority*, at 1102, *Oceana, Inc. v. Ross*, at 783; *Oceana, Inc. v. Coggins*, at 923; *Oceana, Inc. v. Bryson*, at 1033.

the optimum yield from each fishery for the United States fishing industry."[28] Each clause in National Standard 1 is critical and should be examined.

Under the "Findings, purposes and policy" section of the MSA, Congress specifically stated that a "national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources."[29] In order to achieve this mandate, National Standard 1 directs that conservation and management measures must prevent overfishing.[30] It is the first clause of the first standard because without conservation, future yield will be reduced or eliminated.[31]

Preventing overfishing, the core function of the Act, is accomplished by setting limits on the amount of fish that can be caught within a certain period, the ACL, and establishing accountability measures to ensure that these limits are not exceeded.[32] But Congress recognized that a certain amount of scientific uncertainty in predicting a stock's overfishing level is inevitable.[33]

---

[28]     16 U.S.C § 1851(a).

[29]     16 U.S.C. § 1801(a)(6).

[30]     16 U.S.C. § 1853(a)(1)(A), 50 C.F.R. § 600.305, *Oceana, Inc. v. Bryson,* at 1035, *Parravano v. Babbitt*, 837 F.Supp. 1034 (1993).

[31]     See e.g.

[32]     58 Fed. Reg. 59,377 (Nov. 9, 1993).

[33]     *Oceana, Inc. v. Locke*, 831 F. Supp. 2d at 128. (*citing* 50 C.F.R. § 600.310(f)); *Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 213 (D. Mass. 2014) ("The objective of the control rule is to provide a buffer between OFL [overfishing limit] and ABC [acceptable biological catch] such that there is less than a 50% chance that overfishing will occur."); 50 C.F.R. § 600.310(f)(2)(i) (implementing regulations for

National Standard 1 also emphasizes achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.[34] The term "optimum yield" refers to the amount of fish that provides the greatest overall benefit to the nation, taking into account the protection of marine ecosystems, and with particular reference to food production and recreational opportunities.[35] The determination of the optimum yield is a decision-making mechanism for achieving a fishery management plan's objectives and balancing various interests to provide the greatest overall benefits to the nation.[36] Rural Western Alaska has a significant interest in sustainably managed fisheries, for both subsistence and commercial purposes.[37]

Finally, National Standard 1 highlights the importance of long-term sustainability of fishery resources in the context of "Maximum Sustainable Yield" (MSY). MSY is defined as the largest long-term average catch or yield that can be taken from a stock or

---

National Standard One stating that ABC "could be based on an acceptable probability (at least 50 percent) that catch equal to the stock's ABC will not result in overfishing").

[34]    16 U.S.C. § 1851(a)(1). *San Joaquin River Group Authority*, at 1102; *Oceana, Inc. v. Ross*, at 783; *Oceana, Inc. v. Bryson*, at 1036.

[35]    16 U.S.C. § 1802(33); *see also* 50 C.F.R. § 600.310(e)(3). *San Joaquin River Group Authority*, at 1084 (This optimum yield is typically "prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor" and "in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." 16 U.S.C. § 1802(33).)

[36]    *Oceana, Inc. v. Bryson*, at 1036. ("The guidelines note that '(t)he determination of (optimum yield) is a decisional mechanism for resolving the (Magnuson Act)'s conservation and management objectives, achieving a fishery management plan's () objectives, and balancing the various interests that comprise the greatest overall benefits to the Nation.' 50 C.F.R. S 600.310(b)(2)(ii).… Thus, under National Standard 1 and NMFS' implementing regulations, a plan must include conservation and management measures that both prevent overfishing (a rate of fishing which would jeopardize the capacity of a fishery to produce the maximum sustainable yield on a continuing basis) and achieve optimum yield (the maximum sustainable yield from the fishery as reduced by any relevant social, economic, or ecological factor.")

