# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

GROUNDFISH FORUM, INC.,

            Plaintiff,

    vs.

NATIONAL MARINE FISHERIES
SERVICE, *et al*.,

            Defendants,
   and

CENTRAL BERING SEA FISHERMAN'S
ASSOCIATION, *et al*.,

            Intervenor-Defendants.

CIVIL NO. 3:23-cv-00283-JMK

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS MOTION AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................. 1

II.     STATUTORY BACKGROUND ........................................................... 2

        A.      Magnuson-Stevens Fishery Conservation and Management Act ................ 2

        B.      The Halibut Act ........................................................................ 5

        C.      National Environmental Policy Act (NEPA) ................................. 6

III.    STATEMENT OF FACTS ................................................................... 7

IV.     STANDARD OF REVIEW ................................................................ 12

V.      ARGUMENT ...................................................................................... 12

        A.      The Rule complies with National Standard 4 ("NS4"). ............................ 12

                1.      The Rule did not allocate halibut within the meaning of NS4
                        because PSC limits are not "fishing privileges." ............................. 12

                2.      NMFS determined that the Rule satisfies NS4. ............................ 15

                        a.      The Rule is inherently fair and equitable. ............................ 16

                        b.      The Rule promotes conservation of halibut. ........................ 21

                        bc.     The Rule is practicable. ........................................................ 23

        B.      NMFS did not violate NEPA because Amendment 123's scope is
                consistent with its statutory authority and the EIS contains a
                reasonable range of alternatives within that scope. ................................... 26

VI.     CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*All. Against IFQs v. Brown*,
  84 F.3d 343 (9th Cir. 1996) .................................................................. 14, 21

*City of Alexandria v. Slater*,
  198 F.3d 862 (D.C. Cir. 1999) ................................................................. 27, 29

*City of Carmel−By−The−Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir.1995) ....................................................................... 7

*City of New York v. U.S. Dep't of Transp.*,
  715 F.2d 732 (2d Cir.1983) .......................................................................... 6

*Communities, Inc. v. Busey,*
  956 F.2d 619 (6th Cir. 1992) ...................................................................... 29

*Conservation Law Found. of New England v. Franklin*,
  989 F.2d 54 (1st Cir. 1993) .......................................................................... 4

*Friends of Southeast's Future v. Morrison*,
  153 F.3d 1059 (9th Cir. 1998) ...................................................................... 6

*Guindon v. Pritzker*,
  240 F.Supp.3d 181 (D.D.C. 2017) ............................................................... 15

*Guindon v. Pritzker*,
  31 F. Supp. 3d 169 (D.D.C. 2014) ................................................................ 4

*HonoluluTraffic.com v. Fed. Transit Admin.*,
  742 F.3d 1222 (9th Cir. 2014) .................................................................... 28

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) .................................................................................... 28

*Kootenai Tribe of Idaho v. Veneman*,
  313 F.3d 1094 (9th Cir. 2002) .................................................................... 27

*Lathan v. Brinegar*,
  506 F.2d 677 (9th Cir.1974) ......................................................................... 6

*League of Wilderness Defenders v. U.S. Forest Serv.*,
  689 F.3d 1060 (9th Cir. 2012) .................................................................... 28

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ...................................................................................... 6

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
  345 F.3d 520 (8th Cir. 2003) ...................................................................... 29

*Montana Wilderness Ass'n v. Connell*,
 725 F.3d 988 (9th Cir. 2013) ....................................................................... 30

*Morongo Band of Mission Indians v. F.A.A.,*
 161 F.3d 569 (9th Cir. 1998) ......................................................................... 6

*Mt. Graham Red Squirrel v. Espy*,
 986 F.2d 1568 (9th Cir. 1993) ..................................................................... 12

*N. L. R. B. v. Wyman-Gordon Co.*,
 394 U.S. 759 (1969) ...................................................................................... 26

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
 545 U.S. 967 (2005) ...................................................................................... 14

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
 606 F.3d 1058 (9th Cir. 2010) ................................................................ 27, 29

*North Carolina Fisheries Ass'n, Inc. v. Gutierrez*,
 518 F. Supp. 2d 62 (D.D.C. 2007) ............................................................... 28

*Ocean Conservancy v. Gutierrez*,
 394 F. Supp. 2d 147 (D.D.C. 2005) ............................................................. 21

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989) ........................................................................................ 6

*State of California v. Block*,
 690 F.2d 753 (9th Cir. 1982) ....................................................................... 29

*Tutein v. Daley*,
 43 F. Supp. 2d 113 (D. Mass. 1999) .............................................................. 3

*U.S. Postal Serv. v. Gregory*,
 534 U.S. 1 (2001) .......................................................................................... 12

*United Cook Inlet Drift Ass'n v. NMFS ("UCIDA")*,
 No. 3:21-CV-00247-JMK, 2022 WL 2222879 (D. Alaska June 21, 2022) ............. 4, 19

*United States v. Erstgaard*,
 222 F.2d 615 (9th Cir. 2012) ......................................................................... 5

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
 435 U.S. 519 (1978) ...................................................................................... 26

*Westlands Water Dist. v. U.S. Dep't of Interior*,
 376 F.3d 853 (9th Cir. 2004) .................................................................... 6, 26

*Wilderness Soc'y v. U.S. Forest Serv.*,
 630 F.2d (9th Cir. 2011) ............................................................................... 27

*Yakutat, Inc. v. Gutierrez,*
   407 F.3d 1054 (9th Cir. 2005) ................................................................. 16

**Statutes**

16 U.S.C. § 1801(a)(6) ........................................................................................ 2

16 U.S.C. § 1801(c)(3) ........................................................................................ 4

16 U.S.C. § 1802(2) ............................................................................................ 5

16 U.S.C. § 1851(a) ..................................................................................... *passim*

16 U.S.C. § 1851(a)(1) ..................................................................................... 22

16 U.S.C. § 1851(a)(8) ................................................................................ 3, 23

16 U.S.C. § 1851(a)(9) ................................................................................ 3, 21

16 U.S.C. § 1851(b) .......................................................................................... 3

16 U.S.C. § 1852(a)(1) ...................................................................................... 4

16 U.S.C. § 1852(b) ........................................................................................... 4

16 U.S.C. § 1852(h)(1) ................................................................................. 2, 4

16 U.S.C. § 1853(a)(14) ................................................................................. 15

16 U.S.C. § 1855(f)(1) ..................................................................................... 12

16 U.S.C. § 773b ......................................................................................... 5, 15

16 U.S.C. § 773c(c) .......................................................................................... 14

16 U.S.C. §§ 773-773k ...................................................................................... 5

5 U.S.C. § 706(2) ...................................................................................... 12, 26

5 U.S.C. §§ 701-706 ......................................................................................... 12

**Regulations**

40 C.F.R. § 1501.9 ............................................................................................ 27

40 C.F.R. § 1502.14 ................................................................................................. 7

50 C.F.R. § 600.325(c)(1) ................................................................................... 13, 14

50 C.F.R. § 600.350(a) .......................................................................................... 14

50 C.F.R. § 600.350(d)(4) ..................................................................................... 24

50 C.F.R. § 679.2 ..................................................................................................... 5

