Ryan P. Steen, Bar No. 0912084
ryan.steen@stoel.com
Jason T. Morgan, Bar No. 1602010
jason.morgan@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900

Connor R. Smith, Bar No. 1905046
connor.smith@stoel.com
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900

*Attorneys for Plaintiff Groundfish Forum, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GROUNDFISH FORUM, INC., | |
| Plaintiff, | Case No.: 3:23-cv-00283-SLG |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; GINA RAIMONDO, in her official capacity as the United States Secretary of Commerce; and JANET COIT, in her official capacity as Assistant Administrator, National Oceanic and Atmospheric Administration, | |
| Defendants. | |

## PLAINTIFF'S REPLY BRIEF

(Local Civil Rule 16.3)

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. ii

TABLE OF ABBREVIATIONS .......................................................................... iv

I. INTRODUCTION .............................................................................................. 1

II. ARGUMENT ..................................................................................................... 3

    A.    Amendment 123 Improperly Allocates All Abundance-Based
           Bycatch Restrictions Only to the Amendment 80 Sector. ........................... 3

          1.    Amendment 123 Is an Allocation. ...................................................... 3

          2.    Amendment 123 Is Not Fair and Equitable. ....................................... 6

          3.    Amendment 123 Is Not Reasonably Calculated to Promote
               Conservation. ..................................................................................... 10

    B.    The Bycatch Reduction Measures Imposed by Amendment 123 Are
           Impracticable and Improperly Intended to Allocate. ................................. 11

    C.    Amendment 123 Violates NEPA. ............................................................... 14

III. CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
273 F.3d 1229 (9th Cir. 2001) ............................................................................ 1

*City of Los Angeles v. Fed. Aviation Admin.*,
63 F.4th 835 (9th Cir. 2023) ............................................................................ 19

*Groundfish Forum v. Ross*,
375 F. Supp. 3d 72 (D.D.C. 2019) ................................................. 7, 9, 11, 14

*Guindon v. Pritzker*,
240 F. Supp. 3d 181 (D.D.C. 2017) ................................................................ 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................. 1, 8, 9

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
606 F.3d 1058 (9th Cir. 2010) ........................................................................ 20

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ..................................................................... 5, 13

*Sustainable Fisheries Coal. v. Raimondo*,
589 F. Supp. 3d 162 (D. Mass. 2022) ........................................................... 11

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) ......................................................................... 20

*Yakutat, Inc., Inc. v. Gutierrez*,
407 F.3d 1054 (9th Cir. 2005) .......................................................................... 6

**Statutes**

16 U.S.C. § 1802(2) ...................................................................................................... 4

16 U.S.C. § 1802(16) .................................................................................................... 3

16 U.S.C. § 1851(a)(4) .................................................................................................. 9

16 U.S.C. § 1852(a)(1)(G) .......................................................................................... 17

# TABLE OF AUTHORITIES

**Page**

16 U.S.C. § 1852(b)(1)(A) ................................................................................................ 17

16 U.S.C. § 1853(a)(14) ...................................................................................................... 6

**Regulations**

50 C.F.R. § 600.325(c) ........................................................................................................ 7

50 C.F.R. § 600.325(c)(2) ................................................................................................ 7, 8

50 C.F.R. § 600.325(c)(3) .................................................................................................. 10

50 C.F.R. § 600.325(c)(3)(i)(B) ....................................................................................... 7, 9

50 C.F.R. § 600.325(c)(3)(ii) ............................................................................................ 10

50 C.F.R. § 679.2 ................................................................................................................. 4

50 C.F.R. § 679.21(a)(2)(ii) ................................................................................................ 2

50 C.F.R. § 679.21(b)(1)(i)(C) ............................................................................................ 3

50 C.F.R. § 679.26 ............................................................................................................... 2

50 C.F.R. § 679.91 ............................................................................................................... 3

50 C.F.R. § 679.91(d) .......................................................................................................... 3

50 C.F.R. § 679.91(d)(1) ..................................................................................................... 3

50 C.F.R. § 679.91(h)(3)(iv) ............................................................................................... 4

**Other Authorities**

142 Cong. Rec., H11437 (1996) ........................................................................................ 11

*Privilege*, *Black's Law Dictionary* (12th ed. 2024) ........................................................ 4

## Table of Abbreviations

| | |
|---|---|
| **ABM** | Abundance-Based Management |
| **ABM Workgroup** | North Pacific Fishery Management Council's Abundance-Based Management Workgroup |
| **APA** | Administrative Procedure Act |
| **BSAI** | Bering Sea and Aleutian Islands Management Area |
| **CDQ** | Community Development Quota |
| **Council** | North Pacific Fishery Management Council |
| **EIS** | Environmental Impact Statement |
| **FMP** | Fishery Management Plan |
| **Groundfish FMP** | Fishery Management Plan for Groundfish in the Bering Sea and Aleutian Islands Management Area |
| **IPHC** | International Pacific Halibut Commission |
| **MSA** | Magnuson-Stevens Fishery Conservation and Management Act |
| **NEPA** | National Environmental Policy Act |
| **NMFS** | National Marine Fisheries Service |
| **PSC** | Prohibited Species Catch |
| **SSC** | Scientific and Statistical Committee |

