UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

Before The Honorable Sharon L. Gleason, Chief Judge

```
GROUNDFISH FORUM, INC.,         )
                                )
            Plaintiff,          )
                                )
   VS.                          )     NO.3:23-CV-00283-SLG
                                )
NATIONAL MARINE FISHERIES       )
SERVICE, et al.,                )
                                )     Anchorage, Alaska
            Defendants.         )     Tuesday, October 1, 2024
_____)
```

**<u>TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND
RECORDING OF PROCEEDINGS</u>** MOTION FOR SUMMARY
JUDGMENT AT DOCKET [26] AND CROSS MOTION FOR
SUMMARY JUDGMENT AT DOCKET[41]

FTR 10:31 a.m. - 12:05 p.m. = 94 minutes
in Anchorage Courtroom 2

**<u>APPEARANCES:</u>**

For Plaintiff:

                    STOEL RIVES LLP
                    600 University Street, Suite 3600
                    Seattle, Washington 98101
              **BY:  RYAN P. STEEN, ESQ.**

                    STOEL RIVES LLP
                    510 L Street, Suite 500
                    Anchorage, Alaska 99501-1959
              **BY:  CONNOR ROYCE SMITH, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                 Official Court Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendants:
                                 U.S. DEPARTMENT OF JUSTICE
 3                               Environment & Natural Resources Division
                                 Wildlife & Marine Resources Section
 4                               150 M Street Northeast
                                 Washington, DC 20002
 5                       BY:   ERIKA FURLONG, ESQ.
                               JENNIFER A. SUNDOOK, ESQ.
 6

 7   For Intervenor Defendants:
                                 JONES FORTUNA LP
 8                               111 New Street, Suite A
                                 Decatur, Georgia 30030
 9                       BY:   JOHN FORTUNA, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>Tuesday - October 1, 2024</u>                          <u>10:31 a.m.</u>

<u>P R O C E E D I N G S</u>

---oOo---

     **THE CLERK:**  Her Honor, the Court, the United States District Court for the District of Alaska is now in session, with the Honorable Sharon L. Gleason presiding.

     Please be seated.

     Your Honor, we're on record in Case Number 3:23-CV-283, Groundfish Forum, Incorporated, versus National Marine Fisheries Services, et al.

     Counsel, please state your appearance for the record.

     **MR. STEEN:**  Good morning, Your Honor.  I'm Ryan Steen here on behalf of Plaintiff Groundfish Forum, and with me is Connor Smith, both from Stoel Rives.

     **THE COURT:**  All right.

     **MS. FURLONG:**  Good morning, Your Honor.  Erika Furlong on behalf of federal defendants, here with Jennifer Sundook.

     **MR. FORTUNA:**  Good morning, Your Honor.  John Fortuna on behalf of intervenor defendants.

     **THE COURT:**  All right.  And have you worked out the time allocation between the two of you?

     **MS. FURLONG:**  Yes, Your Honor.

     **THE COURT:**  All right.  Very good.

     All right.  Ready to proceed?  I've read all of the briefing.  There's a lot.

1    Go right ahead, please.

2    **MR. STEEN:** Good morning, Your Honor. May it please

3 the Court, as I mentioned, I'm Ryan Steen here on behalf of the

4 plaintiff, Groundfish Forum.

5    I'd like to reserve about -- at least seven minutes for

6 rebuttal, please.

7    **THE COURT:** All right.

8    **MR. STEEN:** I don't see a time rep here. So I'll just

9 eyeball it.

10    **THE COURT:** Yeah.

11    We just fixed the clock here.

12    **MR. STEEN:** Yeah.

13    **THE COURT:** So -- but it's hard to read.

14    Go right ahead.

15    **MR. STEEN:** So fishery management decisions aren't

16 easy, especially when dealing with bycatch questions in the

17 context of many vessels catching many types of fish in the same

18 giant area.

19    The decisions can be made correctly. For example,

20 Amendment 111 did that. That's the action that preceded

21 Amendment 123. There, the Agency transparently discloses what

22 it is doing, recognizes that it is allocating fishing

23 privileges, and attempts to do so fairly and equitably across

24 the sectors that contribute to the problem that's trying to be

25 solved.

1    As NMFS said there, Amendment -- Amendment 111 achieves

2    the objective of producing bycatch fairly and equitably by

3    decreasing halibut limits by sector and by establishing the PSC

4    reduction for each sector based on an evaluation of what is

5    practicable for that sector.  That's at NOAA36973 and -74, and

6    there's a detailed analysis of the allocation in National

7    Standard 4, how it applies for those allocations in

8    Amendment 111 at NOAA1592.

9        By contrast, Amendment 123 shows how to do it wrong.  The

10   Agency's scientific analysis showed that its new, quote,

11   "abundance-based approach to bycatch in the Bering Sea and

12   Aleutian Islands groundfish fishery" did not have a

13   conservation benefit because it just resulted in the fish being

14   caught by the directed halibut fishery rather than being

15   conserved.

16       Rather than revisit the approach when the science said it

17   should, the Agency doubled down and applied it to a single

18   sector that was the most politically convenient.  Unlike in

19   Amendment 111, NMFS denied this time that it was making an

20   allocation at all, even though its action plainly altered the

21   status quo fishing privileges allocated in Amendment 111.

22       NMFS demanded these new restrictions, even though there

23   were no new tape -- no new tools available to accomplish them,

24   meaning that the new restrictions had to be met by foregoing

25   harvest.

1    So I'd like to emphasize a few points on the focused

2  claims that we're making here, starting with the allocation.

3  The Agency's position that Amendment 123 is, quote, "not an

4  allocation" is simply not credible.  First, it completed

5  exactly the opposite in Amendment 111, and it doesn't even

6  acknowledge that it changed its position, which is a

7  requirement of administrative law, and it didn't do that.

8    If you just look at NMFS's own regulations, 50 C.F.R.

9  679.91, there's a section there that's titled "Amendment 80,

10 Program Annual Harvester Privileges."  There's a few sections

11 under that section that detail the harvester privileges for the

12 Amendment 80 sector.  Just under Subsection (c), which is the

13 target species, quote, "allocations," there's a section for

14 the, quote, "halibut PSC allocations."

15    Those allocations are also included as part of the, quote,

16 "cooperative quota" for the sector, which is at 50 C.F.R.

17 679.2, 679.91(h)(3), small Roman numeral (vi).  NMFS calls them

18 an allocation.  Catching a federal -- the catching of federal

19 fish requires a privilege.  That section grants those

20 privileges, whether it's target catch or PSC.

21         **THE COURT:**  Can I back you up?

22         **MR. STEEN:**  Yes.

23         **THE COURT:**  You referenced 679.91(c).  I see (d) as

24 talking about allocations of halibut PSC.

25         **MR. STEEN:**  Yeah.

1          (d) is the one that's -- I'm sorry.  (d) is hal- --

2          **THE COURT:**  (d) is the one?

3      All right.  All right.

4          **MR. STEEN:**  Yes.  (c) is the one I was using for

5  contrast that are the target species --

6          **THE COURT:**  Got it.

7          **MR. STEEN:**  -- target species allocations.

8          **THE COURT:**  All right.  All right.

9          **MR. STEEN:**  So these allocations are directly

10 distributed across the sectors in the groundfish fishery.  If

11 you don't have PSC, you can't fish, and you lose your

12 opportunity to participate in the fishery.

13     It's plainly an allocation.  It was not treated as such by

14 the Agency.  And when you're starting from the premise of

15 treating some- -- of pretending something isn't what it is,

16 everything from there is messed up, and that's what happened

17 here.

18     So let's just start with National Standard 4, fair and

19 equitable analysis.  So under National Standard 4, quote, "The

20 Secretary has a statutory duty to explain how the amendment

21 comports with the specific requirements of National

22 Standard 4."  That's from *Sustainable Fisheries Coalition v.*

23 *Raimondo*, 589 F. Supp. 3d 162.

24     Here, there's no analysis of fairness or equity in the

25 record that takes account of how fairness or equity works when

1  you consider the other sectors that Amendment -- Amendment 80

2  participates with in the groundfish fishery.  There's no

3  analysis of what is possible, practicable, or reasonable for

4  those other sectors, much less any analysis of why it's fair

5  and equitable to change the allocations.

