# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

GROUNDFISH FORUM, INC.,

        Plaintiff,

  v.

NATIONAL MARINE FISHERIES
SERVICE*, et al.*,

        Defendants,

  and

CENTRAL BERING SEA
FISHERMAN'S ASSOCIATION, *et al.,*

        Intervenor-Defendants.

Case No. 3:23-cv-00283-SLG

## DECISION AND ORDER

Plaintiff in this case is Groundfish Forum, Inc., a non-profit trade organization based in Seattle, Washington, that represents five companies and 17 trawl catcher-processors comprising the Amendment 80 sector.[1] The Amendment 80 sector harvests groundfish in the Bering Sea and Aleutian Islands ("BSAI") region and it is governed by the Groundfish Fishery Management Plan ("FMP") developed by the North Pacific Fishery Management Council.[2] The Groundfish FMP was

---

[1] Docket 1 at ¶ 13. The Amendment 80 sector operates as the Alaska Seafood Cooperative, which receives all Amendment 80 sector fishing allocations. Docket 1 at ¶ 14.

[2] Docket 26 at 12-13.

developed pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA").[3]  The Groundfish FMP allocates the harvest of target species and sets the limit for halibut bycatch, or prohibited species catch ("PSC"), for each of the four different sectors operating in the BSAI, including the Amendment 80 sector.[4]

Plaintiff challenges Federal Defendants' implementation of Amendment 123 to the Groundfish FMP; that amendment changes how the halibut bycatch limit is set for the Amendment 80 sector.[5]  Before Amendment 123, the halibut bycatch limit for all four BSAI groundfish sectors was a static limit set in metric tons. Amendment 123 implemented a halibut bycatch limit based on halibut abundance for the Amendment 80 sector only.  Under Amendment 123, if halibut abundance is high, the Amendment 80 sector's halibut bycatch limit is unchanged from the static limit in effect before Amendment 123.  However, when halibut abundance falls below high abundance, the Amendment 80 sector's halibut bycatch limit is reduced from 10 to 35% below that limit.[6]

Plaintiff contends that Amendment 123 violates the MSA, the Administrative

---

[3] *See* 16 U.S.C. §§ 1801–1891d.

[4] Docket 26 at 8.

[5] Federal Defendants are the National Marine Fisheries Service ("NMFS"); National Oceanic and Atmospheric Administration ("NOAA"); Gina Raimondo, in her official capacity as Secretary of the United States Department of Commerce; and Janet Coit, in her official capacity as Assistant Administrator of NOAA.

[6] NOAA003880.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 2 of 39
Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 2 of 39

Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA") and seeks an order vacating Amendment 123. For the reasons set forth below Plaintiff's request for relief is DENIED and its claims are DISMISSED.

## BACKGROUND

The Groundfish FMP was created pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§ 1801–1891d, which provides for exclusive federal management over fisheries within the United States' Exclusive Economic Zone.[7] In order to conserve and manage federal fisheries, the MSA established eight Regional Fishery Management Councils, which prepare FMPs and plan amendments, and propose implementing regulations.[8]

The MSA directs each Regional Fishery Management Council to prepare and submit an FMP for each fishery under its authority that requires conservation and management.[9] FMPs must comply with both the National Standards and the Required Provisions that are contained in the MSA.[10] National Standard 4 requires "allocat[ions] or assign[ments] [of] fishing privileges" to be "fair and equitable" and "reasonably calculated to promote conservation."[11] While the MSA does not

---

[7] 16 U.S.C. §§ 1811(a), 1802(11).

[8] 16 U.S.C. §§ 1852(a), (h), 1853(c).

[9] 16 U.S.C. § 1852(h)(1).

[10] *See* 16 U.S.C. §§ 1851, 1853.

[11] 16 U.S.C. § 1851(a)(4) ("If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 3 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 3 of 39

define allocation, assignment, privilege, or fishing privileges, 50 C.F.R. § 600.325(c) provides that "[a]n 'allocation' or 'assignment' of fishing privileges is a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals."[12]  The MSA defines "fishery" as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and . . . any fishing for such stocks."[13]  Further, National Standard 9 and Required Provision 11 both provide that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch."[14]

The North Pacific Fishery Management Council ("Council") is the regional council that has "authority over the fisheries in the Arctic Ocean, Bering Sea, and

---

fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges."); *see also* 16 U.S.C. § 1853(a)(14) (If it is necessary for an FMP to contain "conservation and management measures which reduce the overall harvest in a fishery[,]" the FMP must "allocate" "any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery" "taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector").

[12] 50 C.F.R. § 600.325(c); *see also* 50 C.F.R. § 600.10 (same definition of "allocation").

[13] 16 U.S.C. § 1802(13).

[14] 16 U.S.C. § 1851(a)(9); *see also* 16 U.S.C. § 1853(a)(11) (FMPs must "include conservation and management measures that, to the extent practicable and in the following priority—(A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided").  Bycatch, also called prohibited species catch ("PSC"), is comprised of "fish which are harvested in a fishery, but which are not sold or kept for personal use."  16 U.S.C. § 1802(2).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 4 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 4 of 39

Pacific Ocean seaward of Alaska."[15] Although the Secretary of Commerce is responsible for reviewing and implementing FMPs, the Secretary has delegated that authority to the National Marine Fisheries Service ("NMFS").[16]

Under the Groundfish FMP, "[f]ishermen are required . . . to avoid the capture of any prohibited species in groundfish fisheries, including halibut . . . . Halibut PSC limits provide a regulated upper limit to mortality resulting from halibut interceptions because continued groundfish fishing is prohibited once a halibut PSC limit has been reached . . . ."[17] In 2016, NMFS and the Council finalized a rule—Amendment 111—to reduce the halibut bycatch limit in the four BSAI groundfish sectors: "[t]he Amendment 80 sector (non-pollock trawl catcher/processors); the BSAI trawl limited access sector (all non-Amendment 80 trawl fishery participants); the non-trawl sector (primarily hook-and-line catcher/processors); and the Western Alaska Community Development Quota Program."[18] Amendment 111 established halibut bycatch limits for each sector of, respectively, 1,745 metric tons, 745 metric tons, 710 metric tons, and 315 metric

---

[15] 16 U.S.C. 1852(a)(1)(G).

[16] 16 U.S.C. § 1802(39); 16 U.S.C. § 1854 (outlining the Secretary's responsibilities and authority); *see also* 16 U.S.C. § 1854(d); *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 889 (9th Cir. 2010) (discussing the Secretary's delegation of authority to NMFS).

[17] NOAA003907.

[18] Fisheries of the Exclusive Economic Zone Off Alaska; Bering Sea and Aleutian Islands Management Area; American Fisheries Act; Amendment 111, 81 Fed. Reg. 24714, 24714 (Apr. 27, 2016) (codified at 50 C.F.R. pt. 648) [hereinafter Amendment 111 Final Rule]; NOAA000508.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 5 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 5 of 39

tons.[19] NMFS determined at that time that "greater reductions were not practicable for the Amendment 80 sector," in part because, "[b]ased on the best available information, the Council and NMFS concluded that it was not clear that the Amendment 80 sector could make additional changes in fishery operations to accommodate higher PSC limit reductions other than foregoing substantial harvests and revenue."[20]  Nevertheless, "[a]lthough the proposed rule would establish a halibut PSC limit of 1,745 mt, NMFS believe[d] it [was] likely that the Amendment 80 sector, specifically participants in the Amendment 80 cooperatives, would use less halibut PSC than the proposed limit."[21]  The final rule for Amendment 111 identified additional actions that NMFS had begun to improve the management of halibut bycatch, including forming a work group to evaluate linking halibut bycatch limits to halibut abundance.[22]

In 2017, NMFS published a Notice of Intent to Prepare an Environmental Impact Statement ("EIS") "on a new halibut bycatch management program for

---

[19] Amendment 111 Final Rule, 81 Fed. Reg. at 24714.