[37]    NOAA003708.

stock complex under prevailing ecological, environmental conditions, and fishery technological characteristics.[38]

The guidelines for National Standard 1 are detailed in the Code of Federal Regulations.[39] These guidelines provide a framework for establishing ACLs, accountability measures, and other management measures. Key aspects of these guidelines include regular scientific assessments of fish stocks to determine their status and trends, setting ACLs that prevent overfishing while allowing for sustainable harvests, and developing and implementing plans to rebuild overfished stocks to sustainable levels.[40] These measures ensure that fishery management is based on the best scientific information available, balancing ecological, economic, and social considerations for the long-term sustainability of fish populations and the benefits they provide to fishing communities.[41]

In the context of supporting the economic and social well-being of fishing communities, National Standard 1 works in conjunction with National Standard 8. Standard 8 addresses economic and social considerations, and aims to minimize, to the extent practicable, adverse economic impacts on fishing communities.[42] While there is considerable variation in different CDQ regions, the percentage of low-income residents

---

[38]    *San Joaquin River Group Authority*, at 1085; *Oceana, Inc. v. Ross*, at 768; *Oceana, Inc. v. Coggins*, at 923.

[39]    50 CFR § 600.310.

[40]    *Id.*

[41]    *Id.*

[42]    16 U.S.C. § 1851(a)(8); *see also* 50 C.F.R. § 600.345(b)(2); *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1122 (9th Cir. 2006)).

in each of these regions is greater than the analogous percentages for the general population of the state of Alaska.[43] National Standard 8 ensures that conservation and management strategies protect the economic well-being of these more vulnerable fishing communities and minimize adverse impacts to their sustained participation in BSAI fisheries, to the extent practicable.[44] This is especially important for CDQ communities, which are generally "remote, isolated places with relatively few commercially valuable natural assets with which to develop and sustain a viable, diversified economic base."[45]

More specifically, CDQ allocations provide communities with various opportunities to invest in "vessels, infrastructure, processing capacity, and specialized gear."[46] Both direct and indirect investments help CDQ groups develop greater market autonomy and diversification through opportunities like seafood branding, marketing, quality control training, and local employment.[47] These investments, in turn, create a more self-sustaining economy, in which CDQ-derived revenue "supports permit brokerages and revolving loan programs...that further sustain fisheries development."[48]

It should be clear that National Standard 1 is crucial for maintaining the health and productivity of U.S. fisheries. By preventing overfishing and ensuring that fish populations are managed sustainably, the law helps to secure the long-term viability of

---

[43]     NOAA003708.

[44]     See e.g. 50 CFR § 600.345

[45]     NOAA003995.

[46]     NOAA003996.

[47]     *Id.*

[48]     NOAA003996.

fish stocks, which in turn supports the economic and social well-being of fishing communities, including those under the CDQ program. And it does this along with National Standard 8 to ensure that fisheries are managed in a way that balances ecological, economic, and social considerations, providing benefits to current and future generations.

        c.      *Amendment 123 aligns with equitable standards outlined by National Standard 4.*

National Standard 4 further qualifies standard 1 and 8 by ensuring that conservation and management measures are grounded in principles of "fairness and equity."[49] Standard 4, however, does not preclude these measures from having differential impacts on people and corporations: "management measures that have different effects on persons in various geographical locations are permissible."[50] As long as these measures do not discriminate based on residence or implicate a discriminatory state-statute, "allocations" of fishing privileges that promote a legitimate FMP objective "may impose hardships on one group if they are outweighed by the total benefits received by another group."[51] Otherwise, they are considered "without [proper] cause." The long-term sustainability of halibut fisheries, as intended by Amendment 123, is a legitimate FMP objective.[52]

---

[49]      50 CFR § 600.325.

[50]      *Id.*

[51]      *Id.*

[52]      *Id.*

Standard 4 also requires that sector allocations are "rationally" connected to legitimate FMP objectives.[53] In *Fishermen's Finest, Inc.,* the North Pacific Council (Council) allocated higher than average Pacific cod Total Allowable Catch (TAC) to sectors that would benefit coastal Alaska communities.[54] Though this decision consequently "disadvantaged" Fishermen's Finest, Inc., the decision was the "rational" byproduct of Council's interest in expanding entry-level, local opportunities for coastal Alaskan communities to fish for Pacific cod.[55] In addition to considering socioeconomic factors, the Council's reallocation decision intentionally favored directed cod fisheries that reported less bycatch than Fishermen's non-AFA trawl CP sector: "[the] shift in percentage points [of TAC] was rationally justified by the need to preserve the more efficient directed cod fishery."[56] Thus, the rational basis for allocation decisions can come in myriad forms, from socio-economic considerations to historical bycatch records.