50 C.F.R. § 679.21(a)(2) ....................................................................................... 13

50 C.F.R. § § 600.305 .............................................................................................. 3

50 C.F.R. § § 600.345 ............................................................................................ 27

53 Fed. Reg. 19275 (March 18, 2024) ...................................................................... 5

58 Fed. Reg. 59375 (Nov. 9, 1993) ........................................................................ 16

72 Fed. Reg. 52668 (Sept. 14, 2007) ................................................................ 7, 8, 9

78 Fed. Reg. 75844 (Dec. 12, 2013) ...................................................................... 13

84 Fed. Reg. 55044 (Oct 15, 2019) ........................................................................ 10

86 Fed. Reg. 50331 (Sept. 8, 2021) ........................................................................ 11

87 Fed. Reg 75570 (Dec. 9, 2022) .......................................................................... 16

88 Fed. Reg. 30934 (May 15, 2023) .......................................................................... 3

88 Fed. Reg. 82740 (Nov. 24, 2023) ................................................................ *passim*

89 Fed. Reg. 17287 (March 11, 2024) ............................................................... 11, 20

## TABLE OF EXHIBITS

| Exhibit 1 | Map of the BSAI and Area 4 |
|-----------|----------------------------|
| Exhibit 2 | Amendment 80 Sector and Area 4CDE Directed Fisheries Comparison |
| Exhibit 3 | Examples of Other Abundance-Based Rules in this Region |

# TABLE OF ABBREVIATIONS

| BSAI | Bering Sea and Aleutian Islands |
|------|--------------------------------|
| Convention | Convention for the Preservation of the Halibut Fishery of the Northern Pacific Halibut |
| Council | North Pacific Fishery Management Council |
| Directed fishery | Commercial fishermen who target Pacific halibut |
| EBS | Eastern Bering Sea |
| EEZ | Exclusive economic zone |
| EIS | Environmental Impact Statement |
| FMP | Fishery management plan |
| Halibut | Pacific halibut |
| Halibut Act | Northern Pacific Halibut Act |
| IPHC | International Pacific Halibut Commission |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| mt | Metric ton |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| PSC | Prohibited species catch |
| SIA | Social impact assessment |
| The Rule | The final rule implementing Amendment 123 to the Fishery Management Plan for the Groundfish of the Bering Sea and Aleutian Islands |

# I. INTRODUCTION

To address low abundance of Pacific halibut biomass and a corresponding dramatic reduction in the amount of halibut available to the directed halibut fisheries and the rural, Native Alaskan communities that depend on these fisheries, the National Marine Fisheries Service ("NMFS") issued a rule under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") to implement Amendment 123 to the Fishery Management Plan for the Groundfish of the Bering Sea and Aleutian Islands ("BSAI"). During this time of low abundance, the Amendment 80 sector's bycatch limits (also known as prohibited species catch ("PSC") limits) remained static, resulting in the sector wasting more halibut (in the form of bycatch) than the directed halibut fisheries were authorized to harvest most years. These extraordinary circumstances initially led NMFS to issue a rule implementing Amendment 111 to reduce halibut PSC for a number of sectors, including Amendment 80. However, even as NMFS issued the Amendment 111 rule, it recognized that further reductions, in the form of abundance-based management, might be necessary. Since that time, the Amendment 80 sector's own data demonstrates that its halibut avoidance tools can dramatically reduce the sector's halibut PSC mortality and, thus, further reductions are practicable.

Plaintiff disregards this context and claims the Amendment 123 Final Rule ("Rule") violates the MSA and the National Environmental Policy Act ("NEPA") because it singles out the Amendment 80 sector and is not fair and equitable. These claims are not credible. The Rule reduces halibut PSC for the Amendment 80 sector because it causes the majority of halibut PSC. Moreover, there is nothing novel about

sector-specific or abundance-based rules. And, although NMFS determined that Amendment 123 does not constitute an allocation under National Standard 4, NMFS nevertheless determined that the Rule is fair, equitable, promotes conservation, and is practicable. Finally, the refined scope of Amendment 123 was the result of public engagement—the touchstone of the NEPA analysis. The alternatives analyzed in the EIS flow naturally from its scope and thus conform with NEPA's procedural requirements. In sum, the Court should grant summary judgment to Defendants because the Rule is supported by the record and fully complies with the MSA and NEPA.

## II.   STATUTORY BACKGROUND

### A. Magnuson-Stevens Fishery Conservation and Management Act

The MSA, 16 U.S.C. §§ 1801 et seq., establishes a national program for conservation and management of fishery resources with federal jurisdiction over such resources within the U.S. exclusive economic zone ("EEZ"). 16 U.S.C. §§ 1801(a)(6), 1811(a). Regulation of fisheries is accomplished through fishery management plans ("FMPs"), plan amendments, and implementing regulations. Id. §§ 1852(h)(1), 1853, 1854(a)-(c). The FMP for Groundfish of the Bering Sea and Aleutian Islands Management Area ("BSAI Groundfish FMP") governs groundfish fisheries in the Bering Sea and Aleutian Islands. *See* NOAA4592. The MSA sets forth required provisions for FMPs, including that FMPs must contain measures "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild

overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *See id.* § 1853(a)(1)(A).

All FMPs and their implementing regulations must be consistent with ten National Standards (NS). *See* 16 U.S.C. § 1851(a). NS4 requires that "[c]onservation and management measures shall not discriminate between residents of different States," and, "if it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." *Id*. § 1851(a)(4). NS8 requires conservation and management measures to "take into account the importance of fishery resources to fishing communities by utilizing economic and social data" to provide for "sustained participation of such communities" and "minimize adverse economic impacts." *Id*. § 1851(a)(8). NS9 requires FMPs to minimize bycatch and mortality of bycatch that cannot be avoided. *See id*. § 1851(a)(9). Advisory guidelines for the NSs are set forth at 50 C.F.R. §§ 600.305 *et seq.* The NS guidelines do not have the force and effect of law, 16 U.S.C. § 1851(b), and are not subject to judicial review under the MSA and Administrative Procedure Act. *See Tutein v. Daley*, 43 F. Supp. 2d 113, 121–125 (D. Mass. 1999). [1] Even so, courts give the guidelines "'considerable deference' in light of their thoroughness, the agency's

---

[1] NMFS has issued an Advance Notice of Proposed Rulemaking to amend the guidelines for National Standards 4, 8, and 9. *See* Fisheries of the United States, 88 Fed. Reg. 30934 (May 15, 2023).

expertise, and the administrative formalities involved in their promulgation." *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 198 (D.D.C. 2014).