# I.  INTRODUCTION

The common theme uniting the briefs of Federal Defendants ("NMFS") and Intervenors (collectively, "Defendants") is their reliance on *post-hoc* revisionist history. However, "courts may not accept . . . counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The "focal point for judicial review is the administrative record" and the "court may not substitute reasons for agency action that are not in the record." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quotation marks and citation omitted). Defendants' *post-hoc* arguments cannot stand.

But before addressing Defendants' legal arguments, Plaintiff pauses to address some of the anti-trawl rhetoric and half-truths that litter Defendants' briefs. Although most are extraneous to the legal issues, a few of those comments merit a brief response.

*First*, Defendants and *amici* tout the public process leading to Amendment 123. *See, e.g.*, Dkt. 41-1 ("NMFS Br.") at 28.[1] But as detailed *infra* at pages 15-20, the record shows a decided lack of transparency. The State of Alaska representative on the Council developed the decision to single out the Amendment 80 fleet behind closed doors and presented it for a Council vote "without notice" to the public—despite recognizing that "it just doesn't seem like the right thing to do." NOAA035110.

*Second*, Defendants repeatedly accuse the Amendment 80 sector of "wasting" halibut. *See, e.g.*, NMFS Br. at 9; Dkt. 39 ("Intv. Br.") at 1. The Amendment 80 sector

---

[1] Original page numbers, rather than blue docket page numbers, are used in this brief.

lawfully operates in the regulatory context *that NMFS created*. Although the fleet has dramatically reduced halibut mortality over almost two decades, Amendment 80 vessels cannot fish for target species without catching some halibut. Dkt. 26 ("Plaintiff Br.") at 6-7; NOAA003873. They cannot sell or even donate those incidentally caught fish because NMFS mandates they be thrown back. 50 C.F.R. §§ 679.21(a)(2)(ii), 679.26. Any "waste" is therefore NMFS's own doing.

*Third*, NMFS claims that "[a]though trawl fishing is highly effective, it is less capable of distinguishing between target and non-target species than other forms of fishing (e.g., hook and line)." NMFS Br. at 8. That is false. In 2021, trawl fisheries off Alaska had a 2% bycatch rate whereas hook-and-line fisheries had a 17% bycatch rate and groundfish pot fisheries had a 3% bycatch rate. *See* NOAA059421.

*Fourth*, Intervenors suggest that the "halibut stock declined by as much as 70% during the period from 1992 to 2010" as a result of bycatch. Intv. Br. at 5. However, "[t]he spawning stock biomass of Pacific halibut in the 1990's was the highest seen in many decades" and declines from that "unusually high" level are "largely a result of decreasing size-at-age, as well as somewhat weaker recruitment strengths than those observed during the 1980s." NOAA004594; NOAA006858; NOAA006948. The stock has been stable from 2011 through 2023. NOAA000495; NOAA053020-21.

*Fifth*, contrary to Intervenors' insinuations, the directed halibut fleet (not the Amendment 80 sector) is by far the "largest component of mortality" of halibut. NOAA018716-17. In 2021, directed halibut fishing was responsible for 65% of all halibut mortality whereas *all* bycatch (not just the Amendment 80 sector) was responsible

for 10%. NOAA059424. The directed halibut fleet also has the "largest effect on spawning biomass" (NOAA018716), which is due to the fact that the directed halibut fleet kills almost exclusively sexually mature females—as much as 92% in Area 4CDE alone. NOAA018717; NOAA018944; NOAA006947-48.

Finger pointing aside, NMFS has violated the MSA and NEPA in approving Amendment 123. NMFS's unlawful decisions must be vacated.

## II. ARGUMENT

### A. Amendment 123 Improperly Allocates All Abundance-Based Bycatch Restrictions Only to the Amendment 80 Sector.

#### 1. Amendment 123 Is an Allocation.

NMFS wrongly argues that National Standard 4 is irrelevant because PSC limits are not "fishing privileges" and therefore not "allocations." NMFS Br. at 13. NMFS's EIS states that "halibut PSC" limits *are* "fishing privileges." NOAA004140. And NMFS's new regulations set the "Amendment 80 Program annual harvester *privileges*," 50 C.F.R. § 679.91 (emphasis added), and those *privileges* include the "amount" of "Allocations of halibut PSC" to the Amendment 80 sector, *id*. § 679.91(d)(1). *See id.* § 679.21(b)(1)(i)(C) ("[f]or Amendment 80 cooperatives and the Amendment 80 limited access fishery, BSAI halibut PSC limits will be allocated according to the procedures and formulas in § 679.91(d)"). Amendment 123 is an allocation of fishing privileges.