6      Under 50 C.F.R. 600.325(c)(3), little (i), big (B),

7  there's some guidelines there for NMFS to follow in determining

8  fair and equitable.  It didn't follow those.  For example, one

9  of them is to compare its consequences -- the consequences of

10 the allocation with those of alternative allocation schemes.

11 They obviously didn't do that here.

12     This is why there's a quote referenced in the record from

13 NMFS's assistant administrator for fisheries when the issue was

14 raised and changed.  When the flip was made to go to

15 single-sector allocations, he was concerned about the, quote,

16 "potential equities that creates between the sectors."  And

17 here's just an example of that.

18     Under Amendment 111, Amendment 80 had 1,745 metric tons of

19 PSC allocated.

20         **THE COURT:**  Uh-huh.

21     **MR. STEEN:**  The other three sectors had a combined

22 1,770 metric tons of PSC allocated.

23         **THE COURT:**  Where would I find that in the record?

24     **MR. STEEN:**  That's at NOAA1097.

25         **THE COURT:**  All right.  Thank you.

1       **MR. STEEN:**  After Amendment 80, as we know,

2 Amendment 80's -- or after Amendment 123, Amendment 80's sector

3 allocations fluctuate.  So let's say it's around 1300, and it

4 can be lower than that under the new -- the new amendment.

5      All of a sudden, that 1,770 from the other three sectors

6 becomes at least 60 percent of the PSC that's allocated to the

7 groundfish fishery.  Was there any analysis for why the

8 now-majority of PSC allocated isn't abundance-based, despite

9 all of NMFS's reasons why abundance-based is apparently so

10 great and why that's fair and equitable?  No.  That analysis is

11 completely missing from the record.

12      The reason that's missing from the record is because all

13 alternatives were eliminated from the EIS, which is -- in these

14 Council actions, is the document that guides the Agency's

15 analysis.

16       **THE COURT:**  Uh-huh.

17       **MR. STEEN:**  They eliminated all multi-sectors from the

18 EIS.  So how could they have analyzed it?

19      So I want to next address -- actually, before I get to

20 that point, on fair and equitable -- so if you look at the

21 Agency's brief, there's about five or six pages dedicated to

22 kind of reinventing the analysis.

23      So there's no citations there to the National Standard 4,

24 quote, "analysis" that's in the -- in -- for the record on this

25 action, which is Section 7.1 of the EIS, which basically says

it's fair and equitable because Amendment 80 has the majority of the bycatch.

Instead, what they refer to is the NEPA socioeconomic analysis and the analyses for other national standards like National Standard 1 and National Standard 8, but those aren't the National Standard 4 analysis. And as I mentioned earlier, there's an affirmative obligation to explain why the action meets National Standard 4.

This is exactly the same error that the Agency made in *Groundfish Forum v. Ross*, 375 F. Supp. 3d 72. See Pages 88 to 92. That's DC District Court, 2019. So there, the Agency did exactly the same thing, and the Court said, "Hey, it's a post-hoc rationalization. If you're going to look to your analysis of socioeconomic benefits in other national standards and tell me now" -- "tell the Court now that that satisfies National Standard 4, you can't do that."

"And by the way, Agency, when you did your analysis, you didn't even use the National Standard 4 regulatory guidelines," which, of course, NMFS didn't do here, either, even though they cite those in their brief.

The other thing that's important from that case -- this is an argument both defendant and intervenor make -- is that National Standard 4 is met if it simply furthers an objective of the FMP. Well, that's not true, and that's exactly the other argument that that court rejected.

1    They said National Standard -- the Court rejected the

2    argument that, quote, "National Standard 4 only requires that

3    the amendment be justified in terms of the objective of the

4    FMP."  That's at 89 of that opinion.

5    And it makes sense because, otherwise, every bycatch

6    reduction measure would be fair and equitable because it would

7    always further the goal of bycatch reduction, which is a goal

8    in every FMP.  There has to be more analysis to it than just

9    that.

10    So another argument I'd like to address is the "NMFS will

11    get to it later" argument.  This is made by defendants and the

12    intervenors.  So the initial reason why that argument's flawed

13    is that, again, the Mash -- Mash -- Magnuson-Stevens Act

14    requires affirmatively that there's -- that all allocations be

15    fair and equitable.

16    And so if the analysis of fairness and equity requires

17    evaluating the other sectors in the fishery, then the Agency

18    has to do that analysis.  It can't wait and just do it years

19    and years in the future, analyzing how each sector might be

20    affected, depending on how it wants to regulate those sectors.

21    But there's one standard --

22    **THE COURT:**  What -- what case -- what case would you

23    cite me to that you think best supports that proposition?

24    **MR. STEEN:**  Well, I guess here I'd like to go --

25    here's likely -- where I'd like to go on that one.

1    So the standard that's not cited by the defendants or

2  intervenor in their brief is under *CBD v. EPA*, 722 F. 3d 401,

3  at 410, DC Circuit, 2013.  So that's one of the cases that's

4  cited but not discussed in the intervenors' brief for this

5  concept.

6    But there, the Court says that an agency invoking the,

7  quote, "one-step-at-a-time doctrine must, at a minimum,

8  articulate what it believes the statute requires and, 2, how it

9  intends to achieve that goal."

10   So here, the record doesn't have any of that kind of

11 articulation.  There's a reference that -- to the fact that the

12 Agency might later consider these other actions, but there's no

13 analysis of that.  And the plain language of the statute of the

14 Magnuson Act says allocations shall be fair and equitable, and

15 there has to be an analysis of that.

16   And I think what maybe best shows why this is just a

17 flawed concept is looking to the examples that -- that they

18 cite in their brief.  So Amendment 122 involves the Pacific cod

19 trawl.  That's a recent action.  It is -- that is a small

20 segment of the trawl limited access sector, which is one of the

21 four main sectors in the groundfish fishery.

22   So -- and in that action, what they did is it did not

23 lower the amount of bycatch for that sector.  It just changed

24 it to Pacific cod trawl and allowed some of the other segments

25 within that sector to catch more.  Then they can be

reallocated. But here's what's really important. That didn't impose -- impose abundance-based management.

So the very first action NMFS takes after it says, "We're going to get to these later" -- it gets to one segment of one of the sectors, and it imposes a supposed restriction on that sector, and it's not even abundance-based.

And so -- I thought this was interesting. So I pulled the website for Amendment 122 and looked to the comments. This is on the Council's publicly available website. Here's what Intervenor Central Bering Sea Fishermen's Association had to say about that:

"It is difficult to understand why the Council would not include consideration of ABM" -- that's abundance-based management -- "in this action, which would set the appropriate level of PSC by factoring in the abundance of halibut stock. This was the reason why the trawl limited access sector PSC was initially considered in Amendment 123 in the first place."

So they themselves are admitting this is a problem. They're complaining about it. The Agency didn't do it. The other one, briefly, that the Agency refers to is Amendment 91, which is a follow-on updated in Amendment 110. That addresses Chinook bycatch, and it's actually referenced at NOAA4818-20.

So that one deals with the Bering Sea Pollock Fishery. That's a different fishery than the BSAI groundfish fishery. And, indeed, it is a type of ABM that's employed there. But

1    here's where the difference -- there's -- there's some key

2    differences.   There, NMFS applied it to all of the sectors in

3    that fishery.   Here, it didn't do that.

4        There, here's what the Agency said:   "This action is

5    necessary to minimize Chinook and sum" -- "chum salmon bycatch

6    in the Bering Sea Pollock Fishy" -- "Fishery, to the extent

7    practicable, while maintaining the potential for full harvest

8    of the pollock total allowable catch within the prohibited

9    species limits."

10        That's what they did in Amendment 111, too.   They allowed

11   for the potential (Inaudible) harvest.   They did not allow that

12   in Amendment 123 --

13            **THE COURT:**  So --

14            **MR. STEEN:**  -- and --

15            **THE COURT:**  -- if you want to save some time, you

16   probably want to --

17            **MR. STEEN:**  I do.   I see you have -- I went down to

18   about six now.