[20] *Id.* at 24721; NOAA000515; *see also* Fisheries of the Exclusive Economic Zone Off Alaska; Bering Sea and Aleutian Islands Management Area; American Fisheries Act; Amendment 111, 80 Fed. Reg. 71650, 71664 (Nov. 16, 2015) (codified at 50 C.F.R. pt. 679) [hereinafter Amendment 111 Proposed Rule] ("The best available information suggests it is not clear that additional changes in fishery operations could accommodate these high levels of reductions other than foregoing substantial harvest and revenue.").

[21] Amendment 111 Proposed Rule, 80 Fed. Reg. at 71664.

[22] Amendment 111 Final Rule, 81 Fed. Reg. at 24717; NOAA000511.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 6 of 39

groundfish fisheries" in the BSAI.[23]   The notice included a purpose and need

statement that had been adopted by the Council; the statement provided:

> The current fixed yield based halibut PSC caps are inconsistent with
> management of the directed halibut fisheries and Council
> management of groundfish fisheries, which are managed based on
> abundance.  When halibut abundance declines, PSC becomes a
> larger proportion of total halibut removals and thereby further reduces
> the proportion and amount of halibut available for harvest in directed
> halibut fisheries.  Conversely, if halibut abundance increases, halibut
> PSC limits could be unnecessarily constraining.  The Council is
> considering linking PSC limits to halibut abundance to provide a
> responsive management approach at varying levels of halibut
> abundance.  The Council is considering abundance-based PSC limits
> to control total halibut mortality, provide an opportunity for the directed
> halibut fishery, and protect the halibut spawning stock biomass,
> particularly at low levels of abundance.  The Council recognizes that
> abundance-based halibut PSC limits may increase and decrease with
> changes in halibut abundance.[24]

In compliance with the National Environmental Policy Act ("NEPA"), the

Council and NMFS staff prepared a preliminary draft Environmental Impact

Statement ("DEIS") in September 2019.[25]   The preliminary DEIS included

alternatives that applied abundance-based management to all four groundfish

BSAI sectors.[26]

---

[23] Fisheries of the Exclusive Economic Zone Off Alaska; Halibut Bycatch Management in the
Groundfish Fisheries of the Bering Sea and Aleutian Islands, 82 Fed. Reg. 58374, 58374 (Dec.
12, 2017) (codified at 50 C.F.R. pt. 679); NOAA035256.

[24] Fisheries of the Exclusive Economic Zone Off Alaska; Halibut Bycatch Management in the
Groundfish Fisheries of the Bering Sea and Aleutian Islands, 82 Fed. Reg. at 58376;
NOAA035258.

[25] NOAA042118; *see* 42 U.S.C. § 4332(C)(i)-(iii).

[26] NOAA040849.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 7 of 39

In December 2019, the Council requested stakeholder input regarding revisions to alternatives, new ideas for alternatives, or suggestions to "streamlin[e]" alternatives.[27]   At the Council's February 2020 meeting, the Council considered changes to the alternatives presented in the DEIS.[28]   "After staff presentations, reports, and public comment," the Council unanimously adopted a motion to focus the action on the Amendment 80 sector alone and to "reduc[e] the number of Alternatives for specifying a control rule."[29]   The Council's newsletter explained that it was eliminating the other BSAI groundfish sectors from the action because

> [The Amendment 80] sector is responsible for more than 60% of the annual halibut bycatch mortality in the Bering Sea.  In limiting this action to the Amendment 80 sector, the Council acknowledged that while the trawl limited access catcher vessel sector is responsible for approximately 20% of the annual mortality, that mortality is primarily taken in the directed Pacific cod fishery and the Council has already initiated a separate action that would reduce their halibut PSC as part of a forthcoming rationalization package.  The other two sectors, freezer longline and catcher vessel hook-and-line sectors contribute

---

[27] NOAA053003 at 0:02:35-0:02:51; *see* NOAA043065 ("[T]he Council requests stakeholder input on additional management alternatives that serve to streamline the action and meet the Council's objectives to establish abundance-based PSC limits that minimize halibut PSC to the extent practicable, and aid the directed halibut fisheries at low levels of abundance.").

[28] NOAA043160.

[29] NOAA043160-62; *see also* NOAA043168-69; NOAA053003 at 3:03:06-3:05:25 (Council member noting lengthy regulatory process and assessing that motion's focus on the Amendment 80 sector would simplify the action to be more easily understood by the public); NOAA053003 at 3:27:34-3:28:58 (Council member explaining motion to focus action on Amendment 80 sector, reduce number of alternatives, modify some alternatives, add a new option); NOAA053003 at 3:29:01-3:31:20 (explaining that motion focuses on Amendment 80 because that sector accounts for largest share of halibut bycatch mortality and is consistent with intent to streamline action); NOAA053003 at 3:31:21-3:33:30 (Council member explaining that the reduced alternatives were the general recommendations of advisory panel and included an unchanged Alternative 2.2, which was proposed by the Amendment 80 sector); NOAA053003 at 3:33:35-3:34:47 (Council member noting that motion was in direct response to the Council's request for stakeholder input on ways to streamline the action).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 8 of 39

a relatively small proportion of the annual halibut PSC. The CDQ sector is also removed from this action at this time.[30]

The Council declined to alter the purpose and need statement at that time.[31]

In a revised DEIS prepared in September 2020, NMFS and Council staff suggested that "[t]he Council may . . . wish to revisit their purpose and need statement and objectives in light of changing this action to only directly modify PSC limits for the Amendment 80 sector."[32] In October 2020, the Council revised the purpose and need statement for the action as follows:

> Halibut is an important resource in the Bering Sea and Aleutian Islands (BSAI), supporting commercial halibut fisheries, recreational fisheries, subsistence fisheries, and groundfish fisheries. The International Pacific Halibut Commission (IPHC) is responsible for assessing the Pacific halibut stock and establishing total annual catch limits for directed fisheries and the North Pacific Fishery Management Council (Council) is responsible for managing prohibited species catch (PSC) in U.S. commercial groundfish fisheries managed by the Council. The Amendment 80 sector is accountable for the majority of the annual halibut PSC mortality in the BSAI groundfish fisheries. While the Amendment 80 fleet has reduced halibut mortality in recent years, continued decline in the halibut stock requires consideration of additional measures for management of halibut PSC in the Amendment 80 fisheries.
>
> When BSAI halibut abundance declines, PSC in Amendment 80 fisheries can become a larger proportion of total halibut removals in the BSAI, particularly in Area 4CDE, and can reduce the proportion of

---

[30] NOAA043184 (Council February 2020 Newsletter).