Here, Amendment 123 may have a slight impact to the Amendment 80 sector, but the allocation of PSC limits is fair, equitable, and "rationally" connected to the long-term sustainable objectives of halibut fisheries. Not only does NMFS's decision take into account the disproportionate impacts of the sector on halibut bycatch, but like the decision in *Fishermen's Finest*, it also considers the socioeconomic context of Western Alaska communities and their reliance on healthy, sustainably managed fisheries.

---

[53]     *Id*.

[54]     *Fishermen's Finest*, *Inc. v. Locke*, 593 F.3d 886, 892 (9th Cir. 2010).

[55]     *Id.*

[56]     *Id.* at 895.

Without Amendment 123 directed halibut fishers would suffer a disproportionate share of the economic harm during times of low abundance.

       d.     *Federal fisheries programs designed to benefit rural Western Alaska depend on sustainably managed fisheries.*

Many rural Western Alaska communities participate in federal fisheries through the CDQ program, which was established in 1992 as part of the Magnuson-Stevens Fishery Conservation and Management Act.[57] Under section 305 of the MSA, a percentage of certain fisheries' total allowable catch in federal waters off Alaska's coast is allocated to communities in Western Alaska.[58] These communities have historically relied on fishing as a primary economic activity.[59]

The CDQ program carries the stated the intention of "help[ing] develop commercial fisheries in communities on the Bering Sea coast by allowing them exclusive access to specified amounts of halibut and sablefish in the BSAI."[60] The program aims to promote economic development, provide job opportunities, and improve the living standards of these communities by allowing them to participate in commercial fishing activities.[61] The allocated quota can include various species such as pollock, cod, crab, and other groundfish.[62] Participating communities can form non-profit corporations to

---

[57]     NOAA003995.

[58]     *See* 16 U.S.C. § 1855(i)(1)(A).

[59]     NOAA003995.

[60]     58 Fed. Reg. 59,376 (Nov. 9, 1993).

[61]     NOAA003995

[62]     *Id.*

manage and distribute the fishing quotas.[63] Revenue generated from the sale of fish

caught under the program is used to "advance economic development" and fund various

community projects, such as infrastructure improvements, education, healthcare, and

cultural preservation.[64]

The program is open to certain communities in Western Alaska that meet specific

criteria, such as being located within defined geographic areas and having a certain level

of historical dependence on fishing.[65] These communities, which are specifically

identified in the Act,[66] are rural and predominantly Alaska Native. Participating

communities typically form non-profit corporations known as CDQ groups to manage

and distribute the fishing quotas.[67] These groups are responsible for overseeing fishing

operations, ensuring compliance with regulations, and maximizing the economic benefits

for their communities.[68] Once allocated quotas are obtained, groups may engage in

commercial fishing activities using various methods such as trawling, longlining, or pot

fishing, depending on the species targeted.[69] The harvested fish are processed and sold,

with revenues generated from the sale of fish contributing to the economic development

of the communities.[70] The revenue generated from fishing activities is reinvested into the

---

[63]     NOAA003996.

[64]     16 U.S.C. § 1855(i)(1)(J).

[65]     NOAA003995.

[66]     16 U.S.C. § 1855(i)(1)(D).

[67]     NOAA003996.

[68]     *Id.*

[69]     *Id.*

[70]     *Id. See also infra* footnotes 75-89.

communities through a variety of community development projects.[71] These projects may include infrastructure improvements (such as construction of harbors or roads), investment in education and workforce development, healthcare initiatives, housing programs, and cultural preservation efforts.[72]

The primary goal of the program is to support economic development, alleviate poverty, and promote social benefits in the eligible communities.[73] It also aims to provide these communities with opportunities to participate in the BSAI fisheries, which would otherwise be inaccessible due to the high costs of entry into the commercial fishing industry.[74] The MSA requires a periodic review of CDQ groups to ensure they are fulfilling program objectives, the most recent of which was a decennial review completed in 2022 by the Alaska Departments of Fish and Game, Labor and Workforce Development, and Commerce, Community, and Economic Development.[75]

There are currently six CDQ groups that represent the eligible communities:

▪ Aleutian Pribilof Island Community Development Association (APICDA) represents Akutan, Atka, False Pass, Nelson Lagoon, Nikolski, and St. George. From 2011-2020 APICDA's Halibut CDQ allocation was harvested at near full utilization at

---

[71]    NOAA003644.

[72]    *Id.*

[73]    16 U.S.C. § 1855(i)(1)(A).