The MSA established eight regional fishery management councils. 16 U.S.C. § 1852(a)(1). Alaskan fisheries are managed by the North Pacific Fishery Management Council ("Council"). *Id.* § 1852(a)(1)(G). Council members include federal and state fishery management officials and other fishery experts nominated by state governors and appointed by the Secretary. 16 U.S.C. § 1852(b). Councils are "simply advisory bodies and have no legal authority." *United Cook Inlet Drift Ass'n v. NMFS ("UCIDA")*, No. 3:21-CV-00247-JMK, 2022 WL 2222879, at *19 (D. Alaska June 21, 2022). Ultimately, NMFS is responsible for implementing, and ensuring compliance with, the MSA and other laws. *See Conservation Law Found. of New England v. Franklin*, 989 F.2d 54, 60 (1st Cir. 1993).

A council is required to prepare and submit to NMFS an FMP "for each fishery under its authority that requires conservation and management," as well as proposed regulations that the Council "deems necessary or appropriate" to implement the FMP. 16 U.S.C. §§ 1852(h)(1), 1853(c). NMFS reviews proposed regulations for consistency with the FMP and applicable law, and pursuant to a process set forth in the MSA, publishes proposed rules, solicits public comment, and promulgates final rules. *Id.* § 1854(b).

One of the MSA's principal goals is to "minimize bycatch and avoid unnecessary waste of fish." 16 U.S.C. § 1801(c)(3). Bycatch refers to fish that are unintentionally caught by a directed fishery that is targeting another species. The MSA defines bycatch as "fish that are harvested in a fishery, but which are not sold or kept for personal use."

16 U.S.C. § 1802(2). The MSA requires all FMPs to "include conservation and management measures, that to the extent practicable" minimize bycatch and minimize the mortality of bycatch that cannot be avoided. *Id.* § 1853(a)(11).

**B. The Halibut Act**

In 1953, Congress enacted the Northern Pacific Halibut Act ("Halibut Act"), 16 U.S.C. §§ 773-773k, to implement the Convention for the Preservation of the Halibut Fishery of the Northern Pacific Halibut ("Convention"), a treaty between the United States and Canada. The Convention authorizes the International Pacific Halibut Commission ("IPHC") to adopt regulations to conserve Pacific halibut, such as annual halibut catch limits, but such regulations are not effective in the United States until the Secretary of State, with the Secretary of Commerce's concurrence, accepts them. *Id.* § 773b. Once accepted, NMFS publishes notice of their efficacy. *See, e.g.,* 53 Fed. Reg. 19275 (March 18, 2024). By contrast, NMFS manages the groundfish fisheries in Alaska and promulgates their halibut bycatch limits (or "prohibited species catch" (PSC))[2] limits under the MSA. *See United States v. Erstgaard*, 222 F.2d 615, 616-17 (9th Cir. 2012).

_____

[2] Prohibited Species Catch is a term that the BSAI Groundfish FMP uses for bycatch of particularly valuable or important species in Alaska. Under the BSAI FMP, "Pacific halibut, Pacific herring, Pacific salmon and steelhead, king crab, and Tanner crab are prohibited species and must be avoided while fishing for groundfish and must be returned to the sea with a minimum of injury except when their retention is required or authorized by other applicable law." North Pacific Fishery Management Council, *Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area* 44 (Nov. 2020), https://www.npfmc.org/wp-content/PDFdocuments/fmp/BSAI/BSAIfmp.pdf ("FMP"); *see also 50 C.F.R. § 679.2.*

### C. National Environmental Policy Act (NEPA)

NEPA "does not mandate particular results, but simply prescribes the necessary process[]" that an agency must follow in issuing an EIS. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "A court must avoid passing judgment on the substance of an agency's decision." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). Instead, its focus is on ensuring that agencies took a "hard look" at the environmental consequences of their decisions. *Robertson*, 490 U.S. at 350. A court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Morongo Band of Mission Indians v. F.A.A.,* 161 F.3d 569, 573 (9th Cir. 1998) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

"Courts have afforded agencies considerable discretion to define the purpose and need of a project." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004) (internal citations and quotations omitted). Preparing an EIS "necessarily calls for judgment, and that judgment is the agency's." *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir.1974). Courts evaluate a Statement of Purpose and Need under a reasonableness standard. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066–67 (9th Cir. 1998). When an action is taken pursuant to a specific statute, the statutory objectives serve as a guide by which to determine the reasonableness of objectives outlined in an EIS. *City of New York v. U.S. Dep't of Transp.,* 715 F.2d 732, 743 (2d Cir.1983).

The regulations implementing NEPA require that an EIS must consider and assess the environmental consequences of the proposed action and reasonable alternatives to the action. *See* 40 C.F.R. § 1502.14. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1995) (internal citations omitted). "Project alternatives derive from an [EIS's] 'Purpose and Need' section." *Id.* Thus, a court begins by determining whether or not the "Purpose and Need" statement was reasonable. *Id.*

### III.    STATEMENT OF FACTS

Halibut is an iconic and highly valued fish with cultural significance for many Alaskan communities. NOAA1096, NOAA4839-40, NOAA3805-09, NOAA4766 (Table 4-7).[3] The commercial fishermen who target halibut ("directed fishery") often operate small vessels and depend exclusively on halibut for their livelihood in the northern and eastern Bering Sea ("Area 4CDE").[4] *See id.* And the rural communities in which these fishermen often live also depend on the directed fishery for their economic survival and cultural identity. *See id.*

The Amendment 80 sector constitutes a subset of the BSAI trawl sector and has an exclusive privilege to target six non-pollock groundfish species. *See* 72 Fed. Reg. 52668

---

[3] Citations to the administrative record begin with "NOAA" and include the relevant bates numbers, excluding any preceding zeros.

[4] *See* Ex. 1 (map of BSAI and Area 4CDE). The Rule's analysis focused on this area because it is where most of the Amendment 80 sector's bycatch occurs, and also where many of the halibut-dependent communities are located. *See* NOAA4616.

(Sept. 14, 2007). Trawl fishing generally involves dragging a large, weighted conical net along the ocean floor.[5] Although trawl fishing is highly effective, it is less capable of distinguishing between target and non-target species than other forms of fishing (e.g., hook and line). *See, e.g.,* NOAA4720. As a result, trawl fishing often results in higher levels of bycatch than other forms of fishing. *See, e.g., id.*

NMFS created the Amendment 80 sector in 2008 principally to mitigate the "race for fish" by creating incentives that would enable the sector to be less wasteful. 72 Fed. Reg. 52668, 52669. Prior to Amendment 80, trawl vessels competed among one another to harvest non-pollock groundfish species, which share similar habitat and are often harvested together. *Id.* This resulted in an "economic incentive to discard less valuable species," which resulted in the sector having "the lowest retained catch rates of any groundfish trawl fishery in the BSAI." *See id.* The sector also had little incentive to minimize PSC for halibut and other species. *Id.* at 52669-70. Amendment 80 addressed this, in part, by facilitating the formation of a cooperative through which participants could trade privileges to harvest target species and PSC limits to encourage more efficient fishing. *Id.* at 52672.