NMFS blows past its regulations and EIS, arguing that "by definition" a PSC limit is not a "fishing privilege." NMFS Br. at 13. By *what* definition? The MSA defines "fishing" as "the catching, taking, or harvesting of fish" and "any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish." 16

U.S.C. § 1802(16). Bycatch is a form of fishing. "Bycatch" refers to "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes … regulatory discards." *Id*. § 1802(2). The MSA does not define "privilege," but the word commonly means: "A special legal right, exemption, or immunity granted to a person or class of persons; …. A privilege grants someone the legal freedom to do or not to do a given act. It immunizes conduct that, under ordinary circumstances, would subject the actor to liability." *Privilege*, *Black's Law Dictionary* (12th ed. 2024).

Halibut PSC plainly is a "fishing privilege"—just as any other harvesting quota or limit. *See* 50 C.F.R. §§ 679.2 (defining "cooperative quota (CQ)" for the Amendment 80 program to include "the annual halibut … PSC"), 679.91(h)(3)(vi) ("Is this CQ an exclusive catch and use privilege? Yes …"). The grant of a PSC limit makes the catching of halibut lawful, thus immunizing the Amendment 80 sector to liability. NOAA035282. If the halibut PSC limit is reached in a given year, then all fishing must cease. Thus, NMFS's "fishing privilege" argument is dead in the water, and the analysis can end there.

NMFS tries to shore up its lead argument with the red herring that "halibut [*directed fishing*] allocations are not governed by the MSA" and are thus irrelevant. NMFS Br. at 14. This just avoids Plaintiff's primary argument that the modification of halibut PSC limits *itself* is an "allocation"—as it was in Amendment 111—regardless of impacts to directed halibut fisheries. Plaintiff Br. at 12-14. As NMFS explained in the Amendment 111 rulemaking: "Because halibut PSC limit reductions could potentially constrain harvest of groundfish [total allowable catches], the proposed action would be an allocation of fishing privileges and must be consistent with National Standard 4."

NOAA036973-74. In fact, Amendment 123 started from the position that the new abundance-based program would retain Amendment 111's "status quo allocations" of PSC among the groundfish sectors.[2] NOAA0039133; NOAA040145 (assuming "that the allocation of the PSC limit between groundfish trawl sectors would remain the same"); NOAA0042161 (preliminary draft EIS describing how PSC "would be allocated" to sectors to maintain status quo). But the decision to single out the Amendment 80 sector for PSC limit reductions substantially changed those "status quo allocations."

Besides, even Intervenors disagree with NMFS's red herring argument, as they admit that halibut bycatch mortality is directly "'taken off the top'" of the harvest levels set for the directed halibut fishery by the IPHC (Dkt. 10 at 10-11) and, thus, they assert, "PSC limits established for Amendment 80 are a de facto allocation of the halibut resource" (NOAA059670). And while NMFS wants to dismiss the allocative impacts as merely incidental or indirect, the "Purpose and Need" includes providing "additional opportunities for the directed halibut fishery," NOAA003907, and "the *direct* effect of reduced PSC limits is increased catch limits for directed halibut fishing," NOAA042367 (emphasis added). In short, whether it is an allocation of PSC among groundfish sectors or an allocation to the directed halibut fishery, "in the end, . . . ABM is really another allocative decision." NOAA0035138 (Council member Baker); NOAA035106 (ABM is

---

[2] NMFS's only response to the obvious about-face from Amendment 111 to Amendment 123 on whether assignment of halibut PSC is an "allocation" is that NMFS "has not implemented a policy change." NMFS Br. at 14. This is legally insufficient. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (when reversing a policy, an agency must display "'awareness that it is changing position'").

"ultimately an allocation issue"); NOAA035101 ("ABM is primarily an allocative action"); NOAA004140 (Amendment 123 "allocate[s] fishing privileges").

Finally, NMFS tries to evade Required Provision 14 by arguing it applies only to "rebuilding plans for overfished stocks and similar measures." NMFS Br. at 15. But that provision also applies to "conservation and management measures which reduce the overall harvest in a fishery." 16 U.S.C. § 1853(a)(14). The Ninth Circuit determined that Required Provision 14 applies to bycatch measures that reduce harvest. *Yakutat, Inc., Inc. v. Gutierrez*, 407 F.3d 1054, 1059 (9th Cir. 2005). And NMFS itself determined that because reduced halibut PSC limits operate as a hard cap, the Amendment 80 sector could experience losses *from reduced harvest* of more than $100 million annually. *See* NOAA053057-60; NOAA003892 (Table ES-1-8).[3]

In sum, NMFS's failure to treat Amendment 123 as an allocation, and its complete and unexplained reversal from Amendment 111, is arbitrary, capricious, and contrary to law. This fundamental error infected the entire decision and alone is grounds for vacatur.