19        So I'm going to go ahead and -- and stop there --

20            **THE COURT:**  All right.

21            **MR. STEEN:**  -- and save the rest of my time,

22   Your Honor.

23            **THE COURT:**  Very good.   Thank you.

24        I can't see you very well there.   You can come to the

25   side, if you'd like.

1      **MS. FURLONG:**  Sure.

2    Good morning, Your Honor.  May it please the Court, my

3  name is Erika Furlong, and I represent federal defendants,

4  along with my co-counsel, Jennifer Sundook.  I'll begin by

5  addressing plaintiff's Magnuson Act claims, and Ms. Sundook

6  will address their NEPA claim.

7      **THE COURT:**  All right.

8      **MS. FURLONG:**  In addition, intervenors' counsel will

9  reserve his presentation to three minutes, and we'd like to

10  reserve three minutes for rebuttal, given that this is a

11  cross-motion.

12      **THE COURT:**  Okay.

13      **MS. FURLONG:**  Your Honor, I provided your clerk with

14  two documents, the first of which is Exhibit 2 to -- to federal

15  defendants' brief.  It's a table that compares the directed

16  fishery to the Amendment 80 prohibited species catch limit or

17  bycatch limit.

18    And the second is a better-quality version of the map that

19  we provided as Exhibit 1.

20      **THE COURT:**  Uh-huh.

21      **MS. FURLONG:**  Federal defendants requested argument

22  for three reasons.

23    The first is, according to the Magnuson Act's plain

24  language, bycatch clearly is not an entitlement.  And,

25  relatedly, this rule is not an allocation.  And even if it were

an allocation, NMFS has satisfied the requirements of National Standard 4 because it determined that the rule is fair, equitable, will promote conservation, and also that it's practicable.

Second, we want to ensure that the Court is well-informed about the record in a rule-making process. So we want to clarify a few points to that end. And then, finally, Ms. Sundook will explain that the change in scope to focus the rule on the Amendment 80 sector complied with NEPA because it was the result of public input and Agency expertise.

Your Honor, Groundfish Forum is effectively asking the Court to recognize an entitlement in bycatch by elevating bycatch to the same, or even a higher, position than an allocation to the directed fishery. In other words, Groundfish Forum claims that harvest privileges and bycatch are all part of the same pie, which must be subject to National Standard 4.

The first problem with this argument is that the Magnuson Act doesn't even govern halibut allocations. Instead, that falls under the Halibut Act, and there can be no direct allocation of halibut under the Magnuson Act -- Act as a result. Moreover, Groundfish Forum didn't even assert Halibut Act claims. Thus, such arguments are outside the scope of this case.

More fundamentally, the Magnuson Act's plain language

makes clear that bycatch is not an allocation or an assignment of fishing privileges.

    **THE COURT:** Well, how do I square that with the Regulation 91(d) that talks about allocations of halibut PSC?

    **MS. FURLONG:** Well, Your Honor, I would acknowledge that the fact that that regulation is titled "Fishing Privileges" is perhaps inartful. But ultimately, the plain language of the Magnuson Act should control.

    And -- and also, that emphasis on fishing privileges ignores the other language in National Standard 4, which talks about opportunity to participate -- participate in the fishery. And, you know, having a prohibited species catch limit is not participation in a fishery.

    So more fundamentally, the Magnuson Act establishes as a principal -- principal goal to, quote, "minimize bycatch and avoid waste of fish." And it requires fish- --

    **ZOOM RECORDING:** You are the only participant.

    **MS. FURLONG:** It requires fishery management.

    Oh. Should I continue?

    **THE COURT:** That's just -- do you need a minute?

    **THE CLERK:** Just a moment, Your Honor, please.

    **THE COURT:** Just one moment.

    **MS. FURLONG:** Sure.

    **THE COURT:** We're having technical difficulties.

    **MS. FURLONG:** Understandable.

1         **THE COURT:**  Do you need to take a few minutes?

2         **THE CLERK:**  Just waiting for one little response from

3  Jessica.

4         **ZOOM RECORDING:**  You are the only participant.

5         **THE COURT:**  Why don't we take about ten minutes.

6         **THE CLERK:**  Okay.  I apologize, Your Honor.

7         **THE COURT:**  I apologize.  We had -- we've migrated, is

8  the term, our computers to Washington yesterday.

9         **ZOOM RECORDING:**  You are the only participant.

10         **THE COURT:**  It's been a little bit of a disaster.

11    Why don't we take about ten minutes.  We'll hopefully get

12  this resolved.  This obviously doesn't count against anybody's

13  time.

14    We'll go off record briefly.

15         **THE CLERK:**  All rise.

16  Court stands in recess for ten minutes.

17         **ZOOM RECORDING:**  You are the only participant.

18                (Recess taken at 10:52 a.m.)

19            (Proceedings resumed at 11:10 a.m.)

20         **THE CLERK:**  All rise.

21    Her Honor, the Court, this United States District Court is

22  again in session.

23         **THE COURT:**  All right.  Please be seated.

24    And it's my understanding -- is we're now on the hearing

25  phone.

1     **THE CLERK:** Yes, Your Honor.

2     **THE COURT:** All right. Very good.

3   And everybody on that, that can hear me, please be sure to

4 mute your phones so that we don't transmit you here in the

5 courtroom.

6   And if there are people that want to participate, the only

7 way they can get the phone number is by looking at the docket,

8 where the staff is docketing that phone number now.

9   So where did we leave off? I think I was with the

10 Government.

11   Go ahead, please.

12     **MS. FURLONG:** Okay. So, Your Honor, as I mentioned,

13 the Magnuson Act makes clear that bycatch is not -- was never

14 intended to be part of the same pie as harvest privileges that

15 are allocated to the directed fishery, and you can see this in

16 three places: In -- the Magnuson Act's principal goal in

17 Section 1801(c)(3), which requires that bycatch be minimized

18 and avoid -- and avoidance of waste.

19   You can also see it in Section 1802(2), where it requires

20 conservation and management measures that, to the extent

21 practicable, minimize bycatch. And you can see it again in

22 National Standard 9, which requires measures to minimize the

23 bycatch, again, to the extent practicable.

24   So these sections --

25     **THE COURT:** Is it your position that if you're

1    regulating bycatch, that you don't need to be fair and

2    equitable?

3            MS. FURLONG:  Your Honor, I wouldn't go that far, of

4    course.  You know, fairness and equity are goals in rule-making

5    and, of course, like all rule-making, would be open to the

6    public.

7            But I'm saying, you know, if -- if this type of hardship

8    and benefits analysis applies equally to the directed fishery

9    and also to those, you know, who are engaging in bycatch, then

10   it would basically put a thumb on the scale of those who

11   already have higher bycatch limits.

12           And it would make it more difficult for NMFS to be able to

13   issue rules that would prevent overfishing, and it would make

14   it more difficult for NMFS to issue rules that would minimize

15   bycatch, especially rules that would be able to do so in an

16   expeditious way, given that, you know, this extra layer of

17   social impact analyses obviously takes a good deal of time and

18   fact-finding.

19           And you can see that here, where this rule-making --

20   that's part of the reason this rule-making ended up taking

21   nearly a decade to -- to -- to be abundance-based.  And, you

22   know, indeed, Congress could have included some allusion to

23   fairness and equity in each of these sections that refer to

24   minimization of bycatch, but it didn't do so.

25           And instead, the only requirement for minimization of

bycatch is that the measure be, quote, "practicable," and nor
should fisheries that engage in wasteful practices be entitled
to continue such practices, even if the practices would cause a
hardship but would nevertheless be practicable. Otherwise,
there would be, again, a thumb on the scale that would prevent
upending the status quo and would prevent NMFS from fulfilling
a core goal of the Magnuson Act.

        Moreover, according to NMFS's guidelines for
National Standard 4, again, a -- for -- for an action to be an
allocation, it must be direct and deliberate dis- -- in a
distribution of an opportunity to participate in a fishery. In
the final rule, NMFS -- NMFS explained that, quote, "While
management measures can have indirect allocative effects, only
those that result in direct distribution of fishing privileges
are allocations for purposes of National Standard 4."