[31] NOAA053003 at 3:44:27-3:46:00 (Council member explaining that revision of the purpose and need statement was not necessary because the purpose and need statement already discussed abundance-based management of PSC and, given discussion about Amendment 80 sector contributing most of halibut mortality in BSAI, purpose and need statement was not inconsistent with change to only consider Amendment 80 sector).

[32] NOAA044538.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 9 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 9 of 39

halibut available for harvest in directed halibut fisheries.  The Council intends to establish an abundance-based halibut PSC management program in the BSAI for the Amendment 80 sector that meets the requirements of the Magnuson-Stevens Act, particularly to minimize halibut PSC to the extent practicable under National Standard 9 and to achieve optimum yield in the BSAI groundfish fisheries on a continuing basis under National Standard 1.  The Council is considering a program that links the Amendment 80 sector PSC limit to halibut abundance and provides incentives for the fleet to minimize halibut mortality at all times.  This action could also promote conservation of the halibut stock and may provide additional opportunities for the directed halibut fishery.[33]

The final Environmental Impact Statement ("FEIS"), issued in December 2022, incorporated the revised purpose and need statement.[34]  It recognized that "[p]revious iterations of this analysis . . . considered modifying the halibut PSC limits for all sectors, but the Council in October 2020 chose to focus this action only on the Amendment 80 PSC limits since the Amendment 80 sector comprises the majority of halibut PSC mortality in the BSAI (52% average from 2015-2020)."[35] The FEIS also "recognize[d] past and ongoing efforts by the Amendment 80 sector to reduce total halibut PSC in the BSAI[,]" but noted that "[c]oncerns persist, however, about continuing low levels of halibut biomass that result in reduced directed fishery catch limits in Area 4 without any parallel reductions in PSC limits."[36]

---

[33] NOAA044492.

[34] NOAA003858; NOAA003873; NOAA003877.

[35] NOAA003874.

[36] NOAA003875.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 10 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 10 of 39

The FEIS considered a total of five alternatives, including a no action alternative and four alternatives that would alter the Amendment 80 bycatch limit depending on halibut abundance; the alterative bycatch limits ranged from 45% below to 15% above the limit set by Amendment 111.[37]  Each alternative used a look-up table to determine annual bycatch limits based on the most recent halibut abundance data from two surveys (IPHC setline survey and EBS shelf trawl survey).[38]

The Preferred Alternative used the following look-up table to set bycatch limits for the Amendment 80 sector ranging from 1,745 metric tons (the limit set by Amendment 111) to 1,134 metric tons, 35% below the Amendment 111 limit, depending on halibut abundance:[39]

---

[37] NOAA003877.

[38] NOAA003877.

[39] NOAA003877; NOAA003880.

| | | EBS shelf trawl survey index (mt) | |
|---|---|---|---|
| | | Low <br> <150,000 | High <br> ≥ 150,000 |
| IPHC setline survey index in Area 4ABCDE (WPUE) | High <br><br> ≥ 11,000 | 1,745 mt <br><br> (current limit) | 1,745 mt <br><br> (current limit) |
| | Medium <br><br> 8,000-10,999 | 1,396 mt <br><br> (20% below current) | 1,571 mt <br><br> (10% below current) |
| | Low <br><br> 6,000-7,999 | 1,309 mt <br><br> (25% below current) | 1,396 mt <br><br> (20% below current) |
| | Very Low <br><br> < 6,000 | 1,134 mt <br><br> (35% below current) | 1,134 mt <br><br> (35% below current) |

[40]

The "Council acknowledge[d] that halibut is fully utilized in the BSAI" and determined that, "at low and very low index states, mortality from PSC should decline in response to reduced amounts of halibut available for harvest by all users. Under those conditions, reducing mortality from PSC is likely to prevent halibut PSC from becoming a larger proportion of total removals in the BSAI, consistent with the Council's purpose and need statement."[41] The FEIS also noted that the Preferred Alternative, using then-existing halibut abundance index levels which corresponded to a "low" abundance on the look-up table, would result in a bycatch limit of 1,309 metric tons.[42] Such a limit would be 37 metric tons below

---

[40] NOAA003880.

[41] NOAA003880.

[42] NOAA004601.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 12 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 12 of 39

the Amendment 80 sector's average halibut bycatch use from 2016 through 2019.[43]  The Council concluded that the Preferred Alternative "would promote conservation of the halibut resource, improve its management, and create a more equitable distribution process between the directed and non-directed fisheries."[44]

In March 2023, NMFS issued a Record of Decision selecting the Preferred Alternative in the FEIS.[45]  In November 2023, NMFS published the final rule implementing Amendment 123.[46]  In December 2023, Plaintiff filed this suit.[47]

Before the Court at Docket 26 is Plaintiff's Opening Brief challenging Federal Defendants' implementation of Amendment 123 under the MSA, NEPA, and the APA.  Federal Defendants responded in opposition and cross moved for summary judgment at Docket 41.  Intervenor-Defendants responded in opposition at Docket 39.[48]  Three sets of amici curiae filed briefs in support of Defendants.[49]  Plaintiff

---

[43] NOAA004601.

[44] NOAA003881.

[45] NOAA001053; NOAA001056; NOAA001066.

[46] Fisheries of the Exclusive Economic Zone Off Alaska; Bering Sea and Aleutian Islands Halibut Abundance-Based Management of Amendment 80 Prohibited Species Catch Limit, 88 Fed. Reg. 82740 (Nov. 24, 2023) [hereinafter Amendment 123 final rule]; NOAA035282-313.

[47] Docket 1.

[48] Intervenor-Defendants are Central Bering Sea Fisherman's Association; City of St. Paul; Alaska Longline Fishermen's Association; Fishing Vessel Owners' Association; Homer Charter Association; The Boat Company; Petersburg Vessel Owners' Association; Alaska Marine Conservation Council; Halibut Association of North America; North Pacific Fisheries Association; Aleut Community of St. Paul; and Seafood Producers Cooperative.  *See* Docket 10; Docket 16.

[49] Docket 38-1 (United States Senator Daniel S. Sullivan and United States Representative Mary Sattler Peltola); Docket 40-1 (State of Alaska); Docket 42 (Cordova District Fishermen United and

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 13 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 13 of 39

replied at Docket 48. Oral argument was held on October 1, 2024.[50]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[51]

## LEGAL STANDARD

Pursuant to the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[52]

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.[53]

The APA requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . . [C]ourts need not

---

Kodiak Archipelago Rural Regional Leadership Forum, and individuals Avery Ault, Daniel Donich, Greg Sutter, Richard Baltzer, and Emily Ault).

[50] Docket 57.

[51] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[52] 5 U.S.C. § 706(2)(A).

[53] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 14 of 39

and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."[54]

**DISCUSSION**

## I.   Magnuson-Stevens Act

### a.   National Standard 4 and Required Provision 14

As a threshold matter, the parties dispute whether Amendment 123 is an allocation of fishing privileges under the MSA: Plaintiff maintains that it is, Federal Defendants and Intervenor-Defendants maintain that is it not.[55]   Whether Amendment 123 constitutes an allocation determines whether National Standard 4—16 U.S.C. § 1851(a)(4)—applies.