[74]    NOAA003734.

[75]    All reports available at https://www.commerce.alaska.gov/web/cdqinformation.aspx, last visited June 25, 2024.

96%.[76] The State's decennial review found that residents of APICDA member communities "have a strong historical dependency on the halibut fishery and harvest halibut allocations in both Area 4B and Area 4C."[77]

- Bristol Bay Economic Development Corporation (BBEDC) represents more than 30 communities in the Bristol Bay region, including Dillingham, King Salmon, Levelock, Naknek, Port Heiden, Togiak, and Ugashik. Halibut harvest in the 4E CDQ fishery has varied over the past several decades, from a high of over 200,000 pounds in 2020 to 60,942 in 2019.[78] BBEDC also participates in the 4D CDQ halibut fishery and several Individual Fishing Quota (IFQ) fisheries.[79] The State found that during the ten year review period the "percent utilization for the combined Area 4D/4E [halibut] harvest increased by an average of 2.9 points per year."[80]

- Central Bering Sea Fishermen's Association (CBSFA) represents St. Paul Island.[81]

- Coastal Villages Region Fund (CVRF) represents Chefornak, Chevak, Eek,

---

[76]     Aleutian Pribilof Island Community Development Association 2022 Annual Report, at 22. Available at https://www.apicda.com/wp-content/uploads/2023/10/Annual-Report-WEB-2022.pdf, last accessed June 24, 2024.

[77]     CDQ Program 2022 Decennial Review Report: APICDA. Available at https://www.commerce.alaska.gov/web/cdqinformation.aspx, last visited June 25, 2024.

[78]     Bristol Bay Economic Development Corporation 2019 Annual Report, at 13. Available at https://bbedc.com/wp-content/uploads/2020/09/BBEDC-2019-AR-ALLWEB.pdf, last accessed June 24, 2024.

[79]     *Id*. at 29

[80]     CDQ Program 2022 Decennial Review Report: BBEDC. Available at https://www.commerce.alaska.gov/web/cdqinformation.aspx, last visited June 25, 2024.

[81]     CBSFA is an Intervenor-Defendant in this litigation.

Goodnews Bay, Hooper Bay, Kipnuk, Konginanak, Kwigillingok, Mekoryuk, Napakiak, Napaskiak, Newtok, Nightmute, Nunam Iqua, Platinum, Quinhagak, Scammon Bay, Toksook Bay, Tuntutuliak, Tununak. CVRF receives CDQ halibut quota for Area 4D and 4E.[82] In the past, CDQ halibut quota was made available to in-region fishermen and processed at the Goodnews Bay facility in Platinum.[83] When the Platinum plant closed, CVRF began leasing halibut quota, "generating revenue for their region-wide benefits programs."[84]

▪ Norton Sound Economic Development Corporation (NSEDC) represents Brevig Mission, Diomede, Elim, Gambell, Golovin, Koyuk, Nome, Savoonga, Shaktoolik, St. Michael, Stebbins, Teller, Unalakleet, Wales, White Mountain. Fishers from this region harvested 36,156 pounds of halibut in 2022, earning a total of $280,209.[85] From 2012 to 2022, residents of NSEDC's member communities harvested almost their entire annual halibut allocation, without exceeding the annual allocations.[86]

▪ Yukon Delta Fisheries Development Association (YDFDA) represents Alakanuk, Emmonak, Grayling, Kotlik, Mountain Village, Nunam Iqua. Currently, YDFDA generates revenue with its halibut CDQ by leasing all of its halibut quota to

---

[82] CDQ Program 2022 Decennial Review Report: CVRF. Available at https://www.commerce.alaska.gov/web/cdqinformation.aspx, last visited June 25, 2024.

[83] *Id.*

[84] *Id.*

[85] Norton Sound Economic Development Corporation 2022 Annual Report, at 8. Available at https://www.nsedc.com/wp-content/uploads/2022-NSEDC-AR-NF-WEB-small.pdf, last accessed June 24, 2024.

[86] CDQ Program 2022 Decennial Review Report: NSEDC. Available at https://www.commerce.alaska.gov/web/cdqinformation.aspx, last visited June 25, 2024.

various harvesting partners in order to ensure a return from these investments.[87] The group "has maintained strong performance relative to halibut during the review period an average harvest rate of over 98 percent."[88]

Each of these groups manages the fishery allocations and other resources provided through the program to foster economic growth and development in their respective regions.[89] But that economic growth and development only comes to Western Alaska communities if the fishery is managed sustainably. The required sustainable management is achieved through Amendment 123.