The Amendment 80 sector has generated significant revenue. Between 2010 and 2019, the wholesale value of the sector's annual haul ranged from around $307 million to $398 million – and total gross wholesale revenue across all activities was even higher.

---

[5] *See* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls.

*See* NOAA4698, 4701. Yet, although an explicit goal of Amendment 80 was to reduce halibut bycatch, 72 Fed. Reg. 52668, 52671, the Amendment 80 sector continues to account for more than three times the amount of halibut bycatch as the next highest sector in the BSAI – and most of this bycatch occurs in Area 4CDE. Ex. 2 (table comparing Amendment 80 PSC with the directed fisheries' halibut harvest), NOAA4616, NOAA4719-20 (Table 3-18), NOAA4827-28.

Since the 1990s halibut biomass has declined, and this decline became especially apparent in 2012 for the Area 4CDE directed fishery. NOAA4594. Yet, even as the directed fishery's halibut allocation shrank by two thirds in just a few years, the Amendment 80's PSC limit remained static and authorized annual waste of nearly 4 million pounds of halibut, whether halibut stock was abundant or low and declining. *See* Ex. 2. Throughout most of this time, the Amendment 80 sector wasted more halibut (as bycatch) than the Area 4CDE directed fishery was authorized to harvest. *See id.*

By 2014, the Council's Advisory Panel recommended an "emergency regulatory process" to reduce halibut PSC limits and to fast-track deck sorting procedures to address "dramatic declines of the directed [halibut] fishery catch limits" in the BSAI. NOAA35323-25. Less than two years later, NMFS issued a rule implementing Amendment 111, which reduced halibut bycatch limits for four sectors, including for the Amendment 80 sector. NOAA508-28. In the notice for the Amendment 111 rule, NMFS acknowledged additional halibut management actions were underway, including an evaluation of whether to link halibut bycatch limits to halibut abundance and an investigation into whether deck sorting could reduce halibut mortalities. *See* NOAA511.

Around this same time, the Council requested that the Amendment 80 sector develop a Halibut Avoidance Plan, which ultimately resulted in the sector increasing implementation of three principal avoidance measures beginning in late 2015: (1) selective fishing time/location, (2) halibut excluders, and (3) deck sorting.[6] *See* NOAA4736-40.

In December 2017, NMFS published a Notice of Intent to publish an Environmental Impact Statement (EIS) to evaluate abundance-based management of halibut PSC limits (or imposition of greater restrictions during low abundance and looser ones during high abundance) for groundfish fisheries in the BSAI. *See* NOAA7. For the next four years, the Council conducted approximately 20 public meetings to address this issue and invited public participation at meetings and by soliciting comments. *See id*. Although the Council initially sought to evaluate abundance-based management for all groundfish sectors, by December 2019, both the Council and stakeholders expressed concern that such an action would be too complex and would hinder reasonable consideration of the alternatives. *See* NOAA53002 at 8:07, 8:11, 8:16, 8:19, 8:32:30, 8:55. In February 2020, the Council heard testimony on ways to streamline the action and unanimously passed a motion to limit Amendment 123 to the Amendment 80 sector because it accounted for the vast majority of PSC in the BSAI. NOAA043065; NOAA53003 at 3:27, 3:29. This naturally simplified the action because different sectors

---

[6] As its name suggests, deck sorting allows halibut to be quickly sorted on deck, as opposed to first putting them in bins and sending them to the on-board observers for data collection, so they can be returned to the sea with higher chances of survival. See 84 Fed. Reg. 55044, 55046 (Oct. 15, 2019).

use different gear-types, which necessarily have different impacts and abilities to manage

PSC, and therefore different analytical considerations. *See* NOAA41812, NOAA41913

In September 2021, NMFS published the Draft EIS on the simplified action for

public comment. 86 Fed. Reg. 50331 (Sept. 8, 2021). The Draft EIS proposed five

alternatives, including one no-action alternative. NOAA4647-49. Halibut PSC limits

under the four action-alternatives ranged from 20% above to 45% below the Amendment

80 sector's then current PSC limit of 1,745 mt. *Id.* At the December 2021 Council

meeting, the Council voted to recommend a preferred alternative for NMFS's approval

and sent the proposed rule to NMFS in October 2022. NOAA4633. NMFS published the

proposed rule to implement Amendment 123 in December 2022 and the final rule in

November 2023. NOAA11. The final rule went into effect in January 2024. NOAA10.

The Rule provides that the Amendment 80 sector's annual halibut PSC limit is

determined by halibut survey results in the BSAI and a corresponding look up table. *See*

88 Fed. Reg. 82740, 82771 (Nov. 24, 2023).[7] The table establishes the PSC limit based

on the abundance state in the BSAI: high – 1,745 metric tons (mt); medium 1,396-1,571

mt; low – 1,309-1,396 mt; and very low – 1,134 mt. *Id*. The current abundance of halibut

is low for the IPHC index and high for the EBS survey, so the Amendment 80's PSC

limit for 2024 is 1396 mt. 89 Fed. Reg. 17287, 17302 (March 11, 2024). The final rule is

expected to minimize habitat mortality and may result in additional harvest opportunities

---

[7] The "look up" table is a matrix that contains PSC limits that correspond to results of the
IPHC setline survey and the Eastern Bering Sea (EBS) shelf trawl survey. NOAA4647.

in the commercial halibut fishery, as well as for the subsistence and recreational fisheries. *See* 88 Fed. Reg. at 82740 (Nov. 24, 2023).

## IV.   STANDARD OF REVIEW

Challenges to agency action are reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706. Under the APA, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A); *see also* 16 U.S.C. § 1855(f)(1). Judicial review under this standard is "extremely narrow," and a court cannot "substitute its own judgment for that of the [agency]." *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 6-7 (2001) (citation omitted). Courts are at their most deferential "where, as here, the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

## V.   ARGUMENT

### A.  The Rule complies with National Standard 4 ("NS4").

Contrary to Plaintiff's assertion, Pls.' Br. at 11-14, the Rule does not involve the type of allocation that is subject to NS4. But, even if it did, NMFS determined the rule is fair, equitable, practicable, and will achieve a conservation purpose – and thus complies with NS4.

1. The Rule did not allocate halibut within the meaning of NS4 because PSC limits are not "fishing privileges."

NS4's three-part test applies only to certain allocations and, by its plain language, does not apply to the bycatch limits established here. An allocation is defined as "a direct and deliberate distribution of an opportunity to participate in a fishery among identifiable, discrete user groups or individuals." 50 C.F.R. § 600.325(c)(1). Any management measure "has incidental allocative effects, but only those measures that result in *direct distributions of fishing privileges* will be judged against the allocation requirements of [NS4]." *Id*. (emphasis added). As explained in the MSA's implementing regulations, "[a]llocations of fishing privileges include, for example, per-vessel catch limits, quotas by vessel class and gear type, different quotas or fishing seasons for recreational commercial fishermen, assignment of ocean areas to different gear uses, and limitations of permits to a certain number of vessels or fishermen." *See id*. The halibut bycatch limit in the Rule is not encompassed by or analogous to any of these examples.