### 2. Amendment 123 Is Not Fair and Equitable.

NMFS argues that, even if Amendment 123 is an allocation, it is "inherently fair and equitable." NMFS Br. at 16. NMFS's *post-hoc* arguments for why Amendment 123

---

[3] NMFS also contends that Required Provision 14 is merely procedural, citing *Guindon v. Pritzker*, 240 F. Supp. 3d 181, 200 (D.D.C. 2017). NMFS Br. at 15. But *Guindon* appears to presume it is procedural, and that presumption is wrong. Required Provision 14 imposes a substantive obligation to "allocate . . . harvest restrictions … fairly and equitably." 16 U.S.C. § 1853(a)(14). Even so, NMFS procedurally conducted no assessment of relative benefits and burdens of its allocation among groundfish sectors. *See* Plaintiff Br. at 14-16.

satisfies National Standard 4—despite its assertion that Amendment 123 is "not an allocation" subject to National Standard 4—have no support in law or fact.

NMFS has a "statutory duty to explain" *in the record* "how the amendment comports with National Standard 4." *Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 91 (D.D.C. 2019). In so doing, NMFS follows its MSA National Standard Guidelines, which explain: "An FMP may contain management measures that allocate fishing privileges if such measures are necessary or helpful in furthering legitimate objectives or in achieving the OY, *and* if the measures conform with paragraphs (c)(3)(i) through (c)(3)(iii) of this section." 50 C.F.R. § 600.325(c) (emphasis added). Specifically, the Guidelines instruct that NMFS "may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups" and this requires "an initial estimate of the relative benefits and hardships imposed by the allocation." *Id.* § 600.325(c)(3)(i)(B). NMFS must show its work in reaching those conclusions, including a "discussion" of "[a]llocation schemes considered, but rejected." *Id.* § 600.325(c)(2).

Plaintiff demonstrated that the record contains none of those required analyses. Plaintiff Br. at 14-16. NMFS has no answer. Nowhere in the record does NMFS explain why the hardship imposed on the Amendment 80 sector is "outweighed" by the benefits to other groundfish sectors or even identify what the benefits are to those other sectors. That alone is fatal under National Standard 4.

With no record, NMFS argues that Amendment 123 is "inherently" fair and equitable because the Amendment 80 sector "is responsible for the majority of the PSC mortality." NMFS Br. at 20. But this does not explain why it is fair and equitable to

single out one sector to the exclusion of all other sectors. Those other sectors have substantial halibut PSC allocation percentages that are not constrained in times of low abundance. NOAA035288. NMFS's Assistant Regional Administrator for Sustainable Fisheries raised this very question, but it goes unanswered in the record:

> First, as I noted on the purpose and need statement issues, I am concerned that we are narrowing the scope of this action, so that we are focusing our abundance based response only on one sector. Although that sector may be responsible for approximately 60% of the total bycatch mortality, that leaves the other 40% that aren't being held to the same standard and that would not flex or change with abundance. I do think it will be appropriate for this Council when this issue comes back to reexamine whether or not our purpose and need statement is still appropriate and the potential equities that creates between the various sectors.

NOAA0053003 at 3:46:30. NMFS's failure to address the issue is particularly arbitrary given that Amendment 111 equitably reduced PSC levels across all four groundfish sectors. NOAA036973-74. By failing to consider the fairness of proportionately changing the halibut PSC allocations, NMFS "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.[4]

NMFS and Intervenors both contend that singling out the Amendment 80 sector was fair because NMFS could address the other sectors later, in separate decisions. But if NMFS wants to pick winners and losers by allocating PSC limits, it can only impose a

---

[4] NMFS also argues that the allocation between the Amendment 80 sector and *the directed halibut fishery* (an allocation which it denies occurred) is fair and equitable. *See, e.g.*, NMFS Br. at 19-21. NMFS provides no record citations for those claims, much less an analysis performed under 50 C.F.R. § 600.325(c)(2). Besides, the EIS concluded that this action results in a net *negative* economic benefit to the nation. NOAA004078.