        The analysis states that, under the set of alternatives
considered, there is no direct allocation or assignment of
fishing privileges to the directed halibut fishery participants
nor any other allocation under National Standard 4. That's at
NOAA35923.

        In other words, bycatch measures are, at best, an
incidental allocation, and that's especially so because direct
halibut allocations are governed by the Halibut Act, not the
Magnuson-Stevens Act.

        And Groundfish Forum has not identified a single case

where another court has held bycatch limits are subject to National Standard 4, and that's clearly because it's neither a sound interpretation of the Magnuson Act nor would it make practical sense from a policy perspective.

However -- however, even if the rule were an allocation, it complies with the Magnuson Act because NMFS performed the national standard analysis and determined the rule is fair and equitable. You can see this at NOAA35293.

In the final rule, NMFS stated, quote, "This action will ensure that the Amendment 80 sector's use of halibut-prohibited species catch does not become a larger proportion of the overall halibut-prohibited species catch in the Bering Sea and Aleutian Islands in years of lower levels of halibut abundance, which will promote conservation of the halibut stock."

For nearly a decade, the Amendment 80 sector benefited from static bycatch limits, even as the directed fishery's allocation and yield declined precipitously due to lower abundance. You can see this in the table that I provided when you compare the directed fishery's allocation in 2011 to its allocation in 2014 and 2015.

Between those years, the directed fishery's allocation decreased from 2,250 metric tons to 780 metric tons. During this same time frame, the Amendment 80 sector's prohibited species limit remained relatively constant at 2,325 metric tons. This just kind of indicates that fairness and equity

permeated this whole rule-making process.  It was, you know, a
consideration from the very beginning.

     Under the final rule, Amendment 80's sector's lowest
bycatch limit, which has never applied, still remains higher
than the directed fishery's allocation for most years in
Area 4CDE.  You can compare the table that I provided with
NOAA35313, the lookup table, and the final rule.

     And Amendment 80 has been meeting most of the bycatch
limits and the rule's lookup table for years thanks to
implementation of the halibut avoidance plan.  Again, you can
compare the table with NOAA35313.

     This is especially notable because NMFS found that, after
implementation of the halibut avoidance measures, the
Amendment 80 sector's gross wholesale value and harvested
groundfish weight remained about the same, and this explains
why Groundfish Forum hasn't shown actual losses and instead
clings to NMFS's worst-case cost estimate.  You can see this at
NOAA4737.

     And none of this is post-hoc.  As described in the brief
on Pages 16 through 19, NMFS performed an extensive social
impact analysis for both the directed fishery and the
Amendment -- Amendment 80 sector.  In addition, the final rule
explains that the National Standard 4 analysis demonstrates
that the rule is fair and equitable because it links the
bycatch limit to abundance, and you can see this again at

1  NOAA35293.

2      NMFS focused on Amendment 80's sector because it

3  contributes the highest proportion of halibut bycatch.  You can

4  see this at NOAA4616.  The Amendment 80 sector, at the time of

5  the rule-making, accounted for three times the amount as the

6  next-highest sector in the Bering Sea and Aleutian Islands.

7      NMFS also determined that cost is not a determinative

8  factor in deciding whether a rule is fair and equitable and

9  promotes conservation and, in this case, that the costs were

10 reasonable when balanced against the purpose and need as well

11 as the need for conservation and to address the social

12 management and other environmental impacts associated with the

13 rule.

14     NMFS also supported its conservation determination.

15 According to NMFS guidelines, conservation and management are

16 intertwined, and this is not reflected in the -- the arguments

17 that Groundfish Forum puts forth.

18     So according to 50 C.F.R. 600.325(c)(3), considerations in

19 conservation also include whether actions encourage rational

20 management of resource, and conservation can be promoted by

21 optimizing yield both in terms of market value and also social

22 benefits.

23     And NMFS applied this definition in the final rule at

24 NOAA35294, and it was consistent with this -- its findings were

25 consistent with this guideline because NMFS determined that

restricting bycatch when abundance is low is rational and
promotes wise use and enables optimum yield.  Lower bycatch and
also, therefore, mortality, by definition, constitutes a
conservation benefit, and NMFS expects benefits to coast-wide
halibut stock, directed fisheries, or both.

        And then, in addition, even -- so -- so ultimately, for,
you know, many of Groundfish Forum's arguments assume that the
International Pacific Halibut Commission will inevitably
reallocate any bycatch savings to the directed fishery, but
this ignores the fact that there are size restrictions on the
directed fishery --

        **THE COURT:**  Uh-huh.

        **MS. FURLONG:**  -- and those smaller fish will
inherently be saved and -- and be able to later result in
positive impacts on the stock.

        So just briefly turning to the rule-making process, the
record clear -- clearly demonstrates it was proper.  After
20 meetings -- or approximately 20 meetings, the Council voted
to recommend the rule as the preferred alternative, and you can
see that at NOAA4633.

        **THE COURT:**  Do you disagree with the plaintiff's reply
brief that details their rendition of the -- of the
deliberations?

        **MS. FURLONG:**  Absolutely, Your Honor, and Ms. Sundook
will get into that in more depth.  I will mention, however,

that -- that, you know, far from being conspiratorial, you fully expect council meetings to involve deliberations.

Although this is not agency deliberations such that they would be excluded from the administrative record, you'd -- it would be proper to be considering some of the same rationales -- same -- same rationale for why you would not want to -- you know, basically, although the Council is not an agency, you would want -- you want deliberations.

And so if a rule could be vacated based on stray comments that occurred during, you know, lively debates during a council meeting, that would have a chilling effect on what you want as, like, a free and open deliberation period in the council.

**THE COURT:** Okay.

**MS. FURLONG:** In addition, I just want to address one document.

NMFS cited NOAA1155, and plaintiffs are correct that that cite was in error. A cite that better addresses the utilization issue can be found in the record at NOAA4722 and NOAA4711.

**THE COURT:** All right.

**MS. FURLONG:** And with that, for all the reasons I've just described, plaintiff cannot meet its burden of demonstrating a violation of the Magnuson Act, and the Court should enter summary judgment for federal defendants on those claims.

1        **THE COURT:**  All right.  Thank you.

2        **MS. FURLONG:**  Thank you.

3        **MS. SUNDOOK:**  Chief Judge Gleason, may it please the

4   Court, good morning.  Jennifer Sundook on behalf of the federal

5   defendants, and I'll be discussing the NEPA claim in this case.

6        **THE COURT:**  All right.

7        **MS. SUNDOOK:**  The change in scope to focus

8   Amendment 123 on the Amendment 80 sector was the result of

9   public input and agency expertise and ultimately offered a

10  solution to the problem of making abundance -- abundance-based

11  management of halibut PSC limits simple enough for the public

12  to understand.

13       This result was the normal outcome of the scoping process.

14  Nothing was done behind closed doors.  Everything was

15  aboveboard.  And the scope was not retrofitted to the

16  alternatives, as alleged by plaintiff, but they evolved

17  together during the scoping process.

18       Plaintiff's approach, in its reply brief, appears to be

19  the epitome of "If you can't argue the law, argue the facts."

20  But the facts, as alleged by plaintiff, have a tenuous

21  connection to reality.

22       So to begin, I will first discuss the years-long process

23  to develop Amendment 123 and show how this change in scope was

24  because this process had stalled because developing a

25  multi-sector approach for abundance-based halibut PSC

1    management was too complex for the public to understand.

2           Then I will discuss how the amended purpose and need

3    statement was a normal result of this public scoping process

4    and complied with NEPA because it was the result of public

5    input and agency expertise to achieve NMFS's statutory mandate

6    to reduce bycatch while maintaining optimum yield.

7           Finally, I will discuss how the alternatives also complied

8    with NEPA because, in the EIS, there were five high-level

9    management alternatives, including a no action alternative, and

10   none of which was a foregone conclusion.

11          Plaintiff is wrong to try to categorize the Amendment 80

12   sector as an alternative.  There was never a scenario where

13   this action was not going to apply to Amendment 80, the sector

14   with the largest halibut bycatch.