National Standard 4 provides that "[c]onservation and management measures shall not discriminate between residents of different States.   If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; [and] (B) reasonably calculated to promote conservation . . . ."[56] NMFS concluded that Amendment 123 is not "a direct allocation or assignment of fishing

---

[54] *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

[55] Docket 26 at 17-20; Docket 41-1 at 20-23; Docket 39 at 15-17.

[56] 16 U.S.C. § 1851(a)(4).   Section 1851(a)(4)(C) requires that an allocation not create an excessive share; that subsection is not at issue in this case.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 15 of 39

privileges to the directed halibut fishery participants, nor any other allocation under National Standard 4."[57]

Plaintiff asserts that the definitions of fishing and bycatch in the MSA and the common meaning of privilege establish that halibut bycatch is a "fishing privilege" pursuant to National Standard 4.[58] Plaintiff contends that allowing halibut bycatch by the Amendment 80 sector is a fishing privilege because "[t]he grant of a PSC limit makes the catching of halibut lawful, thus immunizing the Amendment 80 sector to liability."[59]

In response, Federal Defendants rely on 50 C.F.R. § 600.325(c)(1), which provides that "[a]n 'allocation' or 'assignment' of fishing privileges is a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals."[60] Pursuant to that regulation, NMFS concluded that Amendment 123 "does not establish an allocation within the meaning of [National Standard] 4 because a PSC limit is by definition not a 'fishing privilege' or an 'opportunity to participate' in the halibut fishery."[61] Federal Defendants explain that "NMFS has never 'allocated' to the Amendment 80 sector

---

[57] NOAA035293.

[58] Docket 48 at 8-9.

[59] Docket 48 at 9.

[60] 50 C.F.R. § 600.325(c).

[61] Docket 41-1 at 21 (first quoting 16 U.S.C. § 1851(a)(4); and then quoting 50 C.F.R. § 600.325(c)(1)).

any privileges to target or harvest halibut. Instead, NMFS and the Council designated halibut as a 'prohibited species' in the groundfish FMP, meaning that the Amendment 80 sector is required to avoid and is prohibited from retaining halibut unless an exception applies."[62]

Intervenor-Defendants contend that Amendment 123 is not an allocation "because setting bycatch limits does not 'distribute' the opportunity to participate in any fishery."[63] In their view, reducing the applicable halibut bycatch limit has no direct effect on the Amendment 80 sector's opportunity to harvest groundfish and any incidental allocative effects of Amendment 123 do not render it an allocation under National Standard 4.[64] And Intervenor-Defendants maintain that Amendment 123 is also not an allocation to the halibut fishery, as the Council does not have the authority to set annual halibut harvest limits.[65]

The MSA defines "fishing" as "the catching, taking, or harvesting of fish" and "any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish."[66] Bycatch is defined in the MSA as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes

---

[62] Docket 41-1 at 21.

[63] Docket 39 at 15.

[64] Docket 39 at 15-16 (citing 50 C.F.R. § 600.325(c)(1)).

[65] Docket 39 at 16.

[66] 16 U.S.C. § 1802(16).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 17 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 17 of 39

economic discards and regulatory discards."[67]   NMFS promulgated a federal regulation defining "allocation or assignment of fishing privileges" in National Standard 4 at 50 C.F.R. § 600.325(c)(1).[68]  That regulation defines "[a]n 'allocation' or 'assignment' of fishing privileges [as] a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals."[69]   Section 600.325(c)(1) further provides that "[a]ny management measure (or lack of management) has incidental allocative effects, but only those measures that result in direct distributions of fishing privileges will be judged against the allocation requirements of Standard 4."

While the Court finds Intervenor-Defendants' analysis of the allocation issue to be persuasive, the Court is concerned by NMFS's consideration of bycatch limits as allocations in Amendment 111 and NMFS's failure to acknowledge or explain why it changed its position in Amendment 123.[70]  The Court will therefore assume without deciding that Amendment 123 is an allocation subject to National Standard 4.

---

[67] *Id.* at § 1802(2).

[68] Plaintiff does not argue that § 600.325(c) is unlawful.

[69] 50 C.F.R. § 600.325(c)(1).

[70] *See* Docket 39 at 15-17; *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position").

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 18 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 18 of 39

The Court turns to whether Amendment 123 satisfies National Standard 4's requirements that it be "fair and equitable" and "reasonably calculated to promote conservation."[71] "[A]llocations are 'fair and equitable' if they are 'rationally connected to the achievement of [optimum yield] or with the furtherance of a legitimate FMP objective.'"[72] Reducing bycatch is a legitimate FMP objective.[73] Further, "'[i]nherent in an allocation is the advantaging of one group to the detriment of another.' Thus, '[a]n allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups.'"[74]

Plaintiff characterizes Federal Defendants' explanation for why Amendment 123 complies with National Standard 4 as a *post hoc* rationalization.[75] However, the FEIS and final rule each addressed National Standard 4. The FEIS observed that "[n]othing in the Preferred Alternative considers residency as a criterion for the Council's decision. Residents of various states, including Alaska and the states of

---

[71] 16 U.S.C. § 1851(a)(4)(A)-(B).

[72] *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 890 (9th Cir. 2010) (alteration in original) (quoting 50 C.F.R. § 600.325(c)(3)(i)(A)).

[73] *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1563 n.13 (D.C. Cir. 1991); *see also* 16 U.S.C. § 1801(c)(3) (declaring congressional policy in the MSA to "consider[] the effects of fishing on immature fish and encourage[] development of practical measures that minimize bycatch and avoid unnecessary waste of fish").

[74] *Fishermen's Finest Inc.*, 593 F.3d at 890 (alterations in original) (quoting 50 C.F.R. § 600.325(c)(3)(i)(A)-(B)).

[75] Docket 48 at 11-12.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 19 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 19 of 39

the Pacific Northwest, participate in the sectors that are directly and indirectly affected by the proposed action, including both groundfish and halibut fisheries."[76] The FEIS also stated that, "[t]o the extent that the PSC limits imposed upon commercial groundfish sectors constitute allocations, the change to those limits here is fair and equitable. Such changes in this action apply only to the Amendment 80 sector because that sector is responsible for a majority of the PSC mortality.[77]

In the final rule, NMFS responded to a comment regarding National Standard 4, determining that, even though NMFS concluded that National Standard 4 did not apply, Amendment 123 was nevertheless

> fair and equitable and consistent with National Standard 4. As explained in the response to [a prior comment], the reason for focusing on the Amendment 80 sector is due to the high proportion of the halibut PSC used in that sector. While the action could impose regulatory costs to one sector, the actual cost borne does not determine whether the action is fair, equitable, reasonably calculated to promote conservation, or provides an excessive share to anyone. NMFS determined that the costs were reasonable when balanced with the purpose and need, and the conservation, social, management, and environmental impacts. NMFS also determined that the action is fair and equitable because this action links halibut PSC limit for the Amendment 80 sector to levels of halibut abundance.[78]

---

[76] NOAA004160.

[77] NOAA004160.

[78] NOAA035293; *see also* NOAA035293-95.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 20 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 20 of 39

NMFS specifically explained that it had determined that imposing "lower bycatch levels during times of low abundance given that the directed fishery is expected to have lower harvest levels at times of low abundance" was "a more equitable approach."[79]  NMFS's analysis in the FEIS and the final rule, while not as robust as Plaintiff might prefer, is not *post hoc*.