## II. Amendment 123 appropriately seeks to minimize the Amendment 80 Sector halibut bycatch.

### a. *Minimizing bycatch is a critical function of the Fisheries Conservation Act.*

Amendment 123 also conforms to the objectives of National Standard 9, which directs conservation and management measures to "minimize bycatch...and the mortality of such bycatch," to the extent practicable.[90] The Amendment 80 sector vessels are required to discard PSC halibut upon catching them, dead or alive; mortality for released halibut is 85% and the sector's majority share of halibut PSC mortality consequently warrants further PSC restrictions, as imposed by Amendment 123.[91] Furthermore,

---

[87]    Yukon Delta Fisheries Development Association 2022 Annual Report, at 17. Available at https://ydfda.org/sites/default/files/2022-05/YDFDA_2019%20AnnReport%20.pdf, last accessed June 24, 2024.

[88]    CDQ Program 2022 Decennial Review Report: YDFDA. Available at https://www.commerce.alaska.gov/web/cdqinformation.aspx, last visited June 25, 2024.

[89]    *Id.*

[90]    16 U.S.C. § 1851(a)(9).

[91]    89 FR 17306, Table 21.

Amendment 80's increasingly efficient "deck-sorting" and investment in "halibut excluder designs" suggest that Sector 80 can practically accommodate these new bycatch restrictions.[92]

In *Fishermen's Finest*, the North Pacific Council (NPC) increased TAC allocations to the AFA trawl CP sector, because it had reported less bycatch than other sectors.[93] National Standard 9 justified the Council's preferential treatment for the former, given the Council's intent to further conserve cod fisheries and minimize total bycatch.[94] Similar to NPC, NMFS has discretion to differentially allocate PSC limits among participating sectors, as long as management decisions comport with the National Standards outlined by MSA. Out of all BSAI sectors, the Amendment 80 sector creates the largest annual dent on PSC mortality, and Amendment 123 is NFMS's fair and conservation-oriented response to help offset the sector's disproportionate impact on halibut bycatch.

      b.     *Conservation and economic benefits of bycatch reductions outweigh short-term costs.*

The plaintiff argues that Amendment 123 imposes unnecessary economic burdens on the Amendment 80 sector without providing conservation benefits.[95] However, this interpretation misrepresents the comprehensive analysis conducted by NMFS. The amendment is designed to ensure long-term sustainability and equitable resource

---

[92]    NOAA004018.

[93]    *Fishermen's Finest, Inc. v. Locke*, 593 F.3d at 893.

[94]    *Id*.

[95]    *See* Complaint and Petition for Review, at 6-7.

allocation, which aligns with the broader objectives of the MSA.[96] The plaintiff's focus

on immediate economic impacts neglects the critical importance of preserving halibut

populations for future generations, particularly for the CDQ groups that rely heavily on

this resource.

The reduction of halibut bycatch mortality is inherently a conservation measure.

Though NMFS does not predict Amendment 123 to influence Pacific halibut spawning

stock biomass, the PSC limits will reduce harvesting pressures on non-spawning stock,

specifically those that are less than 26 inches.[97] These fish will, in turn, support future

halibut stocks as they migrate and recruit into BSAI's commercial halibut fisheries.[98]

Again, NFMS conservation objectives are not short-sighted, as suggested by the plaintiff;

rather, they operate within a MSY framework that prioritize long-term sustainability and

optimum yield.

     c.     *Amendment 123 accounts for Amendment 80 sector's disproportionate impact on bycatch.*

The assertion that Amendment 123 unfairly singles out the Amendment 80 sector

fails to recognize the equitable considerations integral to NMFS's decision-making

process. The allocation of halibut bycatch limits takes into account the different

capacities and impacts of each sector, including the crucial role of CDQ groups in

---

[96]     NOAA003881 (Amendment 123 "would promote conservation of the halibut resource, improve its management, and create a more equitable distribution process between the directed and non-directed fisheries. In addition to supporting prosecution of groundfish fisheries, it is a highly valued fish species that supports directed subsistence, recreational, and commercial halibut fisheries coastwide.")

[97]     NOAA004171.