The Rule does not establish an allocation within the meaning of NS4 because a PSC limit is by definition not a "fishing privilege" or an "opportunity to participate" in the halibut fishery. NMFS has never "allocated" to the Amendment 80 sector any privileges to target or harvest halibut.[8] Instead, NMFS and the Council designated halibut as a "prohibited species" in the groundfish FMP, meaning that the Amendment 80 sector is required to avoid and is prohibited from retaining halibut unless an exception applies. *See* NOAA4592; 50 C.F.R. § 679.21(a)(2). This reading is consistent with NS9, which

---

[8] NMFS carefully allocated fishing privileges, or quota, to the commercial and charter sectors, leaving out many non-qualifying fishers. *See* 58 Fed. Reg. 59,375 (Nov. 9, 1993) (commercial sector's catch share program); 78 Fed. Reg. 75844 (Dec. 12, 2013) (charter sector's catch share program).

requires conservation and management measures that minimize bycatch. 50 C.F.R. § 600.350(a). Contrary to Plaintiff's suggestion, NMFS has not implemented a policy change with respect to how it evaluates prohibited species rules under NS4. *See* Pls.' Br. at 13. NMFS simply and adequately explained that this Rule does not directly allocate halibut in a manner that would be subject to NS4's requirements. 88 Fed. Reg. 82751, 82755; *see Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005) (an adequately explained change in policy is not invalidating). Thus, the halibut PSC limit is the amount of bycatch mortality that is tolerated before the sector's directed groundfish harvest activities must be curtailed; it does not grant the Amendment 80 sector a privilege or opportunity to participate in the halibut fishery. To hold otherwise would expand fishing privileges in a manner that would undermine NMFS's ability to minimize bycatch and its longstanding halibut catch share program under which halibut privileges were carefully allocated according to a specific formula based on participation in the directed fishery. *See All. Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996).

Implicit in Plaintiff's argument is that the Rule constitutes an allocation to the directed fishery. But halibut allocations are not governed by the MSA and, thus, are outside the scope of this case. *See* 16 U.S.C. § 773c(c); ECF No. 1 ¶¶ 84-88. Even if they were governed by the MSA, the Rule will at most have an indirect or secondary allocative impact on the directed halibut fishery – not the direct and deliberate distribution that is required to implicate NS4. *See* 88 Fed. Reg. 82740, 82751; 50 C.F.R. § 600.325(c)(1). By reducing halibut bycatch, the Rule may permit the IPHC more

latitude to decide whether to recommend allocating more halibut to the directed fishery in the future, consistent with the Convention and the Halibut Act. *See* 16 U.S.C. § 773b.

Nor do the MSA's requirements for FMPs convert the Rule into an allocation. *C.f.* Pls.' Br. at 12 (referring to 16 U.S.C. § 1853(a)(14) as "Required Provision 14"). MSA Section 1853(a)(14) applies only to actions "which reduce the overall harvest in a fishery," such as rebuilding plans for overfished stocks and similar measures. 16 U.S.C. § 1853(a)(14). Yet Plaintiff provides no evidence to support the contention that the Rule will or has reduced the Amendment 80 sector's overall harvest. Indeed, since the Amendment 80 sector began implementing deck sorting in 2015, its PSC has repeatedly been below the limits now established by the Rule – with the exception of the Rule's "very low" abundance scenario, which has not yet occurred. *Compare* Ex. 2, *with* NOAA4600. Even so, the Rule complies with MSA Section 1853(a)(14) because, as described below, NMFS considered the economic impact of each alternative, which is all the MSA requires. *Guindon v. Pritzker*, 240 F.Supp.3d 181, 200 (D.D.C. 2017) (holding that Required Provision 14 imposes a procedural obligation, and the Court need only ask whether NMFS produced the required assessments, without an evaluation of their conclusions).

While the Rule is not an allocation under NS4, the Court need not wade into this issue because, as explained below, NMFS determined the action is fair, equitable, practicable, and promotes conservation of halibut and is thus consistent with NS4.

2. <u>NMFS determined that the Rule satisfies NS4.</u>

Plaintiff's argument that the Rule is an allocation also fails on the facts. *See* Pls.'
Br. at 17-22. As NMF explained, even if the Rule made an allocation, it is consistent with
NS4. 88 Fed. Reg. at 82740, 82751 (final rule); *see also* 87 Fed. Reg 75570, 75579-80
(proposed Dec. 9 2022); NOAA1137-40; NOAA4880; NOAA4833; NOAA3781.

    *a. The Rule is inherently fair and equitable.*

To determine whether an allocation is fair and equitable, the Council and NMFS
must analyze whether such allocation is rationally connected to the achievement of a
legitimate FMP objective and provide justification. *See* 50 C.F.R. § 600.325(c)(3)(i)(A);
*see also Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1073 (9th Cir. 2005) (finding that a
decision does not lack a rational basis if it considers the fishermen's interests, considers
the relevant factors, and articulates a rational connection between the facts found and the
choice made). Consistent with NS1 and NS9, NMFS and the Council determined that
Amendment 123 would reduce bycatch and also prevent overfishing while achieving
optimum yield. NOAA1144-45; NOAA4593; NOAA4878-79. The Final EIS described
four justifications to support this determination: (1) when halibut abundance is low, the
Amendment 80 sector may be less likely to encounter it and may still be able to obtain
their total allowable catch; (2) when halibut abundance declines, the Amendment 80
sector becomes a larger proportion of the overall halibut mortality, which reduces the
halibut available to the directed fisheries and other users; (3) abundance-based
management may provide the Amendment 80 sector with new incentives to minimize
halibut mortality at all times (i.e., even when abundance is low); and (4) the Rule

promotes conservation of halibut because it reduces waste of bycaught halibut and lowers the amount of halibut mortality caused by the Amendment 80 sector by hundreds of thousands of pounds whenever the IPHC survey index is in the medium, low, or very low state. *See* NOAA4878-79. The Final EIS and Social Impact Assessment (SIA) included extensive evaluation of the social costs of each of the alternatives, including no action, and NMFS determined the action was fair and equitable. *See* NOAA3781, NOAA4833, NOAA1144-45, NOAA4850 ("[T]his action addresses an inequity and promotes fairness in halibut management such that when halibut abundance is low, both the directed fishery's allocation and the Amendment 80 fishery's PSC allotment will be adjusted based on estimated abundance.").