"hardship on one group" (here, the Amendment 80 sector) "if it is outweighed by the total benefits received by another group." 50 C.F.R. § 600.325(c)(3)(i)(B). NMFS cannot punt its obligation to comply with the statutory mandate that every allocative action "*shall be* [] fair and equitable" by saying that it may (or may not) take some future action that may (or may not) make its present action more (or less) equitable. 16 U.S.C. § 1851(a)(4) (emphasis added).[5]

NMFS tries to fill the National Standard 4 gap by cobbling together an argument based on the National Standard 1, 8, and 9 analyses in the record. *See* NMFS Br. at 16-19. But the D.C. district court rejected nearly identical arguments, explaining that the court is "limited to the rationale put forth by" NMFS in the record and "'may not accept … counsel's post hoc rationalizations for agency action.'" *Groundfish Forum*, 375 F. Supp. 3d at 91 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50). In so doing, the court rejected NMFS's "argument that the socio-economic benefits identified for purposes of National Standard 8 are a sufficient substitute for the Service's obligation to provide a rational explanation of how [the amendment] is consistent with the requirements of National Standard 4." *Id*. at 92. NMFS made the same error here.

Finally, it bears emphasis that there is nothing "inherently" fair or equitable about singling out one fishing sector for economically damaging restrictions without rationally explaining the reason for doing so and without even considering the possibility of sharing

---

[5] Intervenors detour into non-MSA cases to argue that agencies "do not 'have to regulate a particular area all at once.'" Intv. Br. at 14. The MSA is different because it mandates that all allocations "shall be" fair and equitable. 16 U.S.C. § 1851(a)(4).

the burden of those restrictions across the sectors in the same fishery (as was done in

Amendment 111). NMFS's failure to comply with National Standard 4 violates the MSA.

### 3. Amendment 123 Is Not Reasonably Calculated to Promote Conservation.

NMFS and Intervenors argue that Amendment 123 promotes conservation for the

simple reason that it reduces halibut bycatch. They miss the point. The critical inquiry is

not whether a particular *regulation* promotes conservation in the abstract, but whether an

"allocation scheme" promotes conservation by, for example, "encouraging a rational,

more easily managed use of the resource" or "optimizing the yield in terms of size, value,

market mix, price, or economic or social benefit of the product." 50 C.F.R.

§ 600.325(c)(3)(ii). Again, the record contains no § 600.325(c)(3) analysis or otherwise

explains why the *allocation scheme* chosen here—*i.e.*, imposing abundance-based limits

on a single sector to the exclusion of other sectors—promotes conservation in either the

halibut fishery or the groundfish fishery.

Without record support of its own, NMFS instead accuses Plaintiff of "cherry

pick[ing]" the record. NMFS Br. at 23. But the tree is full of cherries. For example, the

modeling performed to support Amendment 123 showed that "the implementation of

abundance-based management of halibut PSC is an allocation decision rather than a

conservation decision." NOAA041940. The SSC critically reviewed the model and

expressly agreed with that conclusion. NOAA042542. NMFS does not dispute these

facts, but says they are taken out of context. Here is the context: after the modeling

results showed that abundance-based management for all sectors had no conservation

benefit, the Council discarded the model, deleted the discussion from the draft EIS, and inexplicably pivoted to options that singled out the Amendment 80 sector for restrictions. Plaintiff Br. at 2-4. As the EIS itself explains, "[t]here is likely to be little difference among the average future halibut spawning biomass under levels of PSC anticipated across all of the alternatives, including the no action alternative." NOAA003894; NOAA035138 (Council member Baker stating that directed halibut users "have muddied the water by saying that ABM is necessary for conservation of the halibut resource, which the available information just does not support."); NOAA035101 (similar).

Thus, the action alternatives merely "reallocate halibut from one user group to another with no real conservation benefit" (NOAA055162), and Amendment 123 violates National Standard 4 for this additional reason. *Groundfish Forum*, 375 F. Supp. 3d at 89 (an "allocation must actually 'promote' a conservation purpose"); *Sustainable Fisheries Coal. v. Raimondo*, 589 F. Supp. 3d 162, 172 (D. Mass. 2022) ("potential" and contingent "biological benefits" provide "lackluster support for … conclusion that the final rule promotes conservation").

## B.     The Bycatch Reduction Measures Imposed by Amendment 123 Are Impracticable and Improperly Intended to Allocate.

Plaintiff identified two independent ways that Amendment 123 violates National Standard 9 and Required Provision 11. *First*, Plaintiff showed that "Congress [did] not intend" that bycatch reduction measures "will be used to allocate among fishing gear groups," 142 Cong. Rec., H11437 (1996), and that NMFS therefore violated the MSA because Amendment 123 is intended to, and does, shift allocations from the Amendment

80 sector to the directed halibut fishery at enormous expense to the Amendment 80 fleet. Plaintiff Br. at 20. NMFS concedes this argument in silence.