15          So to -- to begin, I want to address these emails that

16   plaintiff appears to hinge its entire argument on, a -- a

17   string of ambiguous emails, beginning with this email from

18   Rachel Baker, an Alaska Fish and Wildlife representative, where

19   she used the phrase "without notice" regarding the motion that

20   she was preparing to present to the public council meeting the

21   next day.

22          I would caution the Court to read too much into this for

23   reasons that my co-counsel mentioned.  Though the deliberative

24   process privilege does not apply, reading too much into this

25   would have a chilling effect on the deliberations in the

council process.  It's really not clear what she meant because there was a lot of notice in this process.

There was a public hearing.  The council meetings are all public, and individuals outside of the -- the Council can attend.  Notably, Groundfish Forum Representative Chris Woodley was at this meeting where the change-in-scope motion was presented.

So this process was open to the public.  There was three hours of discussion and deliberation before this motion was presented and then further deliberation after the motion was presented and discussions before it was passed unanimously.

So, again, it's just not clear what she meant by "without notice."  There was a lot of notice.  It could be that she meant without notice to the NMFS staff.  If you look in the context of the email, in the same sentence, she references making more work for the NMFS staff.  So it's really not clear what she meant here.

Additionally, Glenn Merrill's response that plaintiffs categorize as surprised and concerned -- if you look at the email in context, this appears to be more about the B30 element, which was a high-level management alternative that ultimately did not end up in the final version of the EIS.

So there was -- this action developed over several years of public council meetings.

THE COURT:  Would you agree that the email the night

before the meeting is the first reference to going from the

four sectors to just the Amendment 80 sector?

       **MS. SUNDOOK:** I believe so, but it was in line with

previous council meetings where the Council recognized that

this -- this process had stalled for several years. In

September of 2019, there were 16 alternatives. And by

October 2019, that council meeting, the members recognized that

there could be up to another year of analysis of the

alternatives.

    So in December of 2019, the Council really called out to

the public and the stakeholders requesting solutions to this

problem. And narrowing the scope to the sector that has the

highest halibut bycatch is a very elegant solution to this

problem and did, in fact, eliminate several alternatives.

    So the -- the public meeting is at NOAA053003, starting at

3 hours and 27 minutes. There -- there's a lot of discussion

about how eliminating other sectors really simplifies the

analysis because NMFS doesn't have to consider the impacts to

other fisheries in the ecosystem. It just -- it really

simplified the process and eliminated two other alternatives

that were proposed by other sectors.

    So I also want to address plaintiff's allegation that

complexity was not the reason for the reduced scope of

Amendment 123. It -- it very clearly was. There's a lot of

support in the record that this is the motivation for the

change in scope.

So I would direct the Court to NOAA42172. There, you can see previous iterations of alternatives. It's a very complex flow chart that is very inscrutable for the public to understand, and that justified the later narrowing in scope.

So even Groundfish Forum Representative Chris Woodley described the process leading up to this point of the February 2020 meeting as complex before the motion to reduce the scope to the Amendment 80 sector.

There was discussion about how eliminating sectors would make it easier for the public to understand abundance-based halibut bycatch management, and the record cite for that is NOAA053003 at three hours and two minutes to three hours and five minutes.

And then, again, after the motion is presented, there's discussion that recognizes that focusing on one sector simplifies the consideration of impacts and gets the action over the finish line. That's at 3 hours and 52 minutes. So this process was not backwards, as plaintiffs allege.

In the February 2020 meeting, the scope was narrowed to focus on the Amendment 20 sector, but the alternatives were not finalized at this meeting. The alternatives that were voted on in that meeting were not the final alternatives in the EIS, and that's because, by narrowing the scope to the Amendment 80 sector, the Council and NMFS were able to really focus on what

alternatives are best suited for this particular sector.

So over the months that followed, they came up with an entirely new set of alternatives to deal specifically with abundance-based bycatch management in the Amendment 80 sector, and this is exactly the purpose of the scoping process.

The Ninth Circuit has recognized that the process is meant to narrow the issues to receive -- receive in-depth treatment in the EIS and determine the range of actions, alternatives, and impacts to be addressed in the EIS.

There's also case law support for the Ninth Circuit upholding this very procedure, and I would point the Court to *City of Carmel-By-The-Sea v. U.S. Department of Transportation*, which is referenced in the briefing. This is a case where the Ninth Circuit upheld the Agency's narrowing of the purpose and need statement based on receiving public comments.

So in this case, it happened much earlier in the process. The Agency decided to narrow the scope based on how protracted the process had become and that the plaintiff -- the public was unable to understand a multi-sector approach. So the purpose and need statement that resulted complied with NEPA.

Plaintiff, in briefing, improperly tries to flip the analysis by starting with the alternatives. But the proper place for the Court to begin is with the purpose and need statement. And as I've discussed, this was the result of decision-making based on agency expertise and informed public

1    participation, which is the touchstone of NEPA.

2        Agencies have considerable discretion in identifying their

3    purpose and need statement because it's based on so much

4    scientific and technical expertise.  The purpose and need

5    statement clearly conforms with NMFS's duties under the

6    Magnuson-Stevens Act to reduce bycatch while maintaining

7    optimum need -- yield, and this purpose and need statement was

8    not too narrow just because it focuses solely on the sector

9    with the largest halibut bycatch.

10       So there were five high-level management alternatives that

11   resulted from this -- this scope, including a no action

12   alternative, and these -- these management alternatives were

13   the product of years of analysis and public discussion.

14       As I mentioned in the beginning, Amendment 80 is not

15   really properly looked at as an alternative.  There was never a

16   scenario where this action was not going to apply to the

17   Amendment 80 sector.

18       This purpose and need statement is tailored to address a

19   unique problem, which is creating an abundance-based halibut

20   bycatch management system that is comprehensible enough to the

21   public to understand, which is what NEPA demands, that

22   public -- the public is involved and part of the process.

23       So that's what NMFS did when it tailored it to address

24   solely the Amendment 80 sector, and I would analogize --

25   analogize what NMFS did to *HonoluluTraffic.com* **v.** *Fed. Transit*

1    *Administration*.  This is also referenced in briefing.

2        And there, the Ninth Circuit found that a purpose and need

3    statement that only included a rapid rail transportation

4    solution was not too narrow because it was clear that this was

5    the only feasible solution to the traffic issues.  And

6    likewise, here, limiting abundance-based management to the

7    largest sector was the only solution that would create

8    abundance-based halibut bycatch management in a way that was

9    not inscrutable to the public.

10       And, Your Honor, to conclude, the alternatives analysis is

11   really two sides of the same coin with the purpose and need

12   analysis.  The touchstone of the inquiry is whether the

13   selection discussion of alternatives fosters informed

14   decision-making and informed public participation, and

15   that's -- that's clearly the case here.

16       This is a paradigm example of the Agency really listening

17   to public feedback and being concerned about the public and

18   making sure that the action is comprehensible to the public and

19   then creating high-level management alternatives that are

20   tailored to this specific sector.  This was clearly the result

21   of substantial agency expertise and influenced by public

22   feedback.

23       As Amendment 123 complied with both NEPA and the

24   Magnuson-Stevens Act, we would request that the Court enter

25   judgment for the defendants, pending any further questions from

1  the Court.

2         **THE COURT:**  No.  Thank you.

3         **MS. SUNDOOK:**  Thank you.

4         **MR. FORTUNA:**  Excuse me.  Excuse me.

5      Good morning, Your Honor.  John Fortuna for the intervenor

6  defendants.  I'm going to do my best to eyeball the time here

7  on the clock and be brief.

8      First, I just want to say that Amendment 123 is fair and

9  equitable on its face.  Reduced halibut harvests caused by low

10  abundance and high bycatch drove the halibut fishery to the

11  brink of collapse.

12      And despite actions to reduce bycatch, including in

13  Amendment 111 cited by plaintiffs, bycatch mortality has

14  exceeded directed fishery landings by millions of pounds.  As

15  recently as 2022, bycatch accounted for 68 percent of the

16  halibut removals in Area 4CDE.