Plaintiff relatedly challenges the adequacy of NMFS's analysis regarding National Standard 4.[80]  In Plaintiff's view, NMFS failed to assess the

> '[a]llocation schemes considered, but rejected by the Council,' how the allocation scheme is 'rationally connected to the achievement of [Optimum Yield] or with the furtherance of a legitimate FMP objective,' and how the allocation results in 'the advantaging of one group to the detriment of another' that is justified by the need to achieve the 'objectives of the FMP.'[81]

Plaintiff also asserts that NMFS failed to make "an initial estimate of the relative benefits and hardships imposed by the allocation, and [a comparison of] its consequences with those of alternative allocation schemes[.]"[82]  Plaintiff contends that "there was not even a basis in the record for an analysis of the 'fairness' or 'equities' of NMFS's action" because no alternatives that "allocated the burdens of

---

[79] NOAA035294.

[80] Docket 26 at 20-21.

[81] Docket 26 at 20-21 (quoting 50 C.F.R. § 600.325(c)(2)-(3)(i)(A)).

[82] Docket 26 at 21 (brackets in original) (quoting 50 C.F.R. § 600.325(c)(3)(i)(B)).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 21 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 21 of 39

abundance-based management across the other Groundfish FMP sectors" "were on the table."[83]

While the section dedicated to National Standard 4 analysis in the FEIS is brief, a review of the entirety of the FEIS demonstrates that NMFS adequately analyzed the factors Plaintiff references under § 600.325(c)(2)-(3).[84] As to allocation schemes considered but rejected, the FEIS analyzed allocation schemes—alternatives—that NMFS considered but rejected.[85] Regarding the furtherance of a legitimate FMP objective, the purpose of Amendment 123 was to impose abundance-based halibut bycatch limits in the Amendment 80 sector, resulting in lower bycatch limits as halibut abundance declines. An objective of the Groundfish FMP is to "manage incidental catch and bycatch."[86] The FEIS noted that "[t]he action . . . is particularly designed to minimize halibut PSC" and it applied to the Amendment 80 sector because that sector was responsible for the majority of halibut bycatch.[87] And the ROD determined that "the change to the Amendment

---

[83] Docket 26 at 21.

[84] *See C & W Fish Co.*, 931 F.2d at 1562, 1564 (examining record as a whole to uphold agency's determination that drift gillnets create a significant bycatch problem and holding that, even though agency did not address promotion of conservation in the final rule, "NOAA had before it sufficient evidence to support its conclusion that the ban will prevent excessive by-catch and, accordingly, is reasonably calculated to promote conservation" and the "fact that NOAA did not repeat this analysis in its Standard 4 inquiry does not render that inquiry inadequate").

[85] *See* NOAA003942-44.

[86] NOAA031286.

[87] NOAA003876; NOAA004160; *see also* NOAA035293 ("[T]he reason for focusing on the Amendment 80 sector is due to the high proportion of the halibut PSC used in that sector.")

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 22 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 22 of 39

80 sector's halibut PSC limit is fair and equitable" because "[t]hat sector is responsible for a majority of the PSC mortality . . . ."[88]  Further, the FEIS analyzed the benefits and hardships of the alternatives on the Amendment 80 fishery, the halibut stock, and the directed halibut fishery.[89]  And Plaintiff's claim that NMFS did not adequately address the regulatory factors because none of the alternatives considered "allocated the burdens of abundance-based management across the other Groundfish FMP sectors" is a repurposed challenge to the alternatives considered by NMFS in the FEIS, which the Court addresses under NEPA below.

Upon review of the record, the Court finds that NMFS satisfactorily explained how Amendment 123 is rationally connected with the legitimate Groundfish FMP goal to manage bycatch and why any hardship imposed on the Amendment 80 sector was outweighed by the total benefits received by the directed halibut fishery and the halibut stock, particularly as bycatch mortality by the Amendment 80 sector in Area 4CDE (where Amendment 80 catches up to 90% of its halibut bycatch limit) has exceeded directed halibut fishery removal for many years.[90]  The Court

---

[88] NOAA001056.

[89] NOAA004059-112; NOAA004126-35; *see also* NOAA035293 ("While the action could impose regulatory costs to one sector, the actual cost borne does not determine whether the action is fair, equitable, reasonably calculated to promote conservation, or provides an excessive share to anyone.  NMFS determined that the costs were reasonable when balanced with the purpose and need, and the conservation, social, management, and environmental impacts.").

[90] Docket 41-3 (table based on NOAA004649 (Table 2-5), NOAA004827-28 (Table 5-16)); NOAA004830 ("Area 4CDE account[ed] for between 83% and 90% of annual A80 PSC since 2015").

The BSAI incorporates three International Pacific Halibut Commission ("IPHC") Regulatory Areas

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 23 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 23 of 39

therefore finds that the agency's reasoning in the FEIS and the final rule is sufficient to support its finding that Amendment 123 is fair and equitable.[91]

In addition, to satisfy National Standard 4, Amendment 123 must be "reasonably calculated to promote conservation."[92] "This requirement poses only a minimal hurdle. . . ."[93] In the final rule, NMFS recognized that, while "none of the alternatives will affect overall halibut spawning stock biomass, which is measured coastwide from California to Alaska[,] [e]ach action alternative . . . would set the Amendment 80 sector's halibut PSC limit at or below the current level depending on indices of halibut abundance."[94] Any "[c]onserved fish may benefit the stock even if they do not immediately increase the spawning stock biomass, including by greater survival of small halibut, i.e., under 26 inches in size, which are expected to have longer-term positive impacts on the stock and directed fishing."[95] Therefore, NMFS concluded that "[t]he reduction of halibut bycatch mortality is a conservation measure; by definition, lower halibut PSC limits will result in lower

---

for which the IPHC sets halibut harvest limits, 4A, 4B, and 4CDE. NOAA004748.

[91] *See C & W Fish Co.*, 931 F.2d at 1563 (holding that agency's reasoning in final rule that a ban on the use of drift gillnets in the Atlantic King Mackerel Fishery "satisfies Standard 4 because it benefits hook-and-line fishermen and at the same time imposes only a slight burden on drift gillnet fishermen" was "sufficient to sustain its finding that the ban is 'fair and equitable' as required by Standard 4").

[92] 16 U.S.C. § 1851(a)(4)(B).

[93] *C & W Fish Co.*, 931 F.2d at 1564.

[94] NOAA035294.

[95] NOAA035294.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 24 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 24 of 39

halibut mortality . . . ."[96]  The Court therefore finds that the agency's reasoning is sufficient to support its finding that Amendment 123 is reasonably calculated to promote conservation.[97]

Plaintiff also contends that Amendment 123 violates Required Provision 14 of the MSA because NMFS did not explain "whether, how, and why the restriction is equitably allocated across the groundfish sectors."[98]

Required Provision 14 provides

to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery[.][99]

Federal Defendants respond that Required Provision 14 does not apply to Amendment 123, as that provision "applies only to actions 'which reduce the overall harvest in a fishery,' such as rebuilding plans for overfished stocks and

---

[96] NOAA035294.

[97] See Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1464 (9th Cir. 1987) (rejecting challenge under National Standard 4 to amendment that purportedly "discriminates in favor of longline fishermen, who are predominately Alaskan, at the expense of trawlers and pot fishermen, who are predominately non-Alaskan" because the record referred to gear conflict issues and the amendment was "tailored to solve the gear conflict problem and to promote the conservation of sablefish").