[98]     *See id.*

supporting indigenous and local economies. By prioritizing sustainability and equitable resource distribution, NMFS ensures that the benefits of the fishery are shared fairly among all stakeholders.

Moreover, Amendment 123 is meant to address Amendment 80's disproportionate impact on halibut mortality.[99] Therefore, NMFS's decision-making is not "without cause," nor is it unfair.[100] Amendment 80 is singularly responsible for 52% of annual halibut PSC mortality across all four primary groundfish sectors.[101] National Standard 4 requires IFQ allocation to comport with principles of "fairness and equity," and notes that "an allocation of fishing privileges may impose hardships on one group if they are outweighed by the total benefits received by another group."[102] Amendment 123 may impose new bycatch limits on the Amendment 80 sector, but these limits have been fairly and rationally decided given the sector's majority impact on annual halibut PSC:

> *The Council in October 2020 chose to focus this action only on the Amendment 80 PSC limits since the Amendment 80 sector comprises the majority of halibut PSC mortality in the BSAI (52% average from 2015-2020)...this action promotes the conservation of the halibut stock, provides greater fairness among direct and indirect users of the halibut resource, and may provide additional opportunities for the directed halibut fishery."[103]*

Even if the sector perceives these new limits as "hardships," they are outweighed by the collective long-term conservation benefits received by all four sectors, particularly

---

[99]     NOAA004266; NOAA004271.

[100]    50 CFR § 600.325.

[101]    NOAA003874

[102]    50 CFR § 600.325.

[103]    NOAA003874.

the CDQ groups that depend on robust halibut stocks. And while NMFS recognizes the sector's prior reductions in halibut bycatch, the Amendment 80 sector remains the majority entity responsible for annual halibut PSC mortality, which warrants the implementation of "additional [conservation] measures" to combat declining halibut stocks.[104]

The Amendment 80 sector is not being singled out in these conservation efforts. Concurrent with the implementation of Amendment 123, NMFS implemented a 25% halibut PSC reduction for the BSAI trawl catcher vessel Pacific cod sector, the groundfish sector with the second highest halibut PSC after Amendment 80.[105] The halibut PSC reduction for the trawl catcher vessel sector was implemented as part of a rationalization program for that sector and highlights that NMFS is actively managing and reducing halibut PSC for other sectors.

Lastly, the plaintiffs contend that the bycatch measures under Amendment 123 are impracticable for the Amendment 80 sector.[106] This argument overlooks the advancements in bycatch reduction technologies and practices that have been adopted by various sectors, including the Amendment 80 fleet.[107] These advancements have demonstrated that further reductions in bycatch are both feasible and necessary to meet

---

[104]     NOAA003873.

[105]     88 FR 53710, Amendment 122 to the FMP of the BSAI Management Area.

[106]     *See* Complaint and Petition for Review, at 33.

[107]     *See e.g.* NOAA004017.

sustainability goals. NMFS's decision is grounded in a pragmatic approach that balances current technological capabilities with the imperative of conservation.

## CONCLUSION

National Standard 1 of the MSA mandates that conservation and management measures must prevent overfishing while achieving optimum yield. This principle is fundamental to Amendment 123, which aims to address the critical status of Pacific halibut stocks. The sustainability of halibut is particularly important for rural Western Alaska communities, including the 65 communities represented by CDQ groups. These communities depend on the health of halibut stocks not only for economic opportunities but also for cultural and subsistence purposes.

In summary, NMFS's approval of Amendment 123 is a well-considered decision rooted in the principles of sustainability, equity and fairness among competing users, and long-term conservation. It accomplishes this while appropriately balancing the ten national standards and creating a more equitable distribution process between the directed fisheries, including CDQ and IFQ fishers, and non-directed fisheries.

Amendment 123 aligns with the statutory requirements of the MSA, balancing the immediate needs of the Amendment 80 sector with the overarching goal of preserving halibut stocks for the benefit of all stakeholders.

DATED: June 27, 2024.

TREG R. TAYLOR
ATTORNEY GENERAL

By: /s/Aaron C. Peterson
    Aaron C. Peterson
    Senior Assistant Attorney General
    Alaska Bar No. 1011087
    Department of Law
    1031 West Fourth Avenue, Ste. 200
    Anchorage, AK 99501
    Phone: (907) 269-5232
    Facsimile: (907) 276-3697
    Email: aaron.peterson@alaska.gov

    *Attorney for State of Alaska*