Consistent with the NS4 guidelines, NMFS identified benefits and hardships in the directed fishery associated with Amendment 123's alternatives (including the no action alternative). *See* 50 C.F.R. § 600.325(c)(3)(i)(B). The Final EIS cataloged the directed fishery's dependence on halibut and concluded that the Rule would "have a positive effect on all directed halibut fisheries." NOAA4849. It also identified 17 Alaskan communities that were halibut-dependent, of which all 17 had Alaska Native populations greater than 65 percent and all but one was a federally recognized tribe. NOAA4843-44. As such, disproportionate impacts to these communities under the no action alternative implicate environmental justice concerns and government policy on the rights of Alaska Natives. *See id;* 50 C.F.R. § 600.325(c)(3)(i)(B). For these rural communities "commercial fishing is not seen as a stand-alone socioeconomic activity, but an integral part of self-identity." NOAA4845. And, for some of these residents, their families have

been involved in halibut fishing for multiple generations and subsistence fishing in this area is rooted in "thousands of years of history." *Id*. Moreover, both halibut (as a species) and halibut fishing (as a traditional activity) are culturally significant for Alaska Native tribes. *Id*. In recent years, participation in commercial fisheries has become more challenging for these communities resulting in less flexibility to adjust to short- and long-term fluctuations in halibut availability. *Id*. And non-fishing sources of income and employment are limited in these areas. NOAA4845-46. In sum, the static PSC limit considered in the no action alternative could impose a hardship on these halibut-dependent communities by indirectly reducing their halibut allocation. NOAA4840.

NMFS also analyzed the relative benefits and hardships to the Amendment 80 sector. Although five Alaskan communities and greater Seattle might be affected by Amendment 123, none of these communities were found to be entirely Amendment 80-sector dependent. *See* NOAA4833-39, NOAA3633-39. Many of the five Alaska communities were also engaged in directed halibut fisheries activities and were, thus, also vulnerable to economic impacts from low abundance under the no action alternative. *See id*. This was true even in Unalaska/Dutch Harbor, the community that is "most closely associated" with Amendment 80 activities. *See id*. As for impacts to the Seattle area, where the Amendment 80 sector is largely based, "numerous variables" could impact the effect of PSC reductions and could be influenced by behavioral changes. *See* NOAA4838.[9] As a result, quantifying costs associated with any reductions is not

---

[9] Plaintiff seems to suggest that Amendment 123 had a discriminatory intent. *See, e.g.*, Pls.' Br. 10 (claiming the Council "singled out the Washington-based Amendment 80

straightforward. See *id.* Although potential lost income and employment opportunities for the Amendment 80 sector's crew is a concern, the Council noted that there are likely to be "many more alternate employment and income opportunities… in a large urban area than are available in smaller communities or rural settings." NOAA4839. Although Plaintiff place weight on revenue loss estimates, Pls.' Br at 4, the Final EIS repeatedly emphasized that these were worst case illustrations, not predictive of future revenue, and did not capture mitigation measures the Amendment 80 sector can employ to reduce PSC. NOAA4788, NOAA4796, NOAA4814, NOAA4852, NOAA4905.

NMFS properly weighed these benefits and hardships and determined that the Rule was fair and equitable. Even if the Rule imposes a hardship on the Amendment 80 sector, the MSA "clearly accounts for 'winners' and 'losers' in any distribution of privileges." *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv. ("UCIDA")*, No. 3:21-CV-00247-JMK, 2022 WL 2222879, at *15 (D. Alaska June 21, 2022). And an allocation under NS4 "may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups." 50 C.F.R. § 600.325(c)(3)(i)(B). As NMFS explained in the final rule, regulatory costs alone do not determine whether an

_____

sector"); *see id.* at 24. Yet, nothing in the proposed action "considers residency as a criterion for the Council's decision" and, although the Amendment 80 sector may be predominantly based in Seattle, residents of other states (including Alaska) participate in the sector. *See* NOAA3633. The final rule also explained that while the Amendment 80 cooperative may be based in Washington, the residency of the Amendment 80 cooperative or any of its members, employees, or associated persons is not the basis for Amendment 123. *See* 88 Fed. Reg. 82740, 82753. The action is a conservation and management measure applicable to the entire Amendment 80 sector, without regard to state of incorporation or residency. *Id.*

action is fair and equitable. *See* 88 Fed. Reg. 82740, 82751. In any case, NMFS determined linking halibut PSC limits to halibut abundance is more equitable than static PSC limits because "when abundance drops, a static level of halibut PSC represents a greater proportion of all halibut fishing mortality." *Id*. at 82747.

Contrary to Plaintiff's assertions, NMFS is not singling out the Amendment 80 sector. *See* Pls' Br. at 1, 16, 24. The Rule focuses on the Amendment 80 sector because it "is responsible for the majority of the PSC mortality." NOAA4880, NOAA4631. Among the BSAI groundfish fisheries, Amendment 80 is responsible for over 60% of the mortality of halibut. NOAA4720. In 2019 alone, the Amendment 80 sector bycaught and killed 1,461 mt (2.4 million pounds) of halibut. *See id.* Nor is there anything novel about a sector-specific rule. NMFS often issues sector-specific regulations because they are based on scientific, technical, and other factual considerations that are common to that sector. For example, NMFS recently reduced halibut PSC limits for another BSAI sector (the Pacific Cod trawl sector) by 25% over two years. *See* 89 Fed. Reg. 17287, 17305 (March 11, 2024). Similarly, NMFS has previously issued abundance-based management rules. Indeed, in crafting Amendment 123, NMFS looked to Amendment 91 (related to Chinook salmon management) as an example of an abundance- and performance-based management regime. NOAA4818-20; *see also* Ex. 3 (table with examples of other abundance-based rules in this region).

Altogether, the Final EIS dedicated hundreds of pages of analysis to thoroughly evaluating the relative impact of the alternatives on both the Amendment 80 sector and the directed fisheries. NMFS had years' worth of data demonstrating that the Amendment

80 sector routinely wastes more halibut as bycatch than the directed fisheries are collectively authorized to catch in Area 4CDE, and post-Amendment 111 data indicating that the Amendment 80 sector could further minimize halibut bycatch. Ex. 2. In the end, based on the Council's recommendation, NMFS concluded that the Rule's benefits in bycatch reduction and secondary benefits to the directed fisheries outweighed any hardships to the Amendment 80 sector. Where, as here, NMFS articulated a rational connection between the facts found and the choice made, the Court may not substitute its judgment regarding an allocation, even if the action will adversely impact the lives of fishermen. *See All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996).

     *b. The Rule promotes conservation of halibut.*

     The NS4 guidelines state that an allocation "may promote conservation by encouraging a rational, more easily managed use of the resource," 50 C.F.R. § 600.325(c)(3)(ii), thereby recognizing that management and conservation are often intertwined. NS4 must also be read in concert with NS9, which requires conservation and management measures to minimize bycatch to the extent practicable. *See* 16 U.S.C. § 1851(a)(9); *see also The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 158 (D.D.C. 2005) (National Standards should not be read in a vacuum, but in relation to other National Standards).