*Second*, Plaintiff demonstrated that Amendment 123's reduced PSC limits are not "practicable" because the record shows that the Amendment 80 sector is currently using all available tools to the fullest extent possible and there are no new tools available. *See* Plaintiff Br. at 21-22. NMFS responds with misdirection, pointing to the tools created and fully implemented as a result of *Amendment 111*. NMFS Br. at 24. NMFS says that *Amendment 123* (which imposes PSC limit reductions of up to 35% below Amendment 111) is also "practicable thanks to implementation" of those same tools. *Id*. But the record says the opposite, explaining that the existing measures could *not* practicably achieve those results and estimating annual losses (due to foregone harvest) of more than $100 million in low-abundance years. NOAA003899.[6] The record also shows that "all PSC reduction tools (e.g. excluders and decksorting) are currently being maximized," NOAA060247, and that any "substantial reductions" in halibut mortality would have to come from "the development and implementation of new technologies" that presently do not exist. NOAA004176. Unidentified future technologies that do not exist are not "practicable" bycatch measures, and the EIS agrees. NOAA004088 (EIS explaining that future "technologies" are "speculative" and "not practicable").

---

[6] NMFS and Intervenors argue that the $100 million-plus in losses estimated in the EIS is a "worst case" estimate. NMFS Br. at 19; Intv. Br. at 22-23. But the record shows that this estimate is on the upper bound of expected costs and that while the industry might be able to mitigate the costs, the "extent" of mitigation is "unknown" because "a key unanswered question is how close the A80 sector is to the point of diminishing returns in halibut PSC mitigation." NOAA004076.

NMFS tries to whitewash its Amendment 111 conclusion that "greater reductions were not practicable" (NOAA000515) as merely a "suggested" finding. NMFS Br. at 24. This was not a *suggestion*. In Amendment 111, the "Council *concluded* that larger reductions are not practicable" and the "rationale the Council and NMFS used for *concluding* that larger reductions in PSC limits are not practicable is described in the preamble to the proposed rule." NOAA000511 (emphases added). If NMFS wants to reach a different conclusion this time, it must acknowledge that it is changing its position (which it has not done) and provide facts in the record to support that change (which it also has not done). *Organized Vill. of Kake*, 795 F.3d at 968.[7]

Next, NMFS cites NOAA001155 to argue that Amendment 123 is practicable "because the Amendment 80 sector is not fully utilizing existing halibut avoidance tools." NMFS Br. at 25. But no such determination appears at NOAA001155 (or anywhere in the record). That citation is to a summary of a public comment (by halibut fishermen) disparaging the Amendment 80 sector. NOAA001155. NMFS also references NOAA004613, but that citation also does not support NMFS. There, NMFS says that "[r]eductions in halibut mortality are expected to result from the sector *increasing costs*,

---

[7] Intervenors argue that greater reductions must be possible because the Amendment 80 sector currently fishes below its PSC limit. Intv. Br. at 19. This is misleading and not a rationale asserted by the agency. The sector intentionally fishes below its limit (at a significant economic loss) "due to a wide range of operational factors, including the fleet's desire to avoid a closure or an enforcement action if a PSC limit is reached." NOAA000449. A mid-season closure would be economically devastating and cause serious market disruptions, so the fleet must operate well below *any* PSC limit to avoid those results. *Cf.* NOAA053003 at 31:00-32:00, 59:00-1:01:00.

*reducing efficiency*, and improving the use of existing tools" (with no discussion or evidence how those improvements would occur). NOAA004613 (emphases added).[8]

Lastly, NMFS says that "Plaintiff does not claim to have lost any actual money due to the Rule, nor does it explain why its members are not fully utilizing the existing tools." NMFS Br. at 26. The MSA does not require Plaintiff to prove a negative. Rather, NMFS has a "statutory duty to explain"—in the record—"how the amendment comports with" the MSA. *See Groundfish Forum*, 375 F. Supp. 3d at 91. Plaintiff told NMFS, in the administrative record, that its members were fully using all existing tools, there were no new tools available, and some member companies may not survive under the lower PSC limits. NOAA053060. NMFS cites no contrary explanation or evidence in the record. Failure to comply with a statutory duty is not an "'idle and useless formality,'" as NMFS suggests. NMFS Br. at 26. NMFS failed to comply with National Standard 9.

## C.    Amendment 123 Violates NEPA.

NMFS claims it limited Amendment 123 to one sector as the "normal result of the scoping process" and "based on meaningful dialogue with members of the public." NMFS Br. at 27 (quotation marks and citation omitted). NMFS claims it "did not single out the Amendment 80 sector" or "'retrofit' the purpose and need statement to match that decision," but merely dropped the multi-sector alternatives from the EIS because they were "too complex" and in response to "public testimony regarding ways to streamline

---

[8] Intervenors claim the "needed reductions are readily achievable," but support that statement only with gratuitous citations to their own comment letter. Intv. Br. at 21 (citing NOAA003205-06, NOAA3264-75, NOAA3293-94). Additionally, the article referenced in note 8 on the same page does not even involve an Amendment 80 vessel.

and simplify the action." NMFS Br. at 27-29. This revisionist history is directly contradicted by the administrative record. What actually occurred is summarized below.