17         **THE COURT:**  So trying to -- so 68 percent in 4CDE?

18         **MR. FORTUNA:**  Yes, Your Honor.

19         **THE COURT:**  All right.  So I'm looking at the chart,

20  which ends at 2020.  There, it looked to be more like 50/50.

21      What am I missing there?

22         **MR. FORTUNA:**  I'd have to look at the chart.  The

23  numbers in these cases are, frankly, a bit confusing sometimes

24  because the areas are -- you know, the mortalities apportion

25  over different areas, and they don't always align.

1    And so I'd have to look at -- at that, but the -- the

2    citation -- and I'll just point the Court for that statistic --

3         **THE COURT:** Yes.  That would be helpful.

4         **MR. FORTUNA:** -- is at NOAA319.

5         **THE COURT:** Okay.

6         **MR. FORTUNA:** There is -- and I do want to address the

7    percentages.  There is just no merit to this suggestion, in

8    plaintiff's reply brief at 2 and 3, that bycatch comprises just

9    10 percent of mortality.

10        **THE COURT:** I was wondering -- and I -- I'll inquire

11   of plaintiffs.  That's a statewide figure or --

12        **MR. FORTUNA:** Your Honor, the cited documents are

13   discussing coast-wide numbers, which goes all the way down to

14   California --

15        **THE COURT:** Okay.

16        **MR. FORTUNA:** -- or what appear to be statewide

17   numbers in Alaska that include the Gulf of Alaska and

18   Halibut IPHC Areas 2C and 3.  This is the Stewart paper, which

19   is at 18 -- NOAA18716.  That's a coast-wide spawning stock

20   biomass paper.

21        The Merrill presentation, which is unsourced -- it was

22   just a pie chart.  But as best we can tell, it includes the

23   Gulf of Alaska Areas 2C and 3.  Those areas have significantly

24   higher directed fishery limits, significantly lower bycatch

25   limits.

1     And if the Court is interested in seeing how those play

2 out, you can look at the Federal Register Notice, which is at

3 89 Fed. Reg. 19275.

4          **THE COURT:**  Can you state that cite again for me?

5          **MR. FORTUNA:**  Sure.

6     It's 89 Federal Register 19275.

7          **THE COURT:**  Okay.

8          **MR. FORTUNA:**  That is the 2024 halibut catch

9 allocations following the IPHC.

10         **THE COURT:**  All right.

11         **MR. FORTUNA:**  In short, those cited documents say

12 nothing about the BSAI and -- which is where Amendment 80's

13 bycatch occurs.

14     The data also shows that Amendment 80 is responsible for

15 the overwhelming share of bycatch in the BSAI.  It was

16 70 percent of the mortality from 7 -- from 2015 to 2020.  This

17 is the data attached as Exhibit 1, Page 3 to intervenors' brief

18 and at NOAA321.

19     Across all groundfish sectors, Amendment 80 was

20 responsible for 65 percent of all bycatch mortality in the

21 BSAI.  The next-highest sector was just 17 percent.  This is in

22 the EIS at NOAA4720.

23     I'll take just a moment to address *Groundfish Forum v.*

24 *Ross*.

25         **THE COURT:**  Go right ahead.

1    **MR. FORTUNA:** Here, NMFS specifically considered the

2    economic benefits to the directed fishery and the halibut

3    (Inaudible) communities in its National Standard 4 analysis.

4    This is reflected in the record at NOAA4880, NOAA1139, and

5    NOAA1163 to -66.

6        This is not a situation like *Groundfish Forum v. Ross*,

7    where community benefits relevant to National Standard 8 were

8    sort of repurposed post-hoc to justify determination under

9    National Standard 4. Here, they were specifically and directly

10   relevant to the fairness analysis that NMFS conducted, and it

11   was properly considered.

12       To the extent plaintiff complains about fairness vis-à-vis

13   the other sectors in the groundfish fishery, the very premise

14   of this action is that Amendment 80's bycatch constituted a

15   disproportionate share of the available halibut and dwarfed

16   that of other sectors. You can see this in the final rule at

17   NOAA1120.

18       That basic distribution is going to continue under

19   Amendment 123. Just by way of example, its current limit,

20   1,396 metric tons, is about 1.9 times greater than the TLAS

21   sector, which is the next-highest sector.

22           **THE COURT:** And you're saying I can find that at

23   NOAA1120?

24           **MR. FORTUNA:** I'm sorry, Your Honor. The -- the

25   NOAA1120 is the statement about --

1    **THE COURT:**  Disproportion?

2        **MR. FORTUNA:**  -- the relative share.

3    **THE COURT:**  Right.

4        **MR. FORTUNA:**  I can provide a records cite.  I don't

5    have the records cite for the -- for the -- the split off the

6    top of my head --

7    **THE COURT:**  Okay.  All right.

8        **MR. FORTUNA:**  -- but I can provide that.

9        Frankly, Your Honor, and with all due respect, it just

10   doesn't take a Ph.D. in fisheries economics or a detailed

11   analysis to recognize that giving Amendment 80 half of all of

12   the allowable bycatch in the BSAI and basically doubling the

13   next-largest sector is not unfair.  That is -- that is the

14   epitome of fair.

15       Finally, I just want to address something this -- that was

16   address -- addressed in the briefing about practicability.

17   Co-counsel for the federal defendants addressed this a little

18   bit, but NMFS specifically found that further bycatch

19   reductions are practicable through the improved use of existing

20   reduction tools.

21       Plaintiffs take issue with that in their reply brief, but

22   I do want to correct the record.  There is ample support for

23   that in the record before this Court.

24   **THE COURT:**  Uh-huh.

25       **MR. FORTUNA:**  The EIS identifies three principal

halibut avoidance measures used by the Amendment 80 sector, and
it makes clear that none of these is fully utilized or
implemented. Information-sharing and cooperative fishing is
not fully utilized due to competition between Amendment 80
vessels. This is at NOAA4805 to -06.

Deck-sorting isn't fully utilized when it's not necessary
to stay below the regulatory limits. This is at NOAA4811 and
NOAA1156 to -57. The same is true for excluders. Some vessels
use them almost all the time. Others don't. Some firms use
excluders and deck-sorting simultaneously. Others choose not
to do that. This is at NOAA4807 and NOAA4810.

The takeaway, Your Honor, is that there is more that can
be done by the Amendment 80 sector, but reducing bycatch costs
money. They will do what is required to stay below the limits
but no more because they're not going to incur costs
unnecessarily. And absent lower regulatory limits imposed on
the sector, practicable and achievable reductions will not
occur.

And with that, Your Honor, I'm happy to take any
questions.

**THE COURT:** No. Thank you.

All right. Mr. Steen, briefly.

Go ahead, please.

**MR. STEEN:** Okay, Your Honor. I'd like to address a
few of the points that were made by the other lawyers.

1    So on the allocation -- I won't hammer that too much, but

2    the one definition that wasn't mentioned was the actual one

3    that refers to allocations, which is at 16 U.S.C. 1851(a)(4),

4    which were conservation and management measures that, quote,

5    "allocate or assign fishing privileges."

6         **THE COURT:**  Can you give me the cite again?

7    16 U.S.C. --

8         **MR. STEEN:**  16 U.S.C. 1851(a)(4).

9         **THE COURT:**  All right.

10         **MR. STEEN:**  That's National Standard 4.

11         **THE COURT:**  Oh.  Right.  Right.

12         **MR. STEEN:**  So fishing, at 16 U.S.C. 1802(16),

13    includes the catching of fish, the catching of halibut.

14    "Privileges" is not defined in the statute, but we've provided

15    a definition in our brief which plainly applies here.

16    The other thing I'd like to point out is, in

17    Amendment 111, the Agency asked -- answered this question

18    itself.  And there, it said, "Because halibut PSC limit

19    reductions could potentially constrain harvest of groundfish,

20    the proposed action would be an allocation of fishing

21    privileges and must be consistent with National Standard 4."

22    That's at NOAA1592.

23    Again, NMFS hasn't acknowledged that it's changing its

24    position, nor has it even explained that change in position,

25    and that's fatal to their arguments.