[98] Docket 26 at 23 (emphasis omitted).

[99] 16 U.S.C. § 1853(a)(14).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 25 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 25 of 39

similar measures."[100]  Federal Defendants assert that Plaintiff has not provided any evidence "to support the contention that the Rule will or has reduced the Amendment 80 sector's overall harvest."[101]  And Federal Defendants maintain, even if Required Provision 14 applied, "NMFS considered the economic impact of each alternative, which is all the MSA requires."[102]  Plaintiff replies that Amendment 123 is an action that will reduce the overall harvest in a fishery because NMFS "determined that because reduced halibut PSC limits operate as a hard cap, the Amendment 80 sector could experience losses from reduced harvest of more than $100 million annually.[103]

From the plain language, the Court agrees with Federal Defendants that Required Provision 14 applies to agency action to "reduce the overall harvest in a fishery."  The purpose of Amendment 123 is to implement an abundance-based halibut bycatch limit for the Amendment 80 sector, not to reduce the overall harvest in the groundfish fishery.  In the FEIS, NMFS recognized that, "[w]hile foregoing the harvest of groundfish is not a purpose of this action, in conserving halibut and achieving a more equitable approach to setting PSC limits, the Council and NMFS

---

[100] Docket 41-1 at 23 (quoting 16 U.S.C. § 1853(a)(14)).

[101] Docket 41-1 at 23.

[102] Docket 41-1 at 23.

[103] Docket 48 at 11 (first citing NOAA053057 (Groundfish Forum Inc.'s comments to NMFS regarding the Amendment 123 proposed rule citing the DEIS); and then citing NOAA003892 (table showing average estimated revenue by PSC limit and alternative)).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 26 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 26 of 39

recognize that that is a potential and unfortunate outcome."[104] But the potential reduction in groundfish harvest is insufficient to make Required Provision 14 applicable. Amendment 123 by its terms does not reduce the groundfish fishery harvest and uncertainties remain as to whether any reduced harvest will materialize when a lowered halibut bycatch limit is in effect, particularly considering the mitigation measures available to the Amendment 80 sector. Therefore, the Court finds that Required Provision 14 is inapplicable.

### b. National Standard 9 and Required Provision 11

The Court now turns to Plaintiff's assertion that Amendment 123 contains bycatch reduction measures that are impracticable, in violation of National Standard 9 and Required Provision 11 of the MSA.[105] Those statutory requirements provide that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch."[106]

In Plaintiff's view, "the evidence is unequivocal that Amendment 111 *already* imposed all the available practicable tools and 'greater reductions were not

---

[104] NOAA004896.

[105] Docket 26 at 24-28.

[106] 16 U.S.C. § 1851(a)(9); *see also* 16 U.S.C. § 1853(a)(11) (FMPs must "include conservation and management measures that, to the extent practicable and in the following priority—minimize bycatch; and minimize the mortality of bycatch which cannot be avoided").

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 27 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 27 of 39

practicable.'"[107] Plaintiff quotes the 2016 Amendment 111 Final Rule, which stated that "greater reductions were not practicable for the Amendment 80 sector."[108] For further support, Plaintiff points to the 2021 DEIS for Amendment 123, which stated that "[b]ecause of the efforts and expenditures already undertaken by the [Amendment 80] sector, dramatic increases in halibut avoidance or reductions in mortality are not expected with the tools that are currently available to the fleet," and that "substantial reductions in halibut mortality" would "likely be derived from the development and implementation of new technologies that are not currently available or practicable."[109] However, the 2021 DEIS also concluded that "[s]ome marginal improvements are anticipated to continue to be realized, especially if halibut limits are further reduced and the fleet forgoes some profitability to reduce halibut mortality further," and "[r]eductions in halibut mortality are expected to result from the sector increasing costs or reducing efficiency."[110] On the whole, the 2021 DEIS does not establish that the bycatch limits in Amendment 123 are impracticable.

Further, in the final rule issued in 2023, NMFS determined that "further halibut bycatch reductions are practicable through the improved use of existing

---

[107] Docket 26 at 27 (emphasis in original) (quoting NOAA001594 (Amendment 111 Final Rule)).

[108] Amendment 111 Final Rule at 24721; *see also* NOAA001594.

[109] Docket 26 at 27-28 (quoting NOAA001997).

[110] NOAA001997.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 28 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 28 of 39

bycatch reduction tools."[111] NMFS explained that "[n]ew bycatch reduction tools are not necessary for this action to be practicable" because bycatch reductions could materialize, for example, with an increased use of deck sorting, and that use of deck sorting by Amendment 80 vessels has varied annually.[112] NMFS also emphasized that when Amendment 111 was promulgated in 2015, "the Council and NMFS believed that more stringent PSC limit reductions than those proposed as part of Amendment 111 were not practicable for the groundfish sectors *at that time*," but "[f]rom 2015 . . . through 2020, the Amendment 80 sector reduced its halibut mortality to levels well below the PSC limit of 1,745 mt established under Amendment 111. Those reductions resulted in halibut mortality levels close to or below the PSC limits that are implemented by this rule . . . ."[113] The FEIS also included data showing that the Amendment 80 sector's halibut bycatch from 2016 through 2020 was all below the limit of 1,745 metric tons set in Amendment 111.[114]

---

[111] NOAA035297.

[112] NOAA035297 ("The amount of halibut deck sorting varied during the 2016 through 2019 period and decreased in 2020. When deck sorting was reported on a vessel during any week from 2016 through 2019, the vessel was deck sorting about 70 to 80 percent of halibut that were brought onboard the vessel. A change occurred in 2020 that resulted in the percentage of halibut that were deck sorted falling to 61 percent; in 2021 (through mid-April) the percentage of halibut deck sorted was estimated to be 49 percent. Some have attributed the declining use of halibut deck sorting after 2019 to lower bycatch of halibut, meaning that individual Amendment 80 vessels did not need to deck sort to reduce halibut mortality because they were not encountering halibut at rates where it was necessary to deck sort. It is possible that with under a lower PSC limit, the Amendment 80 sector could increase their use of halibut deck sorting.").

[113] NOAA035283 (emphasis added).

[114] NOAA003890 (1,412 metric tons in 2016; 1,167 metric tons in 2017; 1,343 metric tons in 2018; and 1,461 metric tons in 2019; 1,097 metric tons in 2020). The table in the FEIS distinguishes

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 29 of 39

As such, the Court disagrees with Plaintiff's claim that the record shows that the abundance-based halibut bycatch limits in Amendment 123 are impracticable.

Plaintiff also contends that NMFS failed to explain its conclusion that, "while NMFS agrees that there may be costs associated with the action, those costs do not exceed what is practicable."[115] However, the record contains more explanation than Plaintiff suggests. The FEIS recognized that it was "clear that the Amendment 80 sector will incur higher costs to avoid halibut in order to maximize harvest of Amendment 80 species . . . , particularly at the low and very low setline index states in the Preferred Alternative."[116] And the FEIS projected loss of revenue by the Amendment 80 sector at each category of halibut abundance and bycatch reduction in the Preferred Alternative.[117] The Council and NMFS explained that, "while economics are a consideration in determining practicability, 'practicable' is not the same as zero cost."[118] In recommending the Preferred Alternative, "the Council and NMFS [were] cognizant that the potential [revenue] losses are

_____

between halibut catch and halibut mortality. The limit on halibut bycatch is a limit on halibut mortality. NOAA003999.