     NMFS determined that the Rule would promote conservation of halibut in both the short and long term by minimizing the Amendment 80 sector's halibut bycatch and improving consistency with the IPHC's halibut management. NOAA4656; NOAA1145. The Rule will conserve between 174 mt (medium/high) to 611 mt (very low) of halibut

each year, which is about 383 thousand to 1.35 million pounds of halibut. NOAA4600.

And NMFS explained that the Rule creates incentives to reduce halibut bycatch in the

Amendment 80 sector[10] and prevent the sector from causing a disproportionate share of

the overall halibut mortality in the BSAI, thereby promoting more rational management

of halibut. *See* NOAA4878-79. Although the Council acknowledged the Amendment 80

sector's concern that encounter rates have not been well correlated with halibut

abundance, the Council determined that the "imbalance among users" and need for

"greater conservation" of halibut required implementing the Rule to ensure that "the

Amendment 80 fisheries does not become a greater share of overall halibut removals in

the BSAI, particularly in Area 4CDE." NOAA4655.

Plaintiff seems to interpret 'conservation' in such a way that NMFS could never

promulgate a rule that reduces bycatch because some fish conserved by such an action

might still be subject to an allocation to a directed fishery. *See* Pls.' Br. at 17-18. Yet

such an interpretation directly contradicts the MSA's express directives that optimum

yield be achieved for (directed) fisheries and that bycatch (among non-directed fisheries)

be minimized to the extent practicable. *See* 16 U.S.C. § 1851(a)(1), (9). Plaintiff's

interpretation is also inconsistent with NS8 because it would prevent NMFS from

considering the importance of fishery resources to fishing communities when

---

[10] For instance, NMFS recognized that there was variability among the Amendment 80
sector's utilization of tools to minimize bycatch, and that the cooperative structure of
Amendment 80 afforded it an opportunity to further maximize halibut bycatch reduction.
*See, e.g.,* NOAA4879.

implementing conservation and management measures. NOAA1153; 16 U.S.C. §
1851(a)(8).

Plaintiff's reliance on cherry picked language from a draft EIS is also unavailing
because it ignores the context of these quotes. *See* Pls.' Br. 17-18. In 2019, a draft of the
EIS described Amendment 123 as an "allocation decision" in the context of explaining a
model used to evaluate alternatives' impacts on halibut stock. *See* NOAA42367.
Although the model conservatively assumed that the IPHC would reallocate a portion of
the halibut conserved by the Rule to the directed fishery, the Council lacks the authority
to do so directly and, thus, the IPHC would ultimately have to exercise its own expertise
and judgment before such an allocation could occur. NOAA4592. Moreover, even if the
IPHC allocates some of the conserved halibut, it could not allocate all conserved halibut
to the directed fisheries due to size requirements applicable to the directed fisheries.
NOAA4832. Thus, the smaller size halibut conserved might eventually contribute to an
increase in halibut biomass. NOAA4629, NOAA4850; *see also,* NOAA1122. Regardless,
the Council ultimately decided not to carry the modeling discussion over to the Final EIS
because the model reflected a large amount of uncertainty and was unable to reliably
estimate changes to halibut stock abundance based on changes in levels of PSC. *See*
NOAA4747-49.

c. *The Rule is practicable.*

When NMFS issued Amendment 111 in 2015, the Amendment 80 sector had not
yet meaningfully implemented some of the most important bycatch reduction tools
available to the sector. Under NS9, NMFS's obligation to minimize bycatch to the extent

practicable is an ongoing one. *See* 50 C.F.R. § 600.350(d)(4) ("Effects of implemented measures should be evaluated routinely."). Thus, NMFS's updated evaluation of what is practicable for the Amendment 80 sector properly included post-2015 data concerning the Amendment 80 sector's PSC mortality.

Although the preamble to Amendment 111 suggested that more stringent PSC limit reductions were not practicable for the Amendment 80 sector as of 2015, NMFS elsewhere noted that additional bycatch reduction would be needed in the future. NOAA1098-99. Similarly, in the preamble to the final rule for Amendment 111, NMFS acknowledged that it was still investigating how deck sorting might reduce PSC. NOAA511. Around this time, the Amendment 80 sector also developed and began implementing the Halibut Avoidance Plan, which created halibut PSC performance standards for the sector and identified halibut avoidance tools, including deck sorting and better communication between vessels about halibut encounters. NOAA4604-05. As the Amendment 80 sector implemented these tools between the latter half of 2015 and 2020, the Amendment 80 sector's halibut mortality rate declined markedly to well below the 1,745 mt limit in the Amendment 111 rule. NOAA1099; NOAA4724 (Table 3-30); NOAA4724 (Table 3-30); *see also*, Ex. 2. Prior to issuing the Rule, NMFS determined that future PSC would most likely be similar to this post-2015 data as the Amendment 80 sector continues to optimize existing halibut avoidance tools. NOAA4613. NMFS concluded that Amendment 123 was practicable thanks to implementation of the halibut avoidance plan, the deck sorting program, and other tools to reduce halibut mortality. *See id*.

NMFS also determined the Amendment 123 is practicable because the Amendment 80 sector is not fully utilizing existing halibut avoidance tools. NOAA1155. NMFS assumed that the Amendment 80 sector would further optimize its operations to prevent halibut PSC limits from constraining groundfish harvest by using "cooperative fishing strategies, evaluating behaviors against standard fleet-wide bycatch rates, communication among captains, test tows, excluder use and deck sorting to reduce mortality when encounters cannot be avoided." NOAA4613. Past efforts show that these halibut avoidance and mortality reduction measures are effective and continued improvements are likely under reduced PSC limits. *See* NOAA4910, NOAA4796.

NMFS also noted that mere inconvenience or reduced profitability do not constitute impracticability. *See* NOAA4799. Although Amendment 123's PSC limits under very low abundance could decrease the Amendment 80 sector's revenue by 9-32%, NMFS determined that such economic consequences would not render the action impracticable. NOAA4896. Such significant potential revenue losses were modeled to occur only in the very low abundance state (and based on the unlikely assumption that there would be no modification in fishing practices), whereas the other abundance states resulted in a PSC limit reduction of only 0-20%. *Id.* Although the Amendment 80 sector may incur some costs associated with the PSC limit reductions, including by leaving some fish unharvested, a more equitable balance between users and greater conservation of halibut warranted such costs. *See* NOAA4954.

Plaintiff again cherry-picks the Council's conservative estimate of economic impacts associated with the Rule. *See* Pls.' Br. at 21 n.4. Yet, Plaintiff does not claim to

have lost any actual money due to the Rule, nor does it explain why its members are not fully utilizing the existing tools. *See id*. Plaintiff also does not acknowledge that – unlike the directed fisheries, which are dependent on halibut – the Amendment 80 sector has inherent flexibility to coordinate among its members to identify fishing strategies that maximize their yield while minimizing PSC. NOAA4736-37.