In April 2016, the Council "unanimously adopted a purpose and need statement to establish abundance-based halibut PSC limits *for the BSAI groundfish fisheries*" (meaning all of the sectors). NOAA035258 (emphasis added); *see* NOAA038674-708. The Council focused on "potential implications of abundance-based halibut PSC allocations using the proportional allocations to the four sectors defined under Amendment 111 as the basis." NOAA038894; *see also* NOAA038900-02.

In December 2017, NMFS published its notice of intent to prepare an EIS, which included the purpose and need statement. NOAA035256-59. The notice describes the "proposed action" as establishing abundance-based halibut PSC limits for the "Federal groundfish fisheries prosecuted in the BSAI using trawl and non-trawl (fixed) gear." NOAA035258. In March 2018, the ABM Workgroup produced a detailed report analyzing various abundance-based "allocations" across all four primary groundfish sectors. NOAA040445-82. In October 2018, the Council reiterated the need to evaluate the effects of the allocations on the four sectors. NOAA040849.

Consistent with that direction, the September 2019 preliminary draft EIS (NOAA041691) analyzed abundance-based bycatch measures on all the "groundfish fisheries." NOAA041713-14. The draft contained 16 total alternatives (NOAA041702-03)—all "designed to accomplish the stated purpose and need" and applicable to all four primary groundfish sectors. NOAA041731-58.

At its October 2019 meeting, the Council discussed whether and how the 16 alternatives could be simplified. *See* NOAA053000 (audio). The entire discussion on that topic focused on how to reduce the *existing* alternatives. There was no discussion about reducing the scope of the action by removing sectors. NOAA053001 at 8:53:54-8:57:19; *see* NOAA042621.

The Council discussed the 16 alternatives in December 2019, with a staff member noting that the analyses "would certainly be easier to understand if there were less" alternatives. NOAA053002 at 8:07:58; *see also id*. at 8:11. They discussed "reducing the number of alternatives." *Id*. at 8:19, 8:25-8:34. There was no mention of removing sectors. The Council passed a motion requesting "stakeholder input on additional management alternatives that serve to streamline the action and meet the Council's objectives to establish abundance-based PSC limits." NOAA043065; *see* NOAA053002 at 8:52:30 (State of Alaska representative Rachel Baker).

The Council met again on February 1, 2020, but in the evening of January 31, 2020, things were already happening behind the scenes. Ms. Baker sent an email to Council Chair Simon Kinneen, saying: "I'm rethinking the decision to remove all sectors except Amendment 80 in the current ABM analysis. It's a really big shift *without notice* . . . . I tend to be a pretty cautious person so may be overthinking it, but *it just doesn't*

*seem like the right thing to do*." NOAA035110 (emphases added). This email is the first mention in the record about any "decision" to "remove all sectors" but Amendment 80.[9]

Ms. Baker sent two more emails later that evening. In the first, Ms. Baker said she was "going to keep all sectors in the current ABM analysis for the first motion" and review a second motion that would apply "only to the Am 80 sector." NOAA035113. In the second email (to Glenn Merrill, NMFS's Assistant Regional Administrator for Sustainable Fisheries), Ms. Baker explained that the "second motion" would request a "discussion paper to evaluate abundance based halibut PSC management approaches for the Amendment 80 sector." NOAA035136; *see also* NOAA035120. Mr. Merrill responded the next morning, clearly surprised and concerned. NOAA035136. Ms. Baker says that "[t]here's a reason we need to do it, can discuss later." *Id*. Mr. Merrill responds: "Why do we need to do this now? What is the goal?" *Id*. Neither the "reason" nor the "decision" mentioned by Ms. Baker is disclosed anywhere in the record.

In the morning of the February 1, 2020 Council meeting, the Council's Advisory Panel presented a motion recommending narrowing the 16 multi-sector alternatives to four *multi-sector* alternatives (consistent with the December 2019 meeting discussion). NOAA043143-46; NOAA053003 at 08:12 a.m. The motion explained that it "is in direct response to the Council's request for stakeholders to provide input on additional management alternatives that serve to streamline the action," "is responsive to public

---

[9] Ms. Baker, who serves as Alaska's designated "principal State official" (16 U.S.C. § 1852(b)(1)(A)), and the five additional Council members "appointed from the State of Alaska" (16 U.S.C. § 1852(a)(1)(G)) comprise a voting majority on the Council.

comment," and "drops alternatives that are no longer relevant and/or do not meet Council objectives." NOAA043144. During discussions, a longline representative suggested streamlining the action by removing his sector. That was met with laughter. *See* NOAA053003 at 2:00:30-3:04:35.