1    Okay.  Secondly, there's a reference, again, to us not

2  showing, quote, "actual losses."  So the only way we can show

3  actual losses would be after the rule was implemented.  So

4  that's obviously not in the record, but what the Court does

5  have in front of it is NMFS's own analysis.

6    And so that analysis showed that the impasse could be

7  revenue reductions of over a million dollars annually,

8  depending on which limit is applied -- this is at NOAA4132 --

9  and that that estimate in revenue reduction, quote, "did not

10 represent the full scope of the economic impacts because there

11 would also be increases in cost and reductions in efficiency."

12    That's at 40- -- the reduction in costs -- increased

13 costs/reductions in efficiency are at NOAA4613.

14    **THE COURT:**  So to back up, Mr. Steen, is there a case

15 you're aware of where a court has applied National Standard 4

16 to reducing bycatch?

17    **MR. STEEN:**  I'm not aware of a case where the Court

18 addressed this precise issue.

19    **THE COURT:**  Uh-huh.

20    **MR. STEEN:**  Oftentimes, they arise in one context or

21 the other, but there's also -- they haven't cited a case where

22 a court says it never applies to bycatch measures.

23    **THE COURT:**  Fair enough.  All right.

24    **MR. STEEN:**  So it's kind of -- you know, Your Honor

25 gets to decide that, I suppose.

1           **THE COURT:**  All right.

2           **MR. STEEN:**  I want to talk about NEPA.  So -- a few

3     points on the NEPA timeline.  So this isn't just about the

4     emails, although they are revealing.

5           You know, the Agency itself didn't provide a rational

6     explanation for why it wasn't carrying forward viable

7     alternatives, why multi-sector alternatives were not viable

8     after they just did it in Amendment 111 after the advisory

9     panel presented a motion that was asked for in December 2019 to

10    inform new alternatives with four new alternatives that had

11    multi-sectors.  This is --

12          **THE COURT:**  Uh-huh.

13          **MR. STEEN:**  -- the morning of the February 1st

14    meeting.

15          So, obviously, they weren't given the news, "Guess what?

16    We're wiping out multi-sectors."  They presented it that

17    morning.  So they clearly had multi-sector alternatives in

18    front of them.  They had 16 of them in the draft EIS.  They

19    wiped them all out without saying -- why not even just one of

20    them?

21          Just keep one multi-sector alternative in the analysis.

22    If you want to have one that singles out Amendment 80, fine,

23    but why not just have one that has multi-sectors?  They didn't

24    include that in all of the analysis.  They took them out

25    completely.

And the Government's counsel says that nothing was done behind closed doors, but, Your Honor, that just is not true. I have an email here. It's not in the record. I'm not sure why it's not in the record. It was obtained from a state FOIA records request. It's among all six members of -- from Alaska on the Council and the Chair of the Council.

And the Court can take this under the exception for whether the record was explained by the Agency or whether the record contains the full documents, but what it says is this: "Let's meet again tonight to review ABM options in Simon's room, Hotel Room 2704, at 5:30, if that works for everybody."

That was sent at 1:00 o'clock the afternoon of Friday, January 31st. The emails that we put in our brief come after that, and they're clearly talking about a decision that was made in this hotel room among the six Alaska representatives.

Your Honor, I would like to offer this to the Court and to the parties, and I would ask -- we can have briefing on it, if Your Honor thinks it's relevant; or if the Court doesn't want it, that's fine, too.

But, you know, the record consists of all documents and materials directly or indirectly considered by agency decision-makers, and the Court can accept a document not in the record if it's not clear that the Agency has considered all relevant factors.

So --

1      **THE COURT:** All right.

2      **MR. STEEN:** -- the Agency just told you that nothing

3 was done behind closed doors. I think this email shows that

4 there was something done behind closed doors that day, Friday,

5 January 31st, before the February 1st meeting.

6      **THE COURT:** All right.

7      **MR. STEEN:** And I have copies, if the Court would like

8 some.

9      **THE COURT:** All right. I'll ask the Government's

10 position when you conclude.

11    Go ahead.

12      **MR. STEEN:** Okay. Sorry. I just lost my place,

13 Your Honor.

14    So on NEPA, it was -- it clearly shows -- the record shows

15 that it first came up on that day, January 31st, the idea of

16 cutting out all sectors except Amendment 80, and was discussed

17 that night in emails.

18    Nobody told the advisory panel, which still presented its

19 motion on reduced multi-sector alternatives the morning of

20 February 1st. And then the motion was rammed through their

21 process because Alaska has the majority of people on the -- on

22 the Council that afternoon.

23    That decision to switch the alternatives, to eliminate

24 alternatives, was made before there was any change in the

25 purpose and need statement. So the tail did wag the dog. The

1    purpose and need statement was retrofitted eight months later

2    to match that.

3         So I want to address a few of the points made by

4    intervenors' counsel.  So there's a lot of noise from,

5    actually, both parties about halibut bycatch from the

6    Amendment 80 fleet between a higher proportion of abundance and

7    wiping out the halibut fishery.  And, Your Honor, it's just not

8    true.  There's many reasons the halibut fishery is having

9    problems, but that's not one of them.

10        If you look at NOAA4000, Figure 3-9, Figure 4-6 at 4141,

11   at 4053, Table 4-14, and at 4055, Table 4-15, you have to put

12   some of these things together because it's not presented super

13   cleanly.  But it shows that Amendment 80 halibut PSC use became

14   a smaller, not a larger, proportion of the total BSI [sic]

15   halibut removals from 2013 to 2021.  And that's because they've

16   been steadily reducing their halibut bycatch, and the halibut

17   stock has been remaining flat.

18        It also shows at 404- -- NOAA4041, Figure 4-6, and at

19   4053, Table 4-14, that over that same period of time, the

20   directed halibut fishery's catch limits increased, not

21   decreased.  So our numbers that we put in our brief are

22   correct, and they refer to the whole halibut stock.

23        That's because halibut is managed as a coast-wide stock.

24   Fish migrate all over the place, along the West Coast up to

25   Alaska, from the Gulf over into the BSAI.  They are -- they

1   move around all over the place.  That's why it is managed as a

2   coast-wide stock.

3       So those overall numbers are absolutely relevant, and

4   there's a large focus from the intervenors and the Government

5   on Area 4CDE.  But, again, that's the area where the directed

6   halibut fleet kills as much as 92 of the spawning females --

7   92 percent of the spawning females.  That's at NOAA8- -- 18717,

8   NOAA18944, and NOAA6947-48.

9       And if Area 4CDE was so important, why wasn't this action

10  focused there?  Instead, it focused on all areas why the

11  Amendment 80 -- where the Amendment 80 sector fishes, not on

12  that area.

13      Finally, Your Honor, I want to address the one point about

14  practicability made by intervenors' counsel.  So NOAA actually

15  summarized it up pretty concisely at NOAA4088.  That's in the

16  EIS.  This is when they considered whether there were other

17  tools.

18      They say there, "In addition to the work that is currently

19  being contemplated, it is anticipated that the pressure to

20  reduce halibut bycatch will continue to motivate the fishing

21  industry, agency scientists, and the public to continue to

22  develop new technologies," which, of course, aren't identified.

23  "The speculative nature of what those may ultimately be and how

24  effective they are makes their current use not practicable."

25      So there were no other tools that could be implemented.

1    There was nothing more that could be done.

2         **THE COURT:** Were you reading there from the 111 or the

3    Amendment --

4         **MR. STEEN:** That's from Amendment 123 --

5         **THE COURT:** It is 123?

6         **MR. STEEN:** -- EIS.

7         **THE COURT:** Okay.

8         **MR. STEEN:** NOAA4088.

9         **THE COURT:** Thank you.

10         **MR. STEEN:** So I'll close there, Your Honor -- and I'd

11   just like to close with this, actually.

12        Equity is not something that can be summed up in a

13   sentence under the Magnuson Act.  There's detailed regulations.