[115] Docket 26 at 28 (quoting NOAA035297).

[116] NOAA004162.

[117] NOAA004162; *see also* NOAA003899 (detailed table showing revenue losses based on each potential scenario under the Preferred Alternative).

[118] NOAA004162.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 30 of 39

substantial; yet, they [did] not believe those costs render the proposed action impracticable under the MSA."[119]

In the final rule, NMFS explained that

NMFS analyzed the potential costs and benefits of the proposed action in Section 5 of the [FEIS]. The quantitative analysis of economic net benefits is limited to purely economic impacts and does not account for noneconomic or unquantifiable impacts. The Council and NMFS weighed the potential for the Amendment 80 sector to mitigate negative economic impacts through operational choices; weighed the retrospective estimate of revenue impacts included in the [FEIS] and weighed the non-quantifiable conservation, social, and management benefits of the abundance-based management of halibut PSC. The [FEIS] encompassed consideration of estimated economic impacts and predicted actual economic impacts and potential non-economic impacts of the action. NMFS analyzed the range of possible economic costs to the Amendment 80 sector for the range of possible PSC limits at different levels of halibut abundance. To the extent the Amendment 80 fishery can improve implementation of existing halibut avoidance and survival strategies, or find more efficient ways to avoid halibut PSC, the expected costs associated with reduced PSC limits may be mitigated. As described below, if they cannot be mitigated, the [FEIS] provides a comparison of what those costs would have been based on historical catch and bycatch levels. These numbers were created to compare costs among the alternatives; they do not try to estimate what the actual, future costs of reducing bycatch will be.[120]

The record therefore shows that NMFS adequately explained its conclusion that Amendment 123 was practicable, in compliance with National Standard 9 and Required Provision 11.[121]

---

[119] NOAA004162.

[120] NOAA035299.

[121] *See Fishermen's Finest Inc.*, 593 F.3d at 896 (noting that, in satisfying National Standard 9,

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 31 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 31 of 39

Plaintiff also maintains that NMFS improperly used Amendment 123 as a pretext to make an allocation to the directed halibut fishery in violation of the MSA.[122] However, as Federal Defendants correctly note, halibut harvest allowances to the directed fisheries are set by the International Pacific Halibut Commission ("IPHC"), not NMFS.[123]

In sum, the Court assumes without deciding that Amendment 123 is an allocation for National Standard 4 purposes. The Court finds that NMFS did not violate the MSA or the APA in its analysis of National Standard 4, Required Provision 14, National Standard 9, or Required Provision 11 in promulgating Amendment 123.

## II. National Environmental Policy Act[124]

Plaintiff also contends that NMFS violated NEPA in adopting Amendment 123 because the FEIS contains an unreasonably and unlawfully narrow purpose

---

"[t]he Council is not tied down by the need to allocate in order to preserve directed cod fisheries for participants with high levels of bycatch").

[122] Docket 26 at 26. In the reply brief, Plaintiff maintains that NMFS did not respond to this argument. Docket 48 at 16-17. Federal Defendants responded in their opposition brief. Docket 41-1 at 22-23.

[123] Docket 26 at 19 n.3; Docket 41-1 at 22-23; *see also* NOAA035297 (Amendment 123 final rule in which NMFS explained that "possible benefits to communities that rely on directed fishing for halibut . . . were only seen as a possible indirect benefit of this action, as increasing allocation to the directed halibut fleet is a function of the IPHC and outside the scope of this action ").

[124] Intervenor-Defendants question whether NEPA applies. Docket 39 at 29-30 n.9 (first citing *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) ("[A]n EA or an EIS is not necessary for federal actions that conserve the environment."); and then citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1090 (9th Cir. 2014) ("The Secretary's decision [to limit commercial oyster harvesting] is essentially an environmental conservation effort, which has not triggered NEPA in the past.")). The Court assumes without deciding that NEPA applies to this action.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 32 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 32 of 39

and need statement and fails to consider alternatives that would "spread the burden" of reduced halibut bycatch to other groundfish sectors.[125]

Pursuant to NEPA, "[b]efore an agency may approve a particular project, it must prepare a 'detailed statement . . . [on, *inter alia*,] the environmental impact of the proposed action,' 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' and 'alternatives to the proposed action.'"[126]

In preparing an environmental impact statement ("EIS"), an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action, "and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."[127] "The range of alternatives that an agency must consider is based on the purpose and need of the proposed agency action," so a court must "begin by determining whether or not

---

[125] Docket 26 at 29-31.

[126] *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 474 (D.C. Cir. 2009) (alteration in original) (quoting 42 U.S.C. § 4332(C)(i)-(iii)).

[127] 40 C.F.R. § 1502.14(a) (2019). The Council on Environmental Quality published a new rule, effective September 14, 2020, that substantially revised the regulations implementing NEPA. However, citations in this case are to the 2019 Code of Federal Regulations, reflecting the regulations originally promulgated in 1978, with a minor substantive amendment in 1986. *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55978 (Nov. 29, 1978); National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. 15618 (Apr. 25, 1986). This is because the 2020 NEPA regulations only apply to NEPA processes begun after September 14, 2020, although agencies have the option to apply the 2020 NEPA regulations to ongoing activities begun before that date. 40 C.F.R. § 1506.13 (2020). The EIS process began in 2017, and NMFS decided to proceed under the pre-2020 NEPA regulations. NOAA003871.

---

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 33 of 39

Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 33 of 39

the purpose and need statement was reasonable."[128] "Agencies enjoy 'considerable discretion' in defining the purpose and need of a project, but they may not define the project's objectives in terms so 'unreasonably narrow,' that only one alternative would accomplish the goals of the project."[129] If the purpose and need statement is reasonable, a court then "determine[s] whether the agency considered a reasonable range of alternatives based on its purpose and need."[130] "The existence of a viable but unexamined alternative renders the environmental review conducted under NEPA inadequate."[131] The "touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation."[132]

The Court first addresses Plaintiff's contention that the purpose and need statement in the FEIS was impermissibly narrow and was improperly "retrofitted" to the Council's decision to focus the action on the Amendment 80 sector.[133] Federal Defendants respond that the Council decided that "[t]he process of

---

[128] *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 843 (9th Cir. 2023) (alterations omitted) (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022)).

[129] *Honolulutraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014) (quoting *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010)).

[130] *Id.* (citing *Audubon Soc'y of Portland*, 40 F.4th at 982).

[131] *Id.* at 844-45 (alteration omitted) (quoting *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S. Ct. 2582 (2023)).

[132] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

[133] *See* Docket 26 at 30-31.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 34 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 34 of 39

developing an abundance-based halibut management strategy for all sectors in a single action proved to be too complex and protracted."[134]  Federal Defendants characterize "[t]he evolution of the Rule" as "a normal result of the scoping process where the agency determines the scope based on 'meaningful dialogue with members of the public about a proposed action.'"[135]

Federal Defendants' assertions are supported by the record.  In December 2019, the Council requested stakeholder input regarding revisions to alternatives, new ideas for alternatives, or suggestions to "streamlin[e]" alternatives.[136]  At the Council's February 2020 meeting, the Council considered changes to the alternatives presented in the DEIS.[137]  "After staff presentations, reports, and public comment," the Council unanimously decided to focus the action on the Amendment 80 sector and to "reduc[e] the number of Alternatives for specifying a control rule."[138]  The Council explained that it was eliminating the other sectors from consideration because

---

[134] Docket 41-1 at 38.