For all these reasons, Plaintiff has not met their burden of proving a violation under the MSA and certainly not one that would justify vacating the Rule under the APA. See 5 U.S.C. § 706(2) (judicial review of an agency action requires due account of the "rule of prejudicial error"). Judicial review should not convert "agency action into a ping pong game," and, thus, remand is not required where, as here, it "would be an idle and useless formality." *N. L. R. B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969); *see also, Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). Because NMFS already determined that the Rule complies with NS4, there can be no doubt that vacating it, as Plaintiff requests, would be an idle and useless formality. *See id.* Thus, the Court should reject Plaintiff's MSA claim.

**B. NMFS did not violate NEPA because Amendment 123's scope is consistent with its statutory authority and the EIS contains a reasonable range of alternatives within that scope.**

Because the scope of the Amendment 123 EIS permissibly concentrates on the Amendment 80 sector—far and away the sector with the largest halibut bycatch—its alternatives are also appropriately limited to the Amendment 80 sector. Plaintiff improperly tries to flip the analysis by beginning with the alternatives rather than the scope of the EIS. *See Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853,

865 (9th Cir. 2004); *City of Alexandria v. Slater*, 198 F.3d 862, 867-69 (D.C. Cir. 1999).

As NMFS reasonably identified and defined its purpose and need statement in the EIS, the alternatives within that scope are also reasonable.

Amendment 123's purpose and need statement conforms with NMFS's duties under the MSA by applying measures for the management of halibut PSC to the sector accountable for the most halibut PSC mortality in the BSAI groundfish fisheries—the Amendment 80 sector. NOAA4627. As reflected in the purpose and need statement, this action minimizes halibut bycatch to the extent practicable in accordance with NS9 (50 C.F.R. § 600.350) and achieves optimum yield on a continuing basis in accordance with NS1 (50 C.F.R. § 600.310). *Id.* As discussed above, the Rule also promotes conservation in accordance with NS4 (50 C.F.R. § 600.325) and utilizes economic and social data in accordance with NS8 (50 C.F.R. 600.345). These actions and objectives are consistent with NMFS's statutory authority under the MSA. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

NMFS did not single out the Amendment 80 sector and "retrofit" the purpose and need statement to match that decision. Pl.'s Mot. 25. The evolution of the Rule was a normal result of the scoping process where the agency determines the scope based on "meaningful dialogue with members of the public about a proposed action." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1117 (9th Cir. 2002) *abrogated on other grounds*, *Wilderness Soc'y v. U.S. Forest Serv.*,630 F.2d 1173 (9th Cir. 2011); *see also* 40 C.F.R. § 1501.9. While NMFS began by considering abundance-based management for all fishing sectors in the BSAI with halibut bycatch, the resulting early draft of the EIS

was exceptionally complex. *See* NOAA53002 at 8:07, 8:11, 8:16, 8:19, 8:32:30, 8:55. The Council then requested and received public testimony regarding ways to streamline and simplify the action. *See* NOAA043065. Recognizing the comparatively minor halibut PSC of the other sectors, the Council unanimously passed a motion to limit Amendment 123 to the Amendment 80 sector. NOAA53003 at 3:27, 3:29.

The scoping decision for the Rule was the result of public engagement and recognition that the Amendment 80 sector accounts for the overwhelming majority of halibut bycatch. This decision was not only informed by public participation but was also based on NMFS's scientific expertise and is entitled to deference. Agencies enjoy considerable discretion to define the purpose and need of a project. *See League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (cleaned up). Resolving issues regarding the scope of an EIS "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *see also North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 80 (D.D.C. 2007) ("Fisheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges."). By choosing to streamline the action, NMFS avoided delay that would have resulted in additional years of excess bycatch.[11]

---

[11] Additionally, purpose and need statements are not too narrow when they are tailored to address a unique problem, like Amendment 80's large halibut PSC. *See, e.g., HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230–31 (9th Cir. 2014) (finding that a purpose and need statement that considered only a rapid rail system as an

Next, the scope of the Rule does not foreclose all but one alternative such that the "EIS would become a foreordained formality." *Nat'l Parks*, 606 F.3d at 1070 (quotations and citation omitted). The EIS considers one no-action alternative and four action alternatives with a wide range of possible halibut PSC limits, none of which are a foregone conclusion based on the scope of the EIS. NOAA4647. These limits are based on considerable agency expertise and are reasonable in light of the scope of the EIS.

Plaintiff laments that no alternative "applied abundance-based restrictions to many sectors in the groundfish fishery." Pl.'s Mot. 23. However, alternatives need not be included in an EIS if they present "unique problems and would not accomplish the [agency's] goal." *Communities, Inc. v. Busey,* 956 F.2d 619, 627 (6th Cir. 1992). As discussed, an alternative that applied to all sectors proved too complex because different sectors use different gear and require different analytical considerations. *See* NOAA41812, NOAA41913. Thus, it was not a viable option. NMFS was not "required to explore alternatives that, if adopted, would not have fulfilled the project goals." *Mid States Coal. for Progress v. Surface Transp*. Bd., 345 F.3d 520, 546 (8th Cir. 2003); *see also City of Alexander v. Slater,* 198 F.3d 862, 867-69 (D.C. Cir. 1999).

Nor did NMFS delete viable alternatives or "shroud[] the issue from public scrutiny behind the claim of administrative expertise." *State of California v. Block*, 690 F.2d 753, 768 (9th Cir. 1982). Indeed, the change of the Rule's scope was based on

---

option to remedy traffic congestion was reasonably framed to "provide faster, more reliable public transportation service . . . than can be achieved with buses operating in congested mixed-flow traffic.").

public engagement and feedback. NOAA043065; NOAA53003 at 3:27, 3:29. "[T]he touchstone of the NEPA inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013) (internal quotations omitted). The process of developing an abundance-based halibut management strategy for all sectors in a single action proved to be too complex and protracted. It was not a viable alternative because its implementation lagged for years. By efficiently developing the action to focus on the sector with the largest halibut bycatch, Amendment 123 is both consistent with NMFS's statutory authority and broad enough to guide the agency's selection of viable alternatives.

## VI.   CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment and enter judgment for Defendants.

Dated: June 27, 2024                    Respectfully submitted,

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Erika Furlong*
ERIKA FURLONG (PA Bar No. 319350)
Wildlife & Marine Resources Section
JENNIFER SUNDOOK (DC Bar No. 241583)
Natural Resources Section
Trial Attorneys
150 M Street NE
Washington, DC 2002
(202)305-0424 (Furlong)
(202)305-0239 (Sundook)
Fax: (202)305-0275
Erika.Furlong@usdoj.gov
Jennifer.Sundook@usdoj.gov

*Attorneys for Defendants*