After a break, Ms. Baker, despite her prior reservations that it was not "the right thing to do," presented a motion to eliminate all multi-sector alternatives and replace them with four alternatives focusing solely on the Amendment 80 sector because that sector has "60%" of the bycatch mortality. NOAA053003 at 3:27:36-3:39:20; NOAA043187 (motion). Mr. Merrill responded (as quoted *supra* at 8) that he was "concerned" about narrowing the action to leave out "the other 40%," which would require the Council to "reexamine whether or not our purpose and need statement is still appropriate." NOAA053003 at 3:46:30. But after only 15 minutes of additional discussion—none of which involved the *viability* of multi-sector alternatives—the motion passed unanimously. NOAA053003 at 4:02:30.

In October 2020—eight months after deciding to narrow the alternatives to the Amendment 80 sector—the Council changed the purpose and need statement to match those new alternatives. NOAA044492-93. Even Intervenor Central Bering Sea Fishermen's Association complained about this backwards process: "we did not advocate for removing the other sectors" and the "reduced scope" also "reduces the overall effectiveness." NOAA003346-47 (emphasis omitted).

This account confirms that NMFS's responsive arguments contradict the record. There was no "public testimony" (NMFS Br. at 28) or "meaningful dialogue" (*id.* at 27)

informing the decision to single out the Amendment 80 sector. The public was only asked for ways to streamline the multi-sector alternatives. The Amendment 80-only idea was presented to and voted on by the Council "without notice" to the public and based on cryptic *non-public* decisions and reasons that are not disclosed in the record. NOAA035110.

NMFS also did not eliminate all multi-sector alternatives because they were "too complex," as it now argues. NMFS Br. at 29. Section 2.8 of the EIS ("Alternatives considered but not carried forward for analysis") states that NMFS dropped "[a]lternatives that apply to all groundfish fishing sectors" "because [sic] Amendment 80 sector comprises the majority of halibut PSC mortality." NOAA004662; *see* NOAA043184 (same reason for "exclusive" focus on Amendment 80 sector). But this explanation does not say *why* a multi-sector alternative was *not viable*. Nor could it. The Amendment 80 sector had an even greater proportion of halibut PSC limits before Amendment 111, but Amendment 111 still evaluated viable multi-sector alternatives. The existence of a viable but unexamined alternative renders the EIS inadequate. *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 844 (9th Cir. 2023).[10]

NMFS *did* retrofit the purpose and need statement to match the narrowed alternatives. That occurred in October 2020—eight months after the February 2020

---

[10] The complexity referenced by NMFS regards the *method* for calculating PSC limits and projecting alternative impacts, *not* the inclusion of multiple sectors. That complexity was fixed by dropping "complex multi-dimensional control rules" and instead using a "look up table" to set PSC limits. NOAA004662. There is no record explanation for why this simplified method could not have been applied to multiple sectors. Besides, mere complexity does not mean an alternative is not viable.

decision to eliminate all multi-sector alternatives. This is not a "normal result of the scoping process" (NMFS Br. at 27). *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (scope of alternatives are derived from purpose and need).

*And*, the retrofitted purpose and need statement is unlawful anyway because it forecloses the consideration of *any* multi-sector alternatives, making the decision to single out the Amendment 80 sector "'a foreordained formality.'" *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010). This confined the scope of action alternatives to effectively *one*: reducing only the Amendment 80 sector's PSC limit. NMFS was also not faced with a "unique problem" (NMFS Br. at 28 n.11, 29) given that (i) it had recently completed Amendment 111, which examined several multi-sector alternatives, and (ii) 16 different multi-sector alternatives had already been developed (but later entirely deleted) in the Amendment 123 process. In short, NMFS violated NEPA.

## III.  CONCLUSION

For the reasons stated above and in Plaintiff's opening brief, Amendment 123, the associated final rule and implementing regulations, and the EIS are arbitrary, capricious, and contrary to law, and should be vacated. Defendants argue for no exceptions to the default remedy of vacatur. Nor could they: vacatur will simply result in reinstating the status quo that existed under the lawful Amendment 111.

DATED: August 1, 2024.          STOEL RIVES LLP


/s/ *Ryan P. Steen*_____
Ryan P. Steen, Bar No. 0912084
ryan.steen@stoel.com
Jason T. Morgan, Bar No. 1602010
jason.morgan@stoel.com
Connor R. Smith, Bar No. 1905046
connor.smith@stoel.com

*Attorneys for Plaintiff*
*Groundfish Forum, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2024, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court, District of Alaska by using the CM/ECF system, which will electronically serve a copy of the foregoing on counsel of record.

/s/ Ryan P. Steen
Ryan P. Steen, AK Bar No. 0912084