14   There's detailed principles.  There's cases that talk about

15   fairness and equity in doing the analysis.  NOAA didn't do the

16   analysis here.  We even heard from the Government, on response,

17   again, cite everything except for analyses under National

18   Standard 4.

19        And I get that there's strong feelings on both sides here

20   with the Amendment 80 fleet, with the halibut fishermen, and

21   who thinks who's right, who's wrong.  Ultimately, it comes down

22   to what does the Magnuson Act require, what does NEPA require,

23   and what does the Administrative Procedure Act require, and was

24   there a rational decision made on the full record that could be

25   traced by the Court and it makes sense?

1        And, Your Honor, that didn't happen here.  The process was

2   flawed from the beginning.  The NEPA's process was done

3   backwards.  And the Agency's actions should be vacated, which

4   would simply just bring back into place Amendment 111, and

5   people would fish under those limits that they were fishing

6   under from 2016 to 2023.

7        None of the defendants or the intervenor has argued that

8   that's disruptive.  They didn't even address vacatur in their

9   arguments.

10          **THE COURT:**  All right.

11          **MR. STEEN:**  So it's not disruptive, and it's a default

12   remedy.

13       Thank you, Your Honor.

14          **THE COURT:**  Thank you.

15       All right.  Ms. Furlong, go ahead.

16          **MS. FURLONG:**  Your Honor, I plan to use about two

17   minutes, and my co-counsel, Ms. Sundook, intends to address one

18   more thing in about one minute.

19          **THE COURT:**  Okay.  Go ahead.

20          **MS. FURLONG:**  So to begin, Your Honor, federal

21   defendants object strenuously to plaintiff's counsel's

22   admission of an extra-record email at this stage of litigation.

23   There was a deadline set very early -- I believe it was in

24   April -- that afforded plaintiff the opportunity to move to

25   supplement the record.

And, in fact, federal defendants were very amenable to working with plaintiff's counsel. So, you know, we certainly would have been receptive to hearing any arguments that they had as to why it should be in the record.

Moreover, plaintiff's counsel has had access to these FOIA documents since far before the litigation. So there is absolutely no basis for thinking that they were unaware of the existence of this email during all this -- this time. And so this is the definition of litigation by ambush, and it's completely improper.

I'll turn now to the argument that -- that bycatch is a fishing privilege under National Standard 4. The Agency used its own guidelines at 600.325 -- I believe it's (c)(3). And according to those guidelines, only direct and deliberate allocations of fish -- and opportunity to participate in a fishery constitutes a fishing privilege.

And plaintiff has not explained why that is an improper guideline and -- and, in fact, only claims that there's no analysis in the record, but that is also false.

So the Government explained in the final rule -- and I believe I already read the quote -- explained in the final rule, at NOAA35923, that this type of management measure is not an allocation for the purposes of National Standard 4, and so it was consistent with that guideline.

And, you know, to the extent that plaintiff's counsel has

suggested that the Agency has changed position, all that's
required in that type of case is that the Agency explain why.
And clearly, there's, you know, language in the record that
explains why this is not an allocation.

Moreover, you know, there has been a change in
administrative law recently with *Loper Bright*, and the
Supreme Court stated clearly that past positions are merely
persuasive evidence as to how to interpret language in a
statute and are not dispositive.  And you can see that at
*Loper Bright*, 144 Supreme Court, at 2259 and 2262.

With respect to vacatur -- so as you've seen by now --

**THE COURT:**  So do you think *Fox v. F.C.C.* is no longer
good law?

**MS. FURLONG:**  I wouldn't go that far, Your Honor, but
certainly it's not afforded -- or it does not seem like it
should be afforded the same weight that plaintiffs seem to
ascribe to it.

**THE COURT:**  All right.

**MS. FURLONG:**  And that -- you know, it would
fundamentally be a fatal flaw to the Agency's determination.

**THE COURT:**  All right.

**MS. FURLONG:**  With respect to vacatur, Your Honor,
the -- you know, this has been a nearly decade-long process to
issue this abundance-based management rule.  The IPHC is
relying on -- on, you know, this rule to be able to set its own

allocations.

Clearly, vacatur of this rule would be disruptive, and it would also be inequitable when you consider the dependency of the Area 4CDE fishing communities on -- on their direct -- directed allocations.

And I'll -- I'll end by mentioning the related issue that National Standard 8 -- you know, the analysis of National Standard 4 should be seen in the context of National Standard 8, which requires NOAA to consider, you know, impacts to fishing communities.

And that's -- that was certainly one of the considerations in this action where you have, you know, communities that are predominantly Native Alaskan, many of whom live in -- or I believe all of whom live in very rural areas and are halibut-dependent, both for -- both personally and in their communities.

**THE COURT:** All right. Thank you.

**MS. FURLONG:** Thank you, Your Honor.

**MS. SUNDOOK:** Your Honor, very briefly.

**THE COURT:** Go ahead.

**MS. SUNDOOK:** Plaintiff seems to dispute that the reason for eliminating sectors was not because of the complexity of the action. However, the evidence in the record is overwhelming that the reason to narrow the scope to Amendment 180 was due to the complexity of the action.

         In the December 2019 council meeting, stakeholder input
was requested.  The Council said that the Council's concern
that the current BSAI halibut ABM approach involves development
of complex controls that adjust halibut PSC limits.  Over the
past two years, council stakeholders and the public have been
challenged to understand the mechanics of the control rule
options and the PSC limits.

         And as my co-counsel said, we do object to the Court
considering this email that's outside of the record, that we
haven't had the chance to take a look at.  But regardless, the
decision to narrow the scope to the Amendment 80 sector was not
made in secret over email.  It was made at the public council
process, where it was presented to the public.

         The public was able to attend.  And, in fact, a
Groundfish Forum representative was at the meeting, where it --
the public could provide input and discussion.  And that's
exactly what occurred over several hours, and then the motion
was passed unanimously after discussion.  The alternatives
developed after the scope.

         There was nothing backward about this process.  The scope
was narrowed to the Amendment 80 sector to reduce complexity,
to streamline the actions so NMFS could find a solution for
abundance-based halibut bycatch management that was
comprehensible to the public.  And then the alternatives
continued to develop after that time.

1    This is completely normal and in line with the scoping
2  process and is the intent of NEPA.  And, again, I would
3  reference that case I referenced before -- this is
4  *City of Carmel* -- where the Ninth Circuit upheld the Agency
5  changing the purpose and need statement after the comments
6  period.
7    Also, there was a comments period in this case as well.
8  So there was just so much public opportunity to provide input
9  in this case.  The -- Amendment 80 was the result -- or I'm
10  sorry.  Amendment 123 was the result of substantial agency
11  technical expertise and was informed by public input.
12    And --
13    **THE COURT:**  Okay.
14    **MS. SUNDOOK:**  -- for that reason, the Court should
15  rule in favor of the defendants.
16    Thank you.
17    **THE COURT:**  Thank you.
18    I will take it under advisement.  And I'm not precluding
19  plaintiff from filing a motion to supplement, but I would
20  anticipate an opposition, from what I heard here.
21    And I'll take that up and factor in the timeliness as well
22  as the fact that I granted plaintiff's motion to expedite a
23  decision here by aiming for November 1st.  So that may factor
24  into the decision whether filing a motion at this point would
25  be appropriate to supplement.

1    With all of that said, thank you for your arguments and

2  your briefing, very helpful.  And we'll go off record at this

3  time.

4        **THE CLERK:**  All rise.

5    This now [sic] is now adjourned.  This court stands in

6  recess until 2:00 p.m.

7              (Proceedings adjourned at 12:05 p.m.)

1

2

3          **<u>CERTIFICATE OF TRANSCRIBER</u>**

4          I certify that the foregoing is a true and correct

5     transcript, to the best of my ability, of the above pages of

6     the official electronic sound recording provided to me by the

7     U.S. District Court, District of Alaska, of the proceedings

8     taken on the date and time previously stated in the above

9     matter.

10         I further certify that I am neither counsel for,

11    related to, nor employed by any of the parties to the action in

12    which this hearing was taken, and further that I am not

13    financially nor otherwise interested in the outcome of the

14    action.

15

16    DATE:  Friday, October 18, 2024

17

18

19

20         _____/S/ James C. Pence-Aviles_____

21         James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                    U.S. Court Reporter
22

23

24

25