[135] Docket 41-1 at 35 (quoting *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1117 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*,630 F.2d 1173 (9th Cir. 2011)).

[136] NOAA053003 at 0:02:35-0:02:51; *see* NOAA043065 ("[T]he Council requests stakeholder input on additional management alternatives that serve to streamline the action and meet the Council's objectives to establish abundance-based PSC limits that minimize halibut PSC to the extent practicable, and aid the directed halibut fisheries at low levels of abundance.").

[137] NOAA043160.

[138] NOAA043160-62; *see also* NOAA043168-69; NOAA053003 at 3:03:06-3:05:25 (Council member noting lengthy regulatory process and assessing that motion's focus on the Amendment

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 35 of 39

the trawl limited access catcher vessel sector is responsible for approximately 20% of the annual mortality, that mortality is primarily taken in the directed Pacific cod fishery and the Council has already initiated a separate action that would reduce their halibut PSC as part of a forthcoming rationalization package. The other two sectors, freezer longline and catcher vessel hook-and-line sectors contribute a relatively small proportion of the annual halibut PSC. The CDQ sector is also removed from this action at this time.[139]

When the Council first decided to focus the action on the Amendment 80 sector in February 2020, it declined to alter the purpose and need statement because it was not clearly necessary at that time.[140] After public testimony and a recommendation from NMFS and Council staff in the preliminary DEIS, the Council adopted the amended purpose and need statement in October 2020.[141] The revised purpose and need statement contains the same objective as the initial purpose and need statement: to link halibut bycatch limits with halibut abundance, but revises the scope of the action to focus on the Amendment 80 sector:

> When BSAI halibut abundance declines, PSC in Amendment 80 fisheries can become a larger proportion of total halibut removals in the BSAI, particularly in Area 4CDE, and can reduce the proportion of

---

80 sector would simplify the action to be more easily understood by the public); NOAA053003 at 3:29:01-3:31:20 (explaining that motion focuses on Amendment 80 because that sector accounts for largest share of halibut bycatch mortality and is consistent with intent to streamline action); NOAA053003 at 3:33:35-3:34:47 (Council member noting that motion was in direct response to the Council's request for stakeholder input on ways to streamline the action).

[139] NOAA043184 (Council February 2020 Newsletter).

[140] NOAA053003 at 3:44:27-3:46:00 (Council member explaining that revision of the purpose and need statement was not necessary because the purpose and need statement already discussed abundance-based management of PSC and, given the discussion about Amendment 80 sector contributing most of halibut mortality in BSAI, purpose and need statement was not inconsistent with a change to only consider the Amendment 80 sector).

[141] *See supra* pages 8-10 & nn.29-31.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 36 of 39

halibut available for harvest in directed halibut fisheries. The Council intends to establish an abundance-based halibut PSC management program in the BSAI for the Amendment 80 sector that meets the requirements of the Magnuson-Stevens Act, particularly to minimize halibut PSC to the extent practicable under National Standard 9 and to achieve optimum yield in the BSAI groundfish fisheries on a continuing basis under National Standard 1. The Council is considering a program that links the Amendment 80 sector PSC limit to halibut abundance and provides incentives for the fleet to minimize halibut mortality at all times.[142]

Contrary to Plaintiff's assertion that revision of the purpose and need statement was unlawful, the Court finds that, in light of the considerable discretion afforded an agency in defining the purpose and need of a project and the thorough deliberative process utilized by the Council, the revision of the purpose and need statement did not violate NEPA.[143]

Plaintiff also contends that the purpose and need statement in the FEIS was unreasonably narrow such that only one alternative would satisfy the action's objective.[144] But, as Federal Defendants note, the FEIS considered five alternatives, including a no action alternative and four other alternatives, each a different matrix to establish halibut bycatch limits according to halibut abundance.[145] No single alternative was prescribed by the purpose and need

---

[142] NOAA044492. *Compare* NOAA035258 *with* NOAA044492.

[143] *See City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1507 (D.C. Cir. 1994) ("The very purpose of a DEIS is to elicit suggestions for change. The resulting FEIS must be evaluated for what it is, not for why the drafter may have made it so.").

[144] Docket 26 at 30-31.

[145] NOAA004647-49.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 37 of 39

statement. The Court therefore finds that the purpose and need statement satisfied NEPA.

Plaintiff also maintains that the range of alternatives considered was legally inadequate because NMFS did not consider purportedly viable alternatives in the FEIS that would "spread the burden" of a reduced halibut bycatch limit across all four groundfish sectors.[146] As noted above, the Court has concluded that the Council's revised purpose and need statement did not run afoul of NEPA. The alternatives considered in the FEIS provided different ways to calculate the applicable abundance-based halibut bycatch limit for the Amendment 80 sector, as that was the objective of the revised purpose and need statement.[147] An alternative that considered abundance-based halibut limits for other groundfish BSAI sectors would not be viable, as it would not "link[] the Amendment 80 sector PSC limit to halibut abundance."[148] And the FEIS explained why such alternatives were eliminated from consideration:

> *Alternatives that apply to all groundfish fishing sectors:* Additional alternatives had been considered previous to the October 2020 alternative set, including alternatives that linked PSC limits to abundance for all fishing sectors in the BSAI: the fixed gear sector, BSAI trawl limited access sector, and the CDQ groups. Those alternatives ranged from status quo with fixed halibut PSC limits by sector to a range of complex gear-specific PSC limits linked to BSAI halibut abundance for all sectors. Under that set of alternatives PSC

---

[146] Docket 26 at 29.

[147] NOAA003877.

[148] NOAA044492.

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 38 of 39
Case 3:23-cv-00283-SLG    Document 60    Filed 11/08/24    Page 38 of 39

limits would have been established for all sectors by gear type (aggregate trawl PSC limit and an aggregate non-trawl PSC limit) using the two- and three-dimensional control rules under consideration at that time (which are superseded by the current alternative set as noted above). In February 2020, the Council narrowed the focus of the action and accompanying analysis to only the Amendment 80 sector, eliminating the other sectors from the action and analysis, because Amendment 80 sector comprises the majority of halibut PSC mortality.[149]

NEPA requires that a FEIS "briefly discuss the reasons for" eliminating "alternatives . . . from detailed study."[150] That is precisely what NMFS and the Council did here. The Court therefore finds that the Council and NMFS did not violate NEPA.

## CONCLUSION

In light of the foregoing, Plaintiff's claims are DISMISSED with prejudice. The Clerk of Court is directed to enter a final judgment for Defendants accordingly.

DATED this 8th day of November 2024, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[149] NOAA003942 (emphasis in original); *see also* NOAA003874.

[150] 40 C.F.R. § 1502.14(a).

Case No. 3:23-cv-00283, *Groundfish Forum, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 39 of 39

Case 3:23-cv-00283-SLG     Document 60     Filed 11/08/24     Page 39